IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TIFFANY FENTERS, | ) | No. CV-F-05-1630 OWW/DLB |
| | ) | |
| | ) | MEMORANDUM DECISION GRANTING |
| | ) | COUNTY DEFENDANTS' MOTION |
| Plaintiff, | ) | FOR SUMMARY JUDGMENT (Doc. |
| | ) | 133) |
| vs. | ) | |
| | ) | |
| | ) | |
| YOSEMITE CHEVRON, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court is Defendants County of Merced, Gordon Spencer, and Merle Wayne Hutton's motion for summary judgment.[1]

A. <u>GOVERNING STANDARDS</u>.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an

_____

[1]The motions for summary judgment filed by the Abbate Defendants and the Cassabon Defendants will be resolved by separate Memoranda Decisions.

1

element of a claim or a defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). Materiality is determined by the substantive law governing a claim or a defense. *Id.* The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party. *Id.*

The initial burden in a motion for summary judgment is on the moving party. The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party to defeat summary judgment. *T.W. Elec.*, 809 F.2d at 630. The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *Id.* The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id.* As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102-1103 (9th Cir.2000):

> The vocabulary used for discussing summary judgments is somewhat abstract. Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to

2

plaintiff and defendant.  Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather than to plaintiff and defendant.  Finally, we distinguish among the initial burden of production and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

A moving party without the ultimate burden of persuasion at trial - usually, but not always, a defendant - has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment ... In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial ... In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact ....

If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial ... In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything ... If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense ... If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment ... But if the nonmoving party produces enough evidence to

> create a genuine issue of material fact, the
> nonmoving party defeats the motion.

The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id.* The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id.*

Rule 56(e)(2) requires that the opposing party "may not rely merely on allegations or denials in its own pleadings" but "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." *Id.* Summary judgment cannot be granted merely because Plaintiff has not timely complied with a Court Order or Local Rule. *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (9th Cir.1993). However, in *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir.2001), the Ninth Circuit held:

> [T]he district court may determine whether
> there is a genuine issue of material fact, on
> summary judgment, based on the papers
> submitted on the motion and such other papers

4

as may be on file and specifically referred
to and facts therein set forth in the motion
papers.  Though the court has discretion in
appropriate circumstances to consider other
materials, it need not do so.  The district
court need not examine the entire file for
evidence establishing a genuine issue of
material fact, where the evidence is not set
forth in the opposing papers with adequate
references so that it could conveniently be
found.

B.  **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**.

**DUF 1**:  In approximately April or May of 2003, Defendant

Spencer was contacted by Jim Abbate with respect to an employee

stealing from Yosemite Chevron owned, in part, by his brother,

Defendant Robert Abbate.

*Plaintiff's Response*: UNDISPUTED.

**DUF 2**:  Jim Abbate explained to Defendant Spencer that Marty

Clair, a former detective with the Merced Police Department, told

him to contact the District Attorney's Office with respect to the

theft from Yosemite Chevron.  [Declaration of Gordon Spencer,

para. 3].

*Plaintiff's Response*:  Disputed, as this omits

pertinent facts.  Clair is a golfing buddy of Jim Abbate and

used to work with Spencer for 20 years, including being a lead

investigator on several homicide cases Spencer tried.  Spencer

Deposition, p. 30-31.  Spencer conceded that Clair is a friend of

his.  Spencer Deposition, p. 31.  After speaking with Clair, Jim

Abbate broached the issue with Spencer at an event they mutually

attended.  Spencer Deposition, p. 33.  There is thus no evidence

that Abbate's complaint came through any conventional

channel or source.

    *Defendants' Reply*: Plaintiff's evidence does not dispute the facts as stated nor is it relevant.  Plaintiff's argument that Abbate's complaint did not come through a "conventional channel or source" is vague, argumentative and unsupported by evidence.  Plaintiff misstates facts; Defendant Spencer did not testify that Clair is a "golfing buddy" of Jim Abbate, nor did he testify that he and Clair worked together for 20 years.  The testimony cited states that Defendant Spencer is not sure whether he spoke to Jim Abbate on the telephone or in person and that it lasted "two minutes at maximum."

    *Court Ruling*: DUF 2 is UNDISPUTED.  Plaintiff's evidence does not dispute the fact that Jim Abbate contacted Defendant Spencer on the advice of Marty Clair.

    <u>DUF 3</u>: Defendant Spencer told Jim Abbate that he would have somebody from the investigations unit of the District Attorney's Office contact him.

    *Plaintiff's Response*: UNDISPUTED.

    <u>DUF 4</u>:  Defendant Spencer then contacted either District Attorney Chief Investigator Dan Murphy (Chief Murphy) or Defendant District Attorney Supervising Investigator Wayne Hutton and informed them of the Yosemite Chevron employee theft allegations and asked them to arrange a meeting with Jim Abbate.

    *Plaintiff's Response*: UNDISPUTED.

    <u>DUF 5</u>:  Neither Defendant Spencer nor Defendant Hutton were involved in making the arrangements for the meeting that was to

take place.   [Declaration of Gordon Spencer, para. 4; Declaration of Merle Wayne Hutton, para. 3].

*Plaintiff's Response*: Disputed.   Spencer was involved in arranging the meeting by instructing personnel from his officer to do so.   Spencer Deposition, p.33.   Spencer himself characterized his role as "setting up" the meeting.   Spencer Deposition, p. 50-51.

*Defendants' Reply*: Defendant Spencer defines "setting up the meeting," as telling someone who works for him to set up a meeting.   There is no evidence that either Defendant Spencer or Defendant Hutton were involved in the logistics, i.e., scheduling the time or place for the meeting.   The testimony cited by Plaintiff also confirms that Defendant Spencer asked Chief Murphy to meet with the complaining witness and that he was not going to sit through the whole meeting.

*Court Ruling*: DISPUTED.   The question is ambiguous. Defendant Spencer had some involvement in arranging the meeting. There is no evidence that Defendant Hutton had any role or involvement in arranging the meeting.

<u>DUF 6</u>:  On May 14, 2003, a meeting between Defendant Abbate, Jim Abbate, Chief Murphy, and Defendant Hutton was held at the Merced County District Attorney's Office.  [Declaration of Gordon Spencer, para. 5; Declaration of Merle Wayne Hutton, para. 3].

*Plaintiff's Response*: Disputed.   Spencer was also present at the meeting.

*Defendant's Reply*: Plaintiff's evidence does not

7

dispute the facts as stated nor is it relevant.  Defendant Hutton states that Defendant Spencer was only there for a portion of the meeting and he was not sure when Defendant Spencer left.

*Court Ruling*: DISPUTED.  The statement is incomplete. The truth is that Defendant Spencer was present for some undetermined amount of time at the May 14, 2003 meeting.

DUF 7:  Of the approximately one hour long meeting, Defendant Spencer was present for approximately five to ten minutes.  [Declaration of Gordon Spencer, para. 5].

*Plaintiff's Response*: Disputed.  According to Defendant Hutton, Spencer may have been present for nearly the entire meeting, which may have lasted for less than the stated time.

*Defendants' Reply*: Defendant Hutton testified that Defendant Spencer was only there for a portion of the meeting and he was not sure when he left, "whether it was towards the beginning or towards the end."  Defendant Hutton also testified that the meeting was not very long and may have lasted one-half hour.

*Court Ruling*: DISPUTED.  The statement is inaccurate. The amount of time Defendant Spencer was present, some disputed amount of time, at the May 14, 2003 meeting is subject to different accounts.

DUF 8:  The sole purpose of Defendant Spencer's presence at the meeting was to introduce the District Attorney investigators to Defendant Abbate and Jim Abbate.  [Declaration of Gordon Spencer, para. 5].

8

1    *Plaintiff's Response*: Disputed, since according to

2    Defendant Hutton, Spencer may have been present for nearly the

3    entire meeting, which may have lasted less than the stated time.

4    Spencer himself says he recalled being at substantive portions of

5    the meeting.   Spencer Deposition, pp.57-58.   There would have

6    been no reason for Spencer to remain at the meeting if that was

7    his only purpose.

8         *Defendants' Reply*: See Replies to DUF 6 and 7.

9         *Court Ruling*: DUF 8 is DISPUTED.   The cited portions

10   of Spencer's deposition do not substantiate Plaintiff's

11   assertion.   The issue is what Spencer's purpose was in being

12   present at the meeting.   The evidence remains in dispute.

13   <u>DUF 9</u>:  On May 14, 2003, Defendant Hutton began his

14   investigation into allegations that Plaintiff and Alejandro

15   Aceves had embezzled from their employer, Yosemite Chevron, by

16   interviewing Defendant Abbate.

17        *Plaintiff's Response*: UNDISPUTED.

18   <u>DUF 10</u>:  The following is a summary of Defendant Abbate's

19   May 14, 2003, statement to Defendant Hutton:

20            Prior to March 27, 2003, defendant
             ABBATE suspected plaintiff was stealing
21           lottery tickets and cigarettes from Yosemite
             Chevron.  Another employee also told
22           defendant ABBATE there were rumors that
             plaintiff and a co-worker, Alejandro Aceves,
23           were stealing money in the following manner:
             After a customer made a purchase, plaintiff
24           or Aceves (whoever was working that
             particular shift) would collect payment from
25           the customer and deposit it in the cash
             drawer.  That person would then void the
26           transaction in the cash register.  When they

9

reconciled their cash drawer at the end of
their respective shifts, there would be more
cash than what the computer showed there
should be.  The extra cash would then be
pocketed.  Defendant ABBATE explained that
there were legitimate reasons for voiding
transactions, e.g., a customer would change
their mind on making a purchase or ask for a
price check on an item.  However, records
showed that the number of voided transactions
by plaintiff and Aceves far exceeded what
would be acceptable during a shift, and were
two to three times greater than the average
number of voided transactions made by other
employees.  On March 31, 2003, (four days
after plaintiff resigned from Yosemite
Chevron), defendant ABBATE went to Yosemite
Chevron towards the end of Aceves' shift in
an attempt to prove or disprove the
embezzlement allegations.  Defendant ABBATE
discovered Aceves' cash drawer had $295.98
over what the cash register total showed.
Defendant ABBATE confronted Aceves who
admitted he had been voiding transactions and
pocketing the extra cash.  Aceves also told
defendant ABBATE that it was plaintiff who
taught him how to do this.  Defendant ABBATE,
by reviewing the Yosemite Chevron receipts,
estimated thousands of dollars had been
embezzled in March 2003 alone.  Defendant
HUTTON requested that defendant ABBATE review
the Yosemite Chevron cash register records to
determine the actual amount embezzled.

*Plaintiff's Response*: UNDISPUTED.

<u>DUF 11</u>:  Defendant Hutton met with Defendant Abbate again on May 16, 2003.  Defendant Abbate provided Defendant Hutton a breakdown of transactions voided by Plaintiff and Aceves from June 2002 to March 2003. Defendant Abbate also provided Defendant Hutton with a box of original Yosemite Chevron daily receipts for the time period between June of 2002 and March of 2003 for the shifts that Plaintiff and Aceves worked.  Defendant Abbate explained that, based on these records, he calculated that

10

Plaintiff had embezzled $12,290.76, from July 2002 through March 2003, and Aceves had embezzled $19,449.16, from August 2002 through March 2003.  Defendant Abbate also explained his methodology in calculating the amounts that were embezzled.

> *Plaintiff's Response*: UNDISPUTED.

**DUF 12**:  On June 4, 2003, arrangements were made for Aceves to meet with Defendant Abbate at Defendant Abbate's office.  This meeting was surreptitiously recorded and monitored by Defendant Hutton, who was present at Defendant Abbate's office, but in another room.  Before Defendant Hutton made his presence known to Aceves, Aceves again confessed to Defendant Abbate, though he claimed he had not embezzled as much and for as long as Mr. Abbate was claiming.  Aceves also again stated that Plaintiff had showed him how to steal by voiding transactions.  When Defendant Hutton entered the room, he introduced himself to Aceves as a supervising investigator for the District Attorney's Office. He also explained that Aceves was not under arrest and was free to leave any time.  Defendant Hutton interviewed Aceves, who once again confessed and admitted that Plaintiff had showed him how to embezzle via voiding transactions.  [Declaration of Merle Wayne Hutton, para.'s 6-7].

> *Plaintiff's Response*:  DISPUTED.  During his trial testimony, Aceves testified that he learned how to do illegal voids himself, in order to obtain extra money.  See Trial Transcript, pp. 266-267, 276, 285, 287.  Aceves never told Abbate he had seen Fenters do any illegal voids or steal any money from

11

the store.  Trial Transcript, pp. 275.  In connection with his firing of Aceves, Abbate first brought up Fenters' name, saying that "he knew Tiffany was in it."  Trial Transcript, p. 291. Aceves thereafter only implicated Fenters and other employees in an attempt to deflect blame from himself and also because Abbate seemed to focus on her.  See Trial Transcript, pp. 272-273, 291-292.  Aceves also mentioned Fenters at the subsequent June 4, 2003 meeting because she was first suggested by Abbate himself. See Trial Transcript, p. 268, 270, 272.  Abbate indicated that Aceves could receive a shorter sentence if he helped make the case against Fenters easier.  See Trial Transcript, p. 294.  The prosecution echoed this offer.  Bacciarini Deposition, p. 64. Abbate also told Aceves that if Aceves could get evidence to convict Fenters that he could benefit in his own case.  See Trial Transcript, pp. 295.  Bacciarini recalls that Aceves may have told him that he was pressured by Abbate to implicate Fenters. Bacciarini Deposition, p. 48-49.  There is thus ample evidence that Abbate suggested Fenters as a possible embezzler and that Aceves never implicated her of his own accord.  Aceves provided similar and more extensive testimony during his deposition.  In addition to confirming that the subject events were fresher in his mind at the time of his criminal testimony, see Aceves Deposition, p. 168, Aceves confirmed that Abbate was the first person to suggest Tiffany Fenters.  Aceves Deposition, pp. 170, 171, 172, 182.  Aceves was never pressured for additional information about anyone else who was identified as a

possible embezzler, just Tiffany.  Aceves Deposition, pp. 173, 178.  Despite the focus on Fenters, no one ever asked Aceves to provide details regarding any alleged conversations he had with Fenters, identify any dates where the two of them met, provide any phone records, identify any shift records where the two of them worked together, review any videotapes from the cash register area where the illicit instruction allegedly took place, or provide any bank records or other evidence of his obtaining illicit funds.  See Aceves Deposition, p. 175-177, 187-188. Aceves testified "that's why it was kind of easy to lie because nobody actually went into detail."  Aceves Deposition, p. 175. It seemed that the objective of Abbate and Hutton was to pursue Fenters and have him testify against her.  Aceves Deposition, pp. 178, 181.  This evidence further demonstrates that Abbate and Hutton's entire object was to construct a case against Fenters, even if it meant disregarding the truth.

*Defendants' Reply*: Fact established.  Plaintiff's evidence does not dispute the facts as stated nor is it relevant.

*Court Ruling*: DUF 12 is UNDISPUTED as to what occurred at the recorded meeting on June 4, 2003.  Plaintiff's theory about Abbate's motives do not change the record of what was said and recorded.  There may be additional facts not included in this statement.  Hutton was acting as a criminal investigator for the District Attorney.  Plaintiff presents no evidence that the tape recording was tampered with or was

otherwise fabricated.   Further, Plaintiff presents no evidence that Defendant Hutton suggested to Aceves that Plaintiff was a co-perpetrator or that Defendant Hutton then had any basis to suspect that Aceves was lying during the June 4, 2003 interview or thereafter.

DUF 13:  Defendant Hutton prepared a written report reflecting his investigation as described above.  [Declaration of Merle Wayne Hutton, para. 8].

Plaintiff's Response: DISPUTED.  Hutton's report did not report crucial facts, i.e., that Aceves was coerced.  Defendant Hutton was present at the June 4, 2003 meeting when Aceves only mentioned Fenters because she was first suggested by Abbate himself.  See Trial Transcript, pp. 268, 270, 272.  Abbate indicated that Aceves could receive a shorter sentence if he helped make the case against Fenters easier.  See Trial Transcript, p. 294.  The prosecution echoed this offer.  Bacciarini Deposition, p. 64.  Abbate also told Aceves that if Aceves could get evidence to convict Fenters that he could benefit in his own case, in part in order to "lure him in."  See Trial Transcript, p. 295; Abbate Deposition, p. 107.  There is thus ample evidence that Abbate suggested Fenters as a possible embezzler and that Aceves never implicated her of his own accord.  There is thus evidence that Hutton, who was present for the interview, was on notice of these facts as of June 2003.

Defendants' Reply: See Reply to DUF 12, supra.

Court Ruling: DUF 13 is UNDISPUTED only to the extent

that Hutton prepared a report which speaks for itself.  The June 4, 2003, tape of the interview shows that Defendant Abbate did not first suggest Plaintiff's name to Aceves.  Furthermore, the transcript of the June 4, 2003 interview establishes that Defendant Hutton did not make any promises to Aceves in exchange for his statement.

**DUF 14-16**:  Attached as Exhibits 1-3 to the Declaration of Merle Wayne Hutton are true and correct copies of this report, the video of the June 4, 2003, confession of Aceves, and a transcript of this confession.

*Plaintiff's Response*: Undisputed, except as to argumentative reference to "confession" instead of "statement."

*Court Ruling*: DUF 14-16 are UNDISPUTED.

**DUF 17**:  Per normal procedures, Defendant Hutton submitted his report (and Defendant Abbate's records summary) to Deputy District Attorney ("DDA") Bruce Gilbert for review and further action, if any.  [Declaration of Merle Wayne Hutton, para. 9].

*Plaintiff's Response*:  Disputed, as the evidence shows normal procedures would have resulted in the Fenters case being investigated by the Merced Police Department.  Hutton acknowledges that Abbate could have taken his allegations to the Merced Police Department instead of the District Attorney's Office.  Hutton Deposition, p. 45.  Moreover, the District Attorney's Office has directed similar potential cases to the Merced PD.  See Exhibit B, Email communication from the Merced DA's Office re: a potential embezzlement case in the City of

Merced.   Spencer could provide only two examples of embezzlement cases in the last five years of his tenure where his officer was the lead investigating agency.   Spencer Deposition, p. 35-38.

*Court Ruling*: DUF 17 is UNDISPUTED.   Plaintiff's evidence does not negate that, after the case had been brought to the District Attorney's Office for investigation, Defendant Hutton's submission of his report and Defendant Abbate's spreadsheet to the Deputy District Attorney for review and further action was according to established procedure.

DUF 18:   DDA Gilbert held the position of "Charging Deputy," whose normal duties were to review all felony level law enforcement reports to determine if probable cause existed based upon the reports submitted, and to file criminal charges. [Declaration of Merle Wayne Hutton, para. 9].

*Plaintiff's Response*: UNDISPUTED.

DUF 19: Defendant Hutton did not request or recommend that Plaintiff be charged with any particular crimes.  [Declaration of Merle Wayne Hutton, para. 9].

*Plaintiff's Response*: Disputed.  Hutton's case report describes his investigation as one for a felony embezzlement. See Investigative Report, Exh. B to Fung. Decl., p. 1 of 6 and Supplemental Report, p. 1 of 2. These same pages show Hutton acted as his own supervisor with respect to his report.

*Court Ruling*: DUF 19 is compound.  Defendant Hutton's report makes no recommendation that Plaintiff be charged.  It may be a "request" for prosecution.  DISPUTED.

16

**DUF 20**: Defendant Hutton's intention in submitting the report was to allow the prosecuting attorneys in the District Attorney's Office to determine if there was sufficient evidence to prosecute Aceves and Plaintiff.  [Declaration of Merle Wayne Hutton, para. 9].

*Plaintiff's Response*: Disputed.  Hutton's case report describes his investigation as one for a felony embezzlement. See Investigative Report, Exh. B to Fung. Decl., p. 1 of 6 and Supplemental Report, p. 1 of 2.  These same pages show Hutton acted as his own supervisor with respect to his report. Moreover, an indication of Hutton's bad faith and malice is his trial testimony that he did not check the financial records provided by Abbate in May 2003 because he had already made arrangements to have them reviewed by an auditor.  See Trial Transcript, p. 378.  However, it is conceded by the defense in connection with this motion that the Cassabon firm was not contacted or retained until October 2003.  This intentional false statement is indicative of malice on Hutton's part.

*Court Ruling*: DUF 20 is DISPUTED.  Defendant Hutton's report makes no recommendation that Plaintiff be charged, but reports "a felony embezzlement" and is submitted for further action.

**DUF 21**:  Other than submitting his report, Defendant Hutton had no input into DDA Gilbert's decision to charge Plaintiff and Aceves with a crime.  [Declaration of Merle Wayne Hutton, para. 9].

1          *Plaintiff's Response*: Disputed on the same grounds

2    asserted in response to DUF 13.

3          *Court Ruling*: DUF 21 is UNDISPUTED.  Plaintiff presents

4    no evidence from which it may be inferred that Defendant Hutton

5    had direct participation in the decision to charge Plaintiff

6    other than preparing the report of his investigation which

7    contributed to the decision.

8    **DUF 22**: Defendant Hutton, based upon his law enforcement

9    training and experience, believed, in good faith, that there was

10   sufficient probable cause to believe that Aceves and Plaintiff

11   had committed the crime of embezzlement from Yosemite Chevron.

12   [Declaration of Merle Wayne Hutton, para. 9].

13         *Plaintiff's Response*:  Disputed on the same grounds

14   asserted in response to DUF 13.

15         *Defendants' Reply*: Plaintiff's evidence does not

16   dispute the facts as stated nor is it relevant.  Defendants

17   incorporate their reply to DUF 12 and 20.

18         *Court Ruling*: DUF 22 is DISPUTED based on Hutton's

19   failure to conduct an analysis of the existing evidence.

20   **DUF 23**:  Prior to a criminal complaint being filed against

21   Plaintiff, Defendant Hutton was not requested by any prosecuting

22   attorneys to conduct any additional or follow up investigation

23   into the embezzlement allegations.

24         *Plaintiff's Response*: UNDISPUTED.

25   **DUF 24**:  At the time of the May 14, 2003, meeting, Defendant

26   Spencer knew Defendant Abbate and his brother, Jim Abbate, and

had a friendly relationship with them, however, he did not

consider himself a close, personal friend.  [Declaration of

Gordon Spencer, para. 6].

        *Plaintiff's Response*:  Disputed.  The objective facts

show that Spencer has an extensive relationship and ties to the

Abbates.  Spencer has known the Abbate family for 15 years and

has known Robert Abbate for six or seven years.  Spencer

Deposition, pp. 8, 9, 11.  Spencer knows that the Abbate family

is "better off than most."  Spencer Deposition, p. 12.  Spencer

knows that the Abbate family is politically active and has seen

members of the family at political functions.  Spencer

Deposition, pp. 13, 21.  Spencer has been to social events also

attended by the Abbates, and they have common acquaintances.

Spencer Deposition, pp. 14-15.  Spencer belongs to the same

country club as the Abbates and has golfed with Jim Abbate.

Spencer Deposition, pp. 16-17.  Spencer has associated with Jim

Abbate at the "19th hole."  Spencer Deposition, p. 17-18.

Spencer helped prepare a dinner in connection with a charity gold

tournament sponsored by the Abbates.  Spencer Deposition, p. 19.

Spencer and Jim Abbate belong to some of the same social

organizations.  Spencer Deposition, p. 20.  Members of the Abbate

family have contributed to Spencer's DA campaigns and attended

campaign fundraisers, even though Spencer ran unopposed.  Spencer

Deposition, pp. 21-22, 26-27.  Spencer then used this money as an

"office holder," as permitted by electoral rules.  Spencer

Deposition, p. 27-28.

19

1    *Court Ruling*: DUF 24 is DISPUTED.  Plaintiff presents

2    evidence from which it may be inferred that Defendant Spencer had

3    a well developed social relationship with Defendant Abbate and

4    the Abbate family in a reasonably small community.  The evidence

5    does not show that Defendant Spencer was a close, personal friend

6    of Defendant Abbate or the Abbate family.

7    <u>DUF 25</u>:  During the pendency of the criminal investigation

8    and prosecution of Plaintiff, Defendant Spencer did not believe

9    that his acquaintance with the Abbate's created any sort of

10   conflict of interest that would preclude the District Attorney's

11   Office from being involved in the investigation and prosecution.

12   [Declaration of Gordon Spencer, para. 7].

13   *Plaintiff's Response*: Disputed on the same grounds

14   asserted in response to DUF 24.

15   *Court Ruling*: DUF 25 is UNDISPUTED as to what Spencer

16   says he "believed."  Whether Spencer's relationship with the

17   Abbate family objectively constituted a conflict of interest such

18   that the District Attorney's Office was precluded by law from

19   investigating Defendant Abbate's claim that Plaintiff had

20   embezzled from Yosemite Chevron remains to be determined.

21   <u>DUF 26</u>:  Had Defendant Spencer believed he had a close

22   personal relationship with the Abbates, he would have referred

23   their theft allegations to the Merced Police Department.

24   [Declaration of Gordon Spencer, para. 7].

25   *Plaintiff's Response*: Disputed on the same grounds

26   asserted in response to DUF 24.

20

1  *Court Ruling*: DUF 26 is DISPUTED as it goes entirely to
2  credibility.

3  **DUF 27**:  Defendant Spencer's actions in facilitating the
4  meeting between the Abbate's and the District Attorney's Office
5  investigators was solely for legitimate law enforcement purposes.
6  [Declaration of Gordon Spencer, para. 8].

7  *Plaintiff's Response*: Disputed.  Before he even met
8  with Abbate initially, Hutton was already told that the
9  embezzlement case was "coming to [his] office."  Hutton
10  Deposition, p. 8.  At this point the only information concerning
11  the case had been obtained in a brief meeting between James
12  Abbate and District Attorney Gordon Spencer.  Hutton Deposition,
13  pp. 8-9, 35-36.  Spencer did not know the magnitude of the
14  alleged embezzlement when he set up the meeting.  Spencer
15  Deposition, pp. 52-53.  Without first conferring with Hutton,
16  Spencer told the Abbates during the initial meeting that they
17  were "in good hands."  Spencer Deposition, p. 54.  This is
18  circumstantial evidence that Spencer was intending on proceeding
19  with prosecuting Fenters regardless of the facts.

20  *Court Ruling*: DUF 27 is UNDISPUTED.  Plaintiff's
21  evidence does not support the inference that Defendant Spencer
22  was intent on  prosecuting Plaintiff for embezzlement regardless
23  of the merits and results of Defendant Hutton's investigation.
24  The evidence establishes that Defendant Spencer had no direct
25  involvement in the investigation or the decision to bring
26  criminal charges against Plaintiff after the May 2003 meeting,

where he introduced Abbate to Hutton.

**DUF 28**:  Defendant Spencer did not take this action to personally benefit either himself or the Abbates.  [Declaration of Gordon Spencer, para. 8].

*Plaintiff's Response*: Disputed.  Abbate acknowledges receiving victim restitution.  Abbate Deposition, p. 56.

*Defendants' Reply*: Plaintiff's evidence does not dispute the facts as stated and is irrelevant.  Defendants assert that Abbate's deposition testimony is vague and irrelevant and that the restitution was the result of the guilty plea of Aceves to embezzlement and not related to Plaintiff.

*Court Ruling*: DUF 28 is UNDISPUTED.  Abbate's deposition testimony is that the restitution was the result of Aceves' guilty plea and the Court's order.

**DUF 29**:  Defendant Spencer did not harbor any ill will, animosity or malicious intent towards Plaintiff.  [Declaration of Gordon Spencer, para. 8].

*Plaintiff's Response*: Disputed on the same grounds asserted in response to DUF 27.

*Court Ruling*: DUF 29 is UNDISPUTED.  The facts that Defendant Spencer had some relationship with the Abbates prior to the complaint of embezzlement being brought to the District Attorney's Office does not constitute evidence of ill will, animosity or malicious intent by Defendant Spencer against Plaintiff.  It is undisputed that Defendant Spencer did not know who she was.

22

1   <u>DUF 30</u>:  **During the pendency of the criminal investigation**

2   **and prosecution of Plaintiff, Defendant Spencer did not know who**

3   **Plaintiff was.**

4       *Plaintiff's Response*: UNDISPUTED.

5   <u>DUF 31</u>: **Defendant Spencer had never heard her name, nor to**

6   **his knowledge had he ever had any contact with her.**

7       *Plaintiff's Response*: UNDISPUTED.

8   <u>DUF 32</u>:  **Prior to the May 14, 2003, meeting, Defendant**

9   **Hutton did not know anything about the Abbate family's reputed**

10  **financial standing, or that they were business owners.**

11      *Plaintiff's Response*: UNDISPUTED.

12  <u>DUF 33</u>: **Defendant Hutton was familiar with the Abbate's name**

13  **as being listed in a roster of a fraternal organization that he**

14  **belongs to, but he had never met with, or spoken to, any member**

15  **of the Abbate family prior to the May 14, 2003, meeting.**

16      *Plaintiff's Response*: UNDISPUTED.

17  <u>DUF 34</u>:  **The decision as to whether the District Attorney's**

18  **Office would conduct the investigation into the Yosemite Chevron**

19  **embezzlement allegations was made by Defendant Hutton.**

20  **[Declaration of Merle Wayne Hutton, para. 11].**

21      *Plaintiff's Response*: **Disputed on the same grounds**

22  **asserted in response to DUF 27.  Further disputed, as the**

23  **evidence shows this decision was unduly influenced by Abbate's**

24  **misrepresentations.  The prosecution relied on Abbate's operating**

25  **in good faith in proceeding to a preliminary hearing and trial.**

26  **Bacciarini Deposition, pp. 87-88.  However, Abbate misrepresented**

23

to Hutton that only one employee worked on the cash register in a given shift, although he knew the opposite was true on a daily basis.  Hutton Deposition, pp. 20, 74; Abbate Deposition, p. 81, 99.  Indeed, employees' log on codes to the cash register were typically the last four digits of their phone numbers, and the phone numbers of employees were posted in the store.  Abbate Deposition, p. 85.  Abbate did not expect employees to review their shift reports on a line by line basis to ensure they were responsible for each transaction.  Abbate Deposition, pp. 90-91. Abbate also never told Bacciarini that more than one employee could have worked on the cash register during a given shift. Bacciarini Deposition, p. 16.  Abbate reiterated this misrepresentation at trial, only later acknowledging during trial on cross examination that voids could not necessarily be linked to a particular employee, as opposed to a particular shift.  See Preliminary Hearing Transcript, pp. 8, 17; Trial Transcript, p. 242.  Hutton would have considered it important to know that actually multiple employees could work on the register in a given shift.  Hutton Deposition, p. 21.  Hutton would have considered this important because it would have made the task of identifying a particular employee who committed wrongdoing more difficult. Hutton Deposition, p. 22.  Until the time the Cassabon firm was retained after the preliminary hearing, the District Attorney's Office relied on Abbate to review the financial information pertinent to the case against Fenters.  Hutton Deposition, pp. 33-34.  Abbate's financial analysis was one of the reasons that

24

Hutton submitted the case against Fenters for filing.  Hutton Deposition, p. 82.  Indeed, the Abbate spreadsheet was the only financial evidence then available in a prospective financial crime case.  Hutton Deposition, pp. 82-83.  Abbate conceded on cross-examination at the preliminary hearing that the voids attributable to Fenters were overstated in his spreadsheet.  See Preliminary Hearing Transcript, pp. 52-59.  Abbate also conceded that certain entries in his spreadsheet appeared to be entered wrongly, and he spent no time reviewing the initial draft spreadsheet he prepared.  See Preliminary Hearing Transcript, pp. 60-61; Abbate Deposition, pp. 60, 64.  Abbate also attributed certain shifts to Fenters, even though the underlying pay point reports did not contain her genuine signature.  See Trial Transcript, pp. 491-492.  Abbate also represented to Hutton that he had contact with another anonymous employee, who turned out to be Robert Wilson, around the time of Tiffany's separation from employment who first provided information regarding the alleged embezzlement, but Abbate did not tell Hutton that Wilson had been fired in December 2002 for stealing from Fenters.  Hutton Deposition, pp. 72, 92-94; Trial Transcript, p. 488.  Abbate continued his pattern of misrepresentation at the preliminary hearing and trial by again merely referring to Wilson as an "ex-employee."  See Preliminary Hearing Transcript, p. 41; Trial Transcript, p. 213.  There never was an anonymous employee, and Abbate was aware of Wilson's firing at all pertinent times.  See Abbate Deposition, pp. 44-45, 97.  Hutton would have considered

this information important to include in his investigation report.  Hutton Deposition, pp. 90-91.  Abbate also initially told Hutton that he had cut Fenters' hours beginning in January 2003 because he suspected she was stealing from his business.  See Hutton's Investigative Report, Exh. B to Fung. Decl., p. 2.  Abbate did not concede until trial that Fenters' hours had not been cut during this time period.  See Trial Transcript, pp. 235-236.  Indeed, even after Aceves first admitted stealing in March 2003, Abbate only believed that he was dealing with a petty issue.  Abbate Deposition, p. 102.  Abbate also did not provide any tax returns or other financial documents reflecting a drop in revenues during the time when the embezzlement was allegedly occurring.  Hutton Deposition, p. 22.  Abbate also did not provide Hutton with any videotapes from the register area.  Hutton Deposition, p. 23.  This is further circumstantial evidence of his intent to conceal the truth and unduly influence the criminal proceedings against Fenters.  The record also shows that the District Attorney's Office did no independent investigation that would have permitted it to exercise its discretion in any genuine and autonomous manner.  Spencer acknowledged, although it was not done in this case, that his office commonly sought the assistance of a forensic accountant or fraud examiner during the investigation stage of a case.  Spencer Deposition, p. 56.  Indeed, Hutton conceded at trial that he did nothing to corroborate Aceves' statement and Abbate's spreadsheet, even though he knew Abbate was not an accountant and

that confessions are not always the full truth.  See Trial
Transcript, pp. 377-378, 401-404.  Hutton never did an
independent analysis of the Abbate spreadsheets.  Bacciarini
Deposition, p. 22; Abbate Deposition, p. 108.  Hutton also never
tested the store surveillance system himself, even though the
system would depict money taken from the register by an employee.
Hutton Deposition, p. 24.  Hutton never took any steps to obtain
any financial information pertaining to Fenters.  Hutton
Deposition, p. 28-29; Trial Transcript, p. 443.  Hutton did not
attempt to speak with Fenters' parents as part of his
investigation, even though there was an allegation that Fenters
had been "cut off" by them and therefore had a motive to
steal.  Hutton Deposition, p. 30.  (Fenters' father, Virgil
Fenters, refuted this allegation at trial.  See Trial Transcript,
p. 418.)  Hutton also never obtained any shift records that
corroborated the allegation that Fenters' hours were cut in
February 2003 due to her being suspected of stealing.  Hutton
Deposition, p. 71.  Hutton "assumed there was a friendly
connection between Fenters and Aceves but made no effort to
confirm that through investigation, i.e., phone records, or other
Yosemite Chevron employees, Hutton Deposition, p. 31.  Hutton
also never asked for specifics regarding where Aceves and Fenters
were when Fenters allegedly taught him to do illegal voiding.
Hutton Deposition, pp. 31-32.  Hutton never investigated any
information suggesting that Abbate was a drug user, although it
was provided by the defense during discovery and Hutton

27

acknowledges that such matters can have a bearing on a witness'
credibility in a case involving alleged financial loss.  Hutton
Deposition, pp. 83-84; Bacciarini Deposition, p. 88.  Hutton
never asked Aceves if he had prior cash register experience.
Trial Transcript, p. 391.  Hutton never investigated how many
employees worked or could use the register in a given shift.
Trial Transcript, p. 393.  The evidence also shows that Abbate
was part of the District Attorney's investigative team for
purposes of Fenters' criminal case.  Hutton acknowledges that
Abbate was assisting in the District Attorney's investigation of
the Fenters matter between May 14 and June 4, 2003.  Hutton
Deposition, p. 43.  Abbate also acknowledges he assisted in the
investigation and had his most extensive contacts with Hutton
during the investigative phase of the Fenters criminal case.
Abbate Deposition, pp. 104, 124.  Hutton testified an interview
protocol was set up between Abbate and himself with respect to
the June 4, 2003 interview of Aceves.  Hutton Deposition, pp. 42-
43.  Abbate also set up the June 4, 2003 interview with Aceves.
Hutton Deposition, p. 44.  Abbate actually conducted the first
part of that interview, which was done in conformity with
guidelines provided by Hutton.  Hutton Deposition, pp. 44-45;
Abbate Deposition, p. 109-110.  Abbate provided an additional
eight months of financial analysis at the District Attorney's
request.  Hutton Deposition, p. 44; Abbate Deposition, p. 79.
Hutton spent approximately 20 hours doing his work on the Fenters
case, while Abbate worked 35 hours, not including time he spent

assisting in interviews at Hutton's direction.  Hutton
Deposition, p. 57; Abbate Deposition, pp. 61-62.  All of Hutton's
investigation is reflected in his initial and follow up reports.
Hutton Deposition, p. 57.  Bacciarini, the lead prosecutor at the
preliminary hearing and at trial, had as many contacts with
Abbate as he did Hutton in preparation for the preliminary
hearing.  Bacciarini Deposition, pp. 10-11.  Additionally, James
Swanson, who was the prosecutor handling the case against Fenters
after the preliminary hearing until just before it went to trial,
told Fenters' attorney that he was not permitted to resolve the
case via a misdemeanor petty theft plea.  See Virgil Fenters
Deposition, pp. 32, 35-36.  This is further circumstantial
evidence of the District Attorney's compromised status in the
Fenters criminal case.

     *Court Ruling*: DUF 34 is UNDISPUTED.  Plaintiff's
evidence is irrelevant and immaterial to the fact stated, *i.e.,*
that Defendant Hutton decided whether the District Attorney's
Office would conduct an investigation of Abbate's claim that
Aceves and Plaintiff had embezzled monies from Yosemite Chevron.
How the investigation was conducted is not part of this fact.

    <u>DUF 35</u>:  Defendant Hutton was the investigator from the
District Attorney's Office who had handled the majority of white
collar financial crimes investigated by his office, so he
therefore assigned himself to the investigation.  [Declaration of
Merle Wayne Hutton, para. 11].

     *Plaintiff's Response*: Disputed on the same grounds

asserted in response to DUF 17.

*Court Ruling*: DUF 35 is UNDISPUTED.  Plaintiff's evidence does not contradict that Hutton was the D.A.'s Office's investigator.

<u>DUF 36</u>:  Defendant Hutton's actions in investigating the embezzlement allegations was motivated solely by legitimate law enforcement concerns.  [Declaration of Merle Wayne Hutton, para. 12].

*Plaintiff's Response*: Disputed on the same grounds asserted in response to DUF 13.

*Defendants' Reply*: Plaintiff's evidence does not dispute the facts as stated and is irrelevant.  Defendants incorporate their reply to DUF 12.  Defendant ABBATE did not testify that he told Aceves that if he could get evidence to convict Plaintiff that he could benefit in his own case, in order to "lure him in."   The trial testimony is objected to as vague as to time, is irrelevant to the issue of malice and does not support the allegation of a false claim.

*Court Ruling*: DUF 36 is DISPUTED as phrased to the extent of Hutton's sole motivation.  Plaintiff's evidence does not create an issue of fact that Hutton's investigation of the alleged embezzlement was not motivated by law enforcement concerns.

<u>DUF 37</u>:  Defendant Hutton did not submit his report to the prosecuting attorneys of the District Attorney's Office for any reason other than for them to determine if there was sufficient

30

1  evidence to charge Aceves and Plaintiff with a crime.

2  [Declaration of Merle Wayne Hutton, para. 12].

3          *Plaintiff's Response*:  Disputed on the same grounds

4  asserted in response to DUF 13.

5          *Defendants' Reply*: Plaintiff's evidence does not

6  dispute the facts as stated.  Defendants incorporate their reply

7  to DUF Nos. 12 and 16.

8          *Court Ruling*: DUF 37 is UNDISPUTED; Plaintiff's

9  evidence does not create a genuine issue that Hutton submitted

10 his investigative report to the prosecutors for any purpose other

11 than a determination whether there was sufficient evidence to

12 charge Plaintiff with a crime.

13  <u>DUF 38</u>:  Defendant Hutton did not harbor any ill will,

14 animosity or malicious intent towards Aceves or Plaintiff, and

15 did not know who Aceves or Plaintiff were prior to Defendant

16 Abbate bringing the embezzlement allegations to the attention of

17 the District Attorney's Office.  [Declaration of Merle Wayne

18 Hutton, para. 12].

19          *Plaintiff's Response*: Disputed on the same grounds

20 asserted in response to DUF 13.

21          *Defendants' Reply*:  Plaintiff's evidence does not

22 dispute the facts as stated and is irrelevant.  Defendants

23 incorporate their reply to DUF Nos. 12 and 36.

24          *Court Ruling*: DUF 38 is UNDISPUTED; Plaintiff's

25 evidence does not create an issue of fact as to Hutton's intent

26 in submitting his investigative report to the prosecutors,

31

1  Plaintiff does not dispute that Hutton did not know Plaintiff
2  before the investigation was conducted.

3      **DUF 39**:  Defendant Hutton did not withhold from his report
4  any information he considered pertinent to his investigation, nor
5  did he include any knowingly false information.  [Declaration of
6  Merle Wayne Hutton, para. 13].

7          *Plaintiff's Response*: Disputed on the same grounds
8  asserted in response to DUF 13.

9          *Defendants' Reply*: Plaintiff's evidence does not
10 dispute the facts as stated and is irrelevant.  Defendants
11 incorporate their reply to DUF Nos. 12 and 36.

12         *Court Ruling*: This is a compound statement.  DUF 39 is
13 UNDISPUTED in part as Plaintiff's evidence does not create an
14 issue of fact that Hutton intentionally withheld pertinent
15 information from his report.  His investigation was superficially
16 and overly reliant on Abbate and his work product.  There is no
17 evidence Hutton knowingly included false information in his
18 report.

19     **DUF 40**:  Defendant Hutton did not manipulate, alter, or in
20 any way change, the Yosemite Chevron business records summary or
21 daily receipts provided by Defendant Abbate, nor did he fabricate
22 any such business records.  [Declaration of Merle Wayne Hutton,
23 para. 14].

24         *Plaintiff's Response*: Disputed on the same grounds
25 asserted in response to DUF 13.

26         *Defendants' Reply*: Plaintiff's evidence does not

32

dispute the facts as stated nor is it relevant.  Defendants incorporate their reply to DUF Nos. 12 and 36.

*Court Ruling*: DUF 40 is UNDISPUTED; Plaintiff's evidence does not create an issue of fact that Hutton manipulated or altered the Yosemite Chevron business records or fabricated any of these business records.  Instead, he failed to obtain and analyze them in depth.

DUF 41:  Defendant Hutton did not direct anyone to manipulate, alter, or in any way change, or fabricate these records.  [Declaration of Merle Wayne Hutton, para. 14].

*Plaintiff's Response*: Disputed on the same grounds asserted in response to DUF 13.

*Defendants' Reply*: Plaintiff's evidence does not dispute the facts as stated.  Defendants incorporate their reply to DUF Nos. 12 and 36.

*Court Ruling*: DUF 41 is UNDISPUTED; Plaintiff's evidence does not create an issue of fact that Hutton directed anyone to manipulate or alter the business records, as no such person is identified.

DUF 42:  The records provided by Defendant Abbate were placed into evidence at the District Attorney's Office and later transported to Defendant Cassabon.

*Plaintiff's Response*: UNDISPUTED.

DUF 43:  Defendant Hutton did not provide any direction, instructions or guidance to Defendant Cassabon with respect to these records.  [Declaration of Merle Wayne Hutton, para. 15].

*Plaintiff's Response*:  Disputed.  Victor Fung testified in his deposition that the first thing he did after Cassabon's retention was to meet with Defendant Hutton and the then assigned prosecutor, James Swanson.  Fung Deposition, p. 18.  During a one hour meeting, Fung was told that the prosecution suspected that Fenters was stealing money by voiding transactions.  Fung Deposition, p. 18.  Fung was told the prosecution wanted him to analyze the pay point reports, a box of which he received on that occasion.  Fung Deposition, p. 20.  Fung also received Hutton's report which had Abbate's spreadsheet as an attachment.  Fung Deposition, pp. 19, 22.  Fung was told the attachment was a spreadsheet prepared by Abbate himself.  Fung Deposition, p. 22.

*Defendants' Reply*: Plaintiff misstates facts.  Defendant Fung testified only that he was told Plaintiff was suspected of stealing and the means by which she was doing it and that Fung was given instructions with respect to his retention and provided information to analyze the financial records.

*Court Ruling*: DUF 43 is UNDISPUTED in part; Plaintiff's evidence does not create an issue of fact that Hutton provided any direction, instructions or guidance to Defendant Cassabon with respect to these records, except that Fung should analyze the records.

DUF 44:  Defendant Hutton did not speak to anybody from Cassabon & Associates with respect to their review or analysis of the records.  [Declaration of Merle Wayne Hutton, para. 15].

*Plaintiff's Response*: Disputed on the same grounds

34

asserted in response to DUF 43.

*Defendants' Reply*: See reply to DUF 43.

*Court Ruling*: DISPUTED.  Hutton at least spoke to Fung.

DUF 45:  Defendant Hutton was not directed how to conduct his investigation in any manner by Defendant Abbate, or any other members of the Abbate family.  [Declaration of Merle Wayne Hutton, para. 16].

*Plaintiff's Reply*:  Disputed on the same grounds asserted in response to DUF 34.

*Defendant's Reply*: Plaintiff's evidence does not dispute the facts as stated.  Defendants incorporate their reply to DUF No. 34.

*Court Ruling*: DUF 45 is UNDISPUTED; Plaintiff's evidence does not create a material issue of fact that Hutton was directed how to conduct his investigation by Abbate.

DUF 46:  Defendant Spencer did not give any direction, instructions or guidance to any District Attorney investigators with respect to the investigation of the Yosemite Chevron embezzlement allegations, including, but not limited to, who to interview, reviewing of Yosemite Chevron business records, report preparation, etc.  Declaration of Gordon Spencer, para. 9; Declaration of Merle Wayne Hutton, para 17.

*Plaintiff's Response*: Disputed.  Hutton recalls having contact with Spencer, and that it was after the initial meeting with the Abbates.  Hutton Deposition, p. 11.  Spencer also concedes he may have had input in the decision to hire the

Cassabon firm.  Spencer Deposition, p. 66.  Spencer was also updated about the case by Bacciarini and Hutton on at least one occasion.  Spencer Deposition, p. 71; disputed also on the same grounds asserted in response to DUF 27; James Swanson, who was the prosecutor handling the case against Fenters after the preliminary hearing until just before it went to trial, told Fenters' attorney that he was not permitted to resolve the case via a misdemeanor petty theft plea.  See Virgil Fenters Deposition, pp. 32, 35-36.

*Defendants' Reply*: Defendants incorporate their reply to DUF Nos. 27 and 34.  Defendants assert that Plaintiff misstates facts; that Hutton did not testify that he had contact with Spencer after the initial meeting with the Abbates but testified that he did not have any contact with Spencer prior to the meeting.  Defendants assert that Plaintiff misstates facts; Spencer testified that it was possible he had input into whether to retain a forensic accounting firm after the preliminary hearing.  Defendants assert Plaintiff misstates facts; that the contact between Spencer and Bacciarini was not a conversation Spencer initiated, that he was in the area of the office where Bacciarini and Hutton worked and there was a short conversation related to the press coverage of the case.

*Court Ruling*: DUF 46 is UNDISPUTED; Plaintiff's evidence does not create an issue of fact that Spencer participated in or directed Hutton's investigation of Abbate's complaint or that he participated in the decision to bring

criminal charges against her.

DUF 47:   Decisions such as these were solely within the discretion of the District Attorney investigations unit, including, but not limited to, Defendant Hutton.   [Declaration of Gordon Spencer, para. 9].

*Plaintiff's Response*: Disputed on the same grounds asserted in response to DUF 34.

*Defendants' Reply*: Plaintiff's evidence does not dispute the facts as stated.  Defendants incorporate their reply to DUF 34.

*Court Ruling*: DUF 47 is UNDISPUTED; Plaintiff's evidence does not create an issue of material fact that the decision to investigate Abbate's charges was not within the discretion of the District Attorney's office, even if the D.A. himself did not get involved in investigations except to refer cases for investigation.

DUF 48:   Defendant Spencer had no contact with any District Attorney investigators concerning the Yosemite Chevron embezzlement investigation at any time during the investigation or prosecution of Plaintiff.   [Declaration of Gordon Spencer, para. 9].

*Plaintiff's Response*: Disputed on the same ground asserted in response to DUF 27, 34 and 46.

*Defendants' Reply*: Plaintiff's evidence does not dispute the facts as stated.  Defendants incorporate their replies to DUF Nos. 27, 34 and 46.

*Court Ruling*: DUF 48 is UNDISPUTED; Plaintiff's evidence establishes that Spencer's involvement in the investigation and prosecution of Plaintiff was limited to an introduction of Hutton to Abbate and to attending the initial meeting between Abbate and Hutton.  There may have been incidental additional contact, which Spencer denies and Hutton does not clearly recall.

DUF 49: Defendant Spencer did not give any direction, instructions or guidance to any attorneys from the District Attorney's Office with respect to the prosecution of Plaintiff, including, but not limited to, decisions whether to prosecute or not prosecute Plaintiff, particular charges to file or any particular resolution of the case.  [Declaration of Gordon Spencer, para. 10].

*Plaintiff's Response*:  Disputed on the same grounds asserted in response to DUF 27, 34, and 46.

*Defendants' Reply*: Plaintiff's evidence does not dispute the facts as stated.  Defendants incorporate their replies to DUF 27, 34, and 46.

*Court Ruling*: DUF 49 is UNDISPUTED; Plaintiff's evidence establishes that Spencer's involvement in the investigation and prosecution of Plaintiff was limited to an introduction of Hutton to Abbate and to attending the initial meeting between Abbate and Hutton.

DUF 50:  These decisions were solely within the discretion of the deputy district attorneys involved in the prosecution.

38

[Declaration of Gordon Spencer, para. 10].

*Plaintiff's Response*:  Disputed on the same grounds asserted in response to DUF 34.

*Defendants' Response*: Plaintiff's evidence does not dispute the facts as stated.  Defendants incorporate their reply to DUF 34.

*Court Ruling*: DUF 50 is UNDISPUTED; Plaintiff's evidence does not create an issue of fact that the decision to proceed with the prosecution of Plaintiff was not within the discretion solely exercised by the deputy district attorneys assigned to the prosecution.  This does not mean that Spencer did not have discretion to make such decisions.

<u>DUF 51</u>: Defendant Spencer had no knowledge that a criminal complaint was filed against Plaintiff until after it had actually been filed.  [Declaration of Gordon Spencer, para. 10].

*Plaintiff's Response*:  Disputed on the same grounds asserted in response to DUF 27, 34 and 46.

*Defendants' Response*: Plaintiff's evidence does not dispute the facts as stated.  Defendants incorporate their replies to DUF Nos. 27, 34 and 46.

*Court Ruling*: DUF 51 is UNDISPUTED; Plaintiff's evidence does not raise an issue of fact that Spencer was told or knew that a criminal complaint was going to be filed against Plaintiff until after it was filed.

<u>DUF 52</u>:  Other than his presence at the May 14, 2003, meeting, Defendant Spencer did not initiate any contact with

39

1  Defendant Abbate or Jim Abbate with respect to the criminal

2  investigation and prosecution of Plaintiff during the pendency of

3  both.  [Declaration of Gordon Spencer, para. 11].

4           *Plaintiff's Response*:  Disputed.  Plaintiff saw Abbate,

5  Bacciarini and Spencer having conversations outside of court in

6  connection with her court appearances.  Fenters Deposition, pp.

7  32-34.  Spencer was also present when the verdict was read.

8  Fenters Deposition, pp. 32-34.  Souza also recalls Spencer being

9  present for at least one hearing where Spencer approached him

10 about the case and mentioned that he was friends with the

11 Abbates.  Souza Deposition, pp. 34-38.  Spencer also had "chit-

12 chat" with the Abbates about the Fenters case during its

13 pendency.  Spencer Deposition, p. 63.

14          *Defendants' Reply*: Fact established.  Plaintiff's

15 evidence does not dispute the facts as stated nor is it

16 relevant.

17          Fenters Dep., pp. 32-34 - This testimony is objected to

18 on the grounds it calls for speculation.  Further, plaintiff

19 misstates facts: Plaintiff testified only that she saw defendant

20 SPENCER, defendant ABBATE and D.A. Bacciarini talking outside of

21 the courtroom on two occasions and she assumed it was in relation

22 to the criminal case.  Fenters Dep., p. 33:15-23.  Plaintiff does

23 not state that defendant SPENCER was present in court when the

24 verdict was read; she testified only that she saw him sitting in

25 the back of the courtroom at the end of her trial.  Fenters Dep.,

26 p. 34:11-12.

**Sousa Dep., pp. 34-38 - Plaintiff misstates facts: Mr. Sousa did not testify to any of the facts plaintiff claims he did: he did not testify that defendant SPENCER was present at a hearing and approached him about the case; nor did he testify defendant SPENCER told him he was friends with the Abbates.**

**Spencer Dep., p. 63 - Plaintiff misstates facts: Defendant SPENCER testified that he may have had chance meetings with members of the Abbate family and that he does not recall providing any information about the case.  Spencer Dep., p. 63:10-20.**

***Court Ruling*: DUF 52 is DISPUTED; Plaintiff's evidence does create an issue of fact that Spencer had contact with Defendant Abbate or Jim Abbate with respect to the criminal investigation and prosecution of Plaintiff during the pendency of both, including the trial, whether or not Spencer initiated the contact.**

**DUF 53: Defendant Spencer had no contact with anybody from Cassabon & Associates during the pendency of the criminal investigation and prosecution of Plaintiff.**

***Plaintiff's Response*: UNDISPUTED.**

**DUF 54:  Defendant Spencer never saw any Yosemite Chevron business records, or summaries of records, related to the embezzlement investigation and prosecution.**

***Plaintiff's Response*: UNDISPUTED.**

**DUF 55:  Defendant Spencer never directed or instructed anybody to manipulate, alter or in any way change Yosemite *****

41

1  Chevron business records or summaries, or to fabricate any

2  such business records.

3        *Plaintiff's Response*: UNDISPUTED.

4     <u>DUF 56</u>:  Defendant Spencer never discussed Yosemite Chevron

5  business records, or summaries of records, with anybody.

6  [Declaration of Gordon Spencer, para. 12].

7        *Plaintiff's Response*: Disputed on the same grounds

8  asserted in response to DUF 52.

9        *Defendants' Reply*: Plaintiff's evidence does not

10 dispute the facts as stated.  See Defendants' reply to DUF 27,

11 34, 46 and 52.

12       *Court Ruling*: DUF 56 is UNDISPUTED; Plaintiff's

13 evidence does not create an issue of fact that Spencer discussed

14 Yosemite Chevron's business records, or summaries of records,

15 with anybody.

16    <u>DUF 57</u>:  Plaintiff was never arrested in relation to

17 the criminal charges for embezzlement brought against her.

18 [Deposition of Tiffany Fenters, p. 28:15-23; p. 63:7-12;

19 Deposition of Bruce Sousa, p.116:16-23].

20       *Plaintiff's response*:  Disputed. Plaintiff's liberty

21 was restricted in connection with her criminal case, since

22 she was ordered to be booked and released at the County Jail.

23 Plaintiff also had to agree as a condition of her official

24 recognizance release to appear at all court hearings, not leave

25 California, waive extradition from another jurisdiction, and

26 subject herself to additional potential criminal penalties.

42

Plaintiff also had to provide a fingerprint and enter into a similar agreement to be released on her recognizance after the preliminary hearing.  See Exhibit C, Doc. 188, selected portions of the Fenters criminal court file. These liberty restrictions are tantamount to an arrest.

*Defendants' Reply*: Plaintiff's evidence does not dispute the facts as stated.  Defendants object to Exhibit C as hearsay, lacking foundation and vague.

*Court Ruling*: DUF 57 is DISPUTED; Plaintiff was not physically arrested.  Her liberty was restricted and she was required to appear in court to answer the charges.  Defendants' objections are without merit; Exhibit C is a copy of a court record and sets for the state court's conditions of petitioner's own recognizance release.

DUF 58: Plaintiff's liberty was never restricted as a result of the charges; she was granted an "Own Recognizance" ("OR") release requiring her to get permission from the court if she was to leave the state and to make court appearances. [Deposition of Tiffany Fenters, p. 276:12-18; Exhibit "JN-2", Felony Minutes, Commitment, Certification attached to Defendant COUNTY's Request for Judicial Notice in Support of Motion for Summary Judgment or Alternatively Summary Adjudication].

*Plaintiff's Response*: Disputed on the same grounds asserted in response to DUF 57.

*Defendants' Reply*: Plaintiff's evidence does not

43

dispute the facts as stated.

*Court Ruling*: DISPUTED whether Petitioner's liberty was restricted; UNDISPUTED that she was released on her own recognizance.

<u>DUF 59</u>:  Neither Defendant Spencer nor Defendant Hutton ever requested that a warrant be issued for Plaintiff's arrest, or that Plaintiff be arrested or otherwise taken into custody. [Declaration of Gordon Spencer, para. 13; Declaration of Merle Wayne Hutton, para. 18].

*Plaintiff's Response*:  Disputed. The defendants knew that plaintiff would be required to have her liberty restricted as a result of her being filed with criminal charges, since all of her release conditions were mandated by Penal Code § 1318 by mere virtue of her being charged.

*Defendants' Reply*: Facts established; Plaintiff cites no contrary evidence.

*Court Ruling*: DUF 59 is UNDISPUTED.  There is no evidence of such a request by either defendant.

<u>DUF 60</u>:  Neither Defendant Spencer nor Defendant Hutton ever requested that Plaintiff be booked or processed at the Merced County Jail. [Declaration of Gordon Spencer, para. 13; Declaration of Merle Wayne Hutton, para. 18].

*Plaintiff's Response*:  Disputed on the same grounds asserted in response to DUF 59.

*Defendants' Reply*: Facts established; Plaintiff cites no contrary evidence.

1   *Court Ruling*: DUF 60 is UNDISPUTED.  There is no

2   evidence of such a request by either defendant.

3       DUF 61:  Neither Defendant Spencer nor Defendant Hutton was

4   in any way involved in Plaintiff being fingerprinted,

5   photographed, or otherwise processed at the Merced County Jail.

6   Neither were ever aware of the fact that this had occurred until

7   some months later.  [Declaration of Gordon Spencer, para. 13;

8   Declaration of Merle Wayne Hutton, para. 18].

9       *Plaintiff's Response*:  Disputed on the same grounds

10  asserted in response to DUF 59.

11      *Defendants' Reply*: Facts established; Plaintiff cites

12  no contrary evidence.

13      *Court Ruling*: DUF 61 is UNDISPUTED, although each

14  defendant could have anticipated fingerprinting after criminal

15  charges were filed.

16      DUF 62:  Neither Defendant Spencer nor Defendant Hutton made

17  any request that Plaintiff be required to post bail or in any way

18  have her liberty restricted in any manner. [Declaration of Gordon

19  Spencer, para. 13; Declaration of Merle Wayne Hutton, para. 18].

20      *Plaintiff's Response*:  Disputed on the same

21  grounds asserted in response to DUF 57.

22      *Defendant's Reply*: Plaintiff's evidence does not

23  dispute the facts as stated.  Defendants object to Exhibit C as

24  hearsay, lacking foundation and vague.

25      *Court Ruling*: DUF 62 is UNDISPUTED as to any request by

26  either defendant.

1    **DUF 63**:  **On June 23, 2003, a criminal complaint charging**

2    **Plaintiff with one felony count of embezzlement was filed in the**

3    **Merced County Superior Court (*The People of the State of***

4    ***California vs. Tiffany Michelle Fenters*, Merced County Superior**

5    **Court Case No. MF36082).**

6              *Plaintiff's Response*: UNDISPUTED.

7    **DUF 64**:   **The complaint was signed and filed by Deputy**

8    **District Attorney Bruce Gilbert.**

9              *Plaintiff's Response*: UNDISPUTED.

10   **DUF 65**:  **On July 30, 2004, a preliminary hearing before the**

11   **Honorable Ronald D. Hansen was held in the Merced County Superior**

12   **Court with respect to the embezzlement charges filed against**

13   **plaintiff.**

14             *Plaintiff's Response*: UNDISPUTED.

15   **DUF 66**:  **Plaintiff was represented at the preliminary**

16   **hearing by her attorney, Mr. Bruce Sousa.**

17             *Plaintiff's Response*: UNDISPUTED.

18   **DUF 67**:  **Defendant Abbate and Defendant Hutton were the only**

19   **witnesses called to testify.**

20             *Plaintiff's Response*: UNDISPUTED.

21   **DUF 68**:  **At the conclusion of the preliminary hearing, Judge**

22   **Hansen found that there was sufficient evidence to believe**

23   **plaintiff had committed the crime of embezzlement.**

24             *Plaintiff's Response*: UNDISPUTED.

25   **DUF 69**:  **Defendant Hutton's testimony at the preliminary**

26   **hearing was essentially the same information obtained by**

46

Defendant Hutton during his investigation as reflected in his report. [Exhibit "JN-3", Reporter's Transcript of Preliminary Hearing attached to Defendant COUNTY's Request for Judicial Notice in Support of Motion for Summary Judgment or Alternatively Summary Adjudication; Declaration of Merle Wayne Hutton, para. 19].

*Plaintiff's Response*:  Disputed on the same grounds asserted in response to DUF 13.

*Defendants' Response*: Plaintiff's evidence does not dispute the facts as stated.  Defendants incorporate their replies to DUF Nos. 12 and 20.

*Court Ruling*: DUF 69 is UNDISPUTED as to the fact stated; Plaintiff's evidence does not create an issue of fact as to Hutton's testimony at the preliminary hearing, which speaks for itself, or that it mirrored what is set forth in his investigative report.

C.   <u>FIRST CAUSE OF ACTION FOR VIOLATION OF 42 U.S.C. § 1983</u>.

The First Cause of Action pursuant to 42 U.S.C. § 1983 is against all defendants and alleges in pertinent part:

> 34.   The defendants' intentional and reckless acts, as described above, constitute a deprivation of Tiffany's ... rights under the Fourth Amendment not to have her liberty restricted without legal basis, to be arrested without probable cause, and not to be prosecuted maliciously without probable cause.   With respect to these constitutional violations, as alleged hereinabove, defendants Yosemite Chevron, Abbco, Abbate, Fung, McIlhatton, and Cassabon were acting in

47

1
          joint activity with and/or conspiring with
          Spencer and Hutton.
2

3          ...

          36.  Merced County's liability under this
4          cause of action is based on its customs and
          policies ....
5

6      Defendants move for summary judgment as to Plaintiff' claim

7  for violation of Section 1983 on numerous grounds.

8          1.  <u>False Arrest/Liberty Restriction Claim</u>.

9      Defendants move for summary judgment on this claim on the

10 grounds that Plaintiff was never "seized" nor was her liberty

11 restricted in any manner; probable cause existed for Plaintiff's

12 arrest; and neither Defendant Hutton nor Defendant Spencer had

13 anything to do with the decision to bring criminal charges

14 against Plaintiff.

15          a.  <u>No Seizure or Restriction of Liberty</u>.

16      Defendants' refer to evidence that Plaintiff was never

17 arrested in relation to the charges alleged against her and was

18 granted an "own recognizance" status requiring her to make court

19 appearances and to obtain Court approval to leave the state.

20      Defendants cite *Karam v. City of Burbank*, 352 F.3d 1188 (9th

21 Cir.2003).

22      In *Karam*, misdemeanor charges were brought against Karam for

23 delaying or obstructing a peace officer in the performance of his

24 duties and trespassing.  A police officer telephoned Karam and

25 told her that she had to turn herself in or be arrested.  Karam

26 appeared at the Burbank Municipal Court and signed an Own-

                                    48

Recognizance Release Agreement ("OR Release").  The OR Release required Karam to obtain permission from the Court before leaving California, to appear in court three weeks hence and at all other times and places ordered by the Court.  The charges against Karam were eventually dismissed.  Karam filed a Section 1983 action, alleging that she was seized in violation of the Fourth Amendment.  The District Court dismissed this claim under Rule 12(b)(6).  The Ninth Circuit affirmed:

> We have not addressed the question whether, absent an arrest, a seizure may occur by virtue of restrictions incident to pretrial release.  However, even if a seizure under the Fourth Amendment conceivably could occur as a result of some combinations of pretrial release restrictions, no such seizure occurred here.
>
> Cases decided by our sister circuits in which they have concluded there was a seizure incident to a pre-trial release have involved conditions significantly more restrictive than those in the present case.  *See, e.g.,* *Johnson v. City of Cincinnati*, 310 F.3d 484, 493 (6th Cir.2002)('[I]n each of the cases addressed by our sister circuits, the government not only curtailed the suspect's right to interstate travel, it also imposed additional restrictions ..., such as obligations to post bond, attend court hearings, and contact pretrial services.').
>
> In the Fifth Circuit's *Evans* case, the plaintiff faced an eight-count felony indictment, and 'was fingerprinted, photographed, forced to sign a personal recognizance bond, and required to report regularly to pretrial services, to obtain permission before leaving the state, and to provide federal officers with financial and identifying information.'  *Evans*, 168 F.3d at 860.  The Fifth Circuit concluded that these conditions curtailed the plaintiff's liberty to such an extent that a Fourth Amendment

seizure occurred.  *Id.* at 861.

The Third Circuit in *Gallo* determined that the plaintiff, who faced felony arson charges, was seized within the meaning of the Fourth Amendment when he was required to post a $10,000 bond, to attend all court hearings, to contact Pretrial Services on a weekly basis, and was prohibited from traveling outside of Pennsylvania and New Jersey. *Gallo*, 161 F.3d at 222.  The court concluded that the plaintiff was seized because '[his] liberty was constrained in multiple ways for an extended period of time.'  *Id.* at 225.

The Second Circuit in *Murphy* concluded that a plaintiff, facing two felony charges, was seized when he was required to make eight court appearances while charges were pending against him, and was ordered not to leave the state of New York.  *See Murphy*, 118 F.3d at 942.  The court relied, in part, on Justice Ginsberg's concurrence in *Albright v. Oliver*, 510 U.S. 266, 278 ... (1994)(plurality opinion), which noted that:

> A person facing *serious criminal charges* is hardly free from the state's control upon his release for a police officer's physical grip.  He is required to appear in court at the state's command.  He is often subject ... to the condition that he seek formal permission from the court ... before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.

*Id.* (emphasis added).

The present case does not involve circumstances comparable to those in *Evans*, *Gallo, Murphy,* or *Albright*.  Karam was not

50

1                                   charged with a felony.  She was not required
to report to anyone.  All she had to do was
2                                   show up for court appearances and obtain
permission from the court if she wanted to
3                                   leave the state.  Obtaining such permission,
while not burden-free, posed much less of a
4                                   burden to her that it would to a person
charged with a felony.  And, with regard to
5                                   the requirement to appear in court, that was
no more burdensome than the promise to appear
6                                   a motorist makes when issued a traffic
citation.  *See Britton v. Maloney*, 196 F.3d
7                                   24, 29-30 (1st Cir.1999).  In sum, Karam's OR
restrictions were de minimus.  No Fourth
8                                   Amendment seizure occurred.

9  **352 F.3d at 1193-1194.**

10      Plaintiff argues that *Karam* is not controlling because she

11  was charged with a felony and, as the court documents submitted

12  in Plaintiff's Exhibit C show, the state court ordered Plaintiff

13  to immediately report to be booked and fingerprinted and to

14  thereafter return the booking form to the state court.  Although

15  Plaintiff was released on her own recognizance, she had to agree

16  to appear at all times and places ordered by the Court, comply

17  with the conditions of pretrial release, not to leave the state

18  without Court permission, and agree to waive her right to

19  extradition.  Plaintiff again relies on Exhibit C.

20      In *Bielanski v. County of Kane*, 550 F.3d 632, 642-643 (7th

21  Cir.2008), the Seventh Circuit held:

22                [W]e have stated that the Fourth Amendment
'drops out of the picture following a
23                person's initial appearance in court.'
*Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th
24                Cir.2006).  The travel restrictions and the
meeting with the probation officer were
25                restrictions imposed by a judge once
Bielanski appeared in court, and so a Fourth
26                Amendment claim against these defendants

cannot stand.  In short, Bielanski has failed to allege a seizure (continuing or otherwise) by these defendants and thus has no claim under the Fourth Amendment.

Plaintiff argues that Ninth Circuit authority does not follow that of the Seventh Circuit.  Plaintiff cites *Fontana v. Haskin*, 262 F.3d 871 (9th Cir.2001).  In *Fontana*, the Ninth Circuit held that the Fourth Amendment protects a criminal defendant after arrest on the trip to the police station.  *Id.* at 878.  The Ninth Circuit ruled:

> [W]e have held that 'once a seizure has occurred, it continues throughout the time the arrestee is in the custody of the arresting officers ... Therefore, excessive use of force by a law enforcement officer in the course of transporting an arrestee gives rise to a section 1983 claim based upon a violation of the Fourth Amendment.'  *Robins v. Harum,*, 773 F.2d 1004, 1010 (9th Cir.1985).  In *Robins*, two criminal defendants were arrested and placed in the rear of a patrol car by a pair of police officers.  En route to the jail, one defendant began to argue with one of the officers about whether the defendant should be allowed to smoke in the car.  The officers abruptly stopped the car, sprang from the vehicle and started trying to pull the pair from the back seat.  A struggle ensued.  Spectators gathered and the defendants yelled for the crowd to 'get some good cops.'  We held that the incident constituted a violation of the Fourth Amendment that could support a section 1983 suit.  *Id.* at 1010.  The initial arrests 'plainly constituted seizures for Fourth Amendment purposes.'  *Id.*  'These seizures continued while the Robinses were en route to the sheriff's department in the custody of the arresting officers.'  *Id.*  These were acts of continuing dominion upon already seized suspects, and this was enough to implicate the Fourth Amendment.
>
> Therefore, the Fourth Amendment prohibition

> against unreasonable search and seizure
> continues to apply after an arrestee is in
> the custody of the arresting officers.
> *Accord Albright v. Oliver*, 510 U.S. 266, 277
> ... (1994) (Ginsburg, J., concurring)
> (seizure continues throughout criminal
> trial).  The trip to the police station is a
> 'continuing seizure' during which the police
> are obliged to treat their suspects in a
> reasonable manner.

*Id.* at 879-880.

Defendants reply that whether Plaintiff was charged with a felony is not relevant; what is significant are the conditions of Plaintiff's OR release:

> The only difference between the conditions in
> *Karam* and here are that plaintiff was
> required by the Court to be fingerprinted and
> photographed at the Merced County Jail.  This
> is more akin to a procedural requirement than
> any type of liberty restriction.  The
> plaintiff was not held at the jail, nor did
> she have to post bail.   Plaintiff agrees
> that she was never arrested; never put in any
> type of cell; and that her 'booking'
> consisted of about 15 minutes at the jail
> with her attorney, Bruce Sousa, where they
> took her fingerprints and photograph ... The
> plaintiff was free to travel.  She did not
> have to report to any agency other than to
> appear in court.  With the exception of being
> fingerprinted and photographed ..., the
> release conditions are identical to those in
> *Karam* and therefore de minimus.

It continues to be the law that pre-trial release conditions not involving custody, which require presence at future legal proceedings do not qualify as a Constitutional seizure.  *See Burg v. Gosselin,* 591 F.3d 95, 100-101 (2nd Cir.2010), *citing Karam*. *Bielanksi* and *Karam* are controlling; *Fontana* involved a question of excessive force.  Plaintiff's evidence establishes that the

restrictions on her liberty were imposed by the Court and not the Defendants.  The fact of a felony charge, of itself, is not determinative of a seizure in violation of the Fourth Amendment. It is the fact of the felony charge with other restrictions that is important.  Further, the record in this action establishes that Defendants Spencer and Hutton had no involvement in the decision to bring formal charges of embezzlement against Plaintiff.  Spencer was not involved at all in the investigation of the claim of embezzlement and there is no evidence that he participated in the decision to bring charges.  Although Hutton was involved in the investigation, there is no evidence, other than his investigative report, that he had any participation in the decision to file the criminal charges.

Summary judgment for Defendants Spencer and Hutton on this ground is GRANTED.

ii.  <u>Probable Cause</u>.

Defendants move for summary judgment on the ground that probable cause to believe Plaintiff embezzled money from Yosemite Chevron existed.  California Penal Code § 503 defines embezzlement as "the fraudulent appropriation of property by a person to whom it is entrusted."

Probable cause exists when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime."  *United States v. Smith*, 790 F.2d 789, 792 (9th Cir.1986).  "A police officer has probable to

effect an arrest if 'at the moment the arrest was made ... the facts and circumstances with [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect had violated a criminal law." *Orin v. Barclay*, 272 F.3d 1207, 1218 (9th Cir.2001).

Defendants argue that Defendant Hutton gathered sufficient information that would lead a reasonable person to believe Plaintiff had appropriated money from Yosemite Chevron, despite the fact that Plaintiff disputes these allegations and was acquitted at trial.

Plaintiff argues that summary judgment is not appropriate because of evidence that Abbate and Hutton took a coerced statement from Aceves in which Abbate mentioned Plaintiff first and suggested her involvement in exchange for substantial penal benefit to Aceves; Abbate offered no reliable financial evidence that showed Plaintiff was responsible for any voids; there was no indication of loss of inventory or revenue; Hutton did not review the financial evidence of Plaintiff's alleged embezzlement; the District Attorney's Office did not follow its customary practice of utilizing a forensic accountant or auditor at the investigation stage; and Hutton omitted in his report and preliminary hearing testimony that Aceves was pressured to implicate Plaintiff.

First of all, as Defendants contend, Defendant Hutton did not identify Plaintiff to Aceves as a possible suspect. Assuming

*arguendo* that Defendant Abbate first mentioned Plaintiff as a
possible suspect to Aceves, there is no evidence that Defendant
Hutton knew this or was otherwise involved in naming her.  It is
undisputed that Defendant Hutton did not know Plaintiff.
Defendants refer to the transcript of the interview between
Defendants Abbate and Hutton, and Aceves attached as Exhibit 3 to
Hutton's declaration:

> BA: Alright, listen, my partners and I know
> you have voided transactions.
>
> AA: Right.
>
> BA: Voiding tr ..., you know charging
> customers and voiding transactions and wait
> until the end of the shift and take the money
> ...
>
> AA: Yeah.
>
> BA: ... um the last day you were over twenty
> five you told me as such, um one of the um
> the problems I have is um you know who else,
> who else was with you, I don't know who else
> was with you and that's what I'my trying to
> get to the bottom of this.
>
> AA: Right.
>
> BA: Alright, that's my first ...
>
> AA: Well, I'm willing to cooperate.
>
> BA: Who else was with you, that's, that's,
> you know that's one of the things I, I need
> cooperation.
>
> AA: Yeah, I'm willing to cooperation with you
> mainly because I know I made a big mistake
> and I'm willing to pay for it.
>
> BA: I know, what uh, so who else was with
> you?
>
> AA: Um other than me is I know it was

56

1          Tiffany.

2  This evidence negates any inference that Defendant Abbate first

3  named Plaintiff as a suspect to Aceves in exchange for his

4  cooperation or that he was pressured to name Plaintiff.

5          Defendants argue that Plaintiff's contention that Aceves was

6  coerced into naming Plaintiff as a participant in the

7  embezzlement is negated by the transcript of the interview:

8          WH: Okay, now I'm not gonna say it's going
           get you out of anything, right?
9
           AA: Right, no I understand.
10
           WH: And I'm not, I want you to understand,
11         I'm not making any promises to you other than
           I will and will promise you this, that I will
12         make sure the Deputy D.A. knows that yes you
           were cooperative here and yes you are willing
13         to do that okay, but just you being willing,
           you still have to do it alright because if
14         you say yeah I'm gonna do it and then you
           decide not to then you're basically lying to
15         me again.

16  Defendant Hutton's statements were made toward the end of the

17  interview after Aceves had described the embezzlement scheme to

18  Defendant Hutton and Abbate, not before.  Defendants argue that,

19  even if Defendant Hutton's statement can be considered coercion,

20  this information was presented to the prosecuting attorney with

21  Defendant Hutton's report and video of the Aceves' confession and

22  also was provided to Plaintiff and her criminal defense attorney,

23  Mr. Sousa, and Judge Hansen at the preliminary hearing.

24          As to Plaintiff's contention that Defendant Abbate did not

25  offer reliable financial information to provide probable cause

26  that Plaintiff had embezzled money from Yosemite Chevron and that

57

Defendant Hutton did not scrutinize that financial evidence, Defendants argue that this is an attack on evidence that may have resulted in Plaintiff's acquittal but is irrelevant to the issue of probable cause. Defendants note that the identical financial information was presented at the preliminary hearing and, despite argued flaws in the financial evidence, Plaintiff was held to answer. Finally, Defendants assert that the contention that Defendant Abbate testified falsely at the preliminary hearing has no bearing on whether Defendants Hutton or Spencer caused criminal charges to be brought against Plaintiff on less than probable cause.

Plaintiff's premise that Hutton should have conducted a better investigation is negated in part by Aceves' identification of Plaintiff as a participant in the embezzlement scheme. Hutton accepted the spreadsheet Abbate provided to describe the loss and Aceves' identification of Plaintiff as a participant. He did not, as was allegedly the usual procedure, hire a forensic accountant to analyze the evidence to provide the foundation for the criminal charge.

### iii.   Collateral Estoppel.

Defendants move for summary judgment as to Plaintiff's claim that the charge of embezzlement against her was not based on probable cause on the ground that Plaintiff is collaterally estopped to litigate this issue because probable cause was found by the judge at the preliminary hearing.

The doctrine of collateral estoppel, or issue preclusion,

prevents relitigation of the same legal and/or factual issues necessarily considered and determined in a prior legal proceeding between the same parties, or their privies.  *See Allen v. McCurry,* 449 U.S. 90, 94 (1980).  The collateral estoppel doctrine applies to claims brought under 42 U.S.C. § 1983.  *Id.* at 105.  The availability of collateral estoppel is a mixed question of law and fact in which legal issues predominate.  *See Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir.1990).  State law governs the application of collateral estoppel to issues that were decided in a prior state court proceeding.  *Allen, id.* at 96.

Under California law, collateral estoppel is applied where: (1) the issue sought to be precluded is identical to that which was decided in a prior proceeding; (2) that issue was actually litigated and necessarily decided in that proceeding; (3) there was a final judgment on the merits; and (4) that party against whom collateral estoppel is asserted was a party or in privity with a party to the prior proceedings.  *McCutchen v. City of Montclair*, 73 Cal.App.4th 1138, 1145 (1999).  In *Moreno v. Baca*, 2001 WL 1204113 (C.D.Cal.2001), the District Court held:

> It is now also clear, under California law, that under the right set of circumstances, issues necessarily decided during a preliminary hearing in a criminal case (pursuant to California Penal Code § 871) or on a motion to suppress per California Penal Code § 1538.5 may be precluded from re-litigation in a subsequent civil suit ....
>
> Under California law, a finding in a preliminary hearing of probable cause to hold

1
2
3
4
5
6
7

      a criminal defendant over for trial is a
final judgment on the merits for *collateral
estoppel* purposes; an accused can immediately
appeal the probable cause determination by
filing a motion to set aside (Cal.Pen.Code §
995) and obtain review of the decision on the
motion to set aside by filing a writ
(Cal.Pen.Code § 999a).  Further, probable
cause cannot be litigated further because it
provides no defense to an accused at trial
... Thus, issues necessarily determined in
that hearing may not be subsequently re-
litigated.

8  2001 WL 1204113 at *3.  In *Haupt v. Dillard, Haupt v. Dillard*, 17

9  F.3d 285, 288-289 (9th Cir.1994), the Ninth Circuit identified

10  factual circumstances that might limit or eliminate collateral

11  estoppel effects of a prior criminal preliminary hearing: (1)

12  where there were facts presented to the judicial officer

13  presiding over the preliminary hearing which were additional to

14  (or different from) those available to the officers at the time

15  they made an arrest; or (2) where tactical considerations

16  prevented a litigant/prior criminal defendant from vigorously

17  pursuing the issue of probable cause during the prior criminal

18  prosecution/preliminary hearing.  *Haupt*, *supra*,  17 F.3d at 289.

19  In *McCutchen*, the Court of Appeals further held that an exception

20  exists to application of collateral estoppel,

21
22
23
24
25

      where the plaintiff alleges that the
arresting officer lied or fabricated evidence
presented at the preliminary hearing ... When
the officer misrepresents the nature of the
evidence supporting probable cause and that
issue is not raised at the preliminary
hearing, a finding of probable cause would
not bar relitigation of the issue of
integrity of the evidence.

26  73 Cal.App.4th at 1147.  *See also Awabdy v. City of Adelanto*, 368

60

1  F.3d 1062, 1068 (9th Cir.2004):

2          When an individual has a full and fair
            opportunity to challenge a probable cause
3          determination during the course of the prior
            proceedings, he may be barred from
4          relitigating the issue in a subsequent § 1983
            claim ... However, collateral estoppel does
5          not apply when the decision to hold a
            defendant to answer was made on the basis of
6          fabricated evidence presented at the
            preliminary hearing or as the result of other
7          wrongful conduct by state or local officials.

8       Plaintiff argues that, because of her evidence that

9  Defendants Hutton and Abbate, the only two witnesses at the

10 preliminary hearing, "acted in bad faith in procuring the

11 preliminary hearing determination," collateral estoppel is

12 inapplicable.

13      As Defendants reply, Plaintiff does not specify the

14 evidentiary support for her claim that evidence against her was

15 fabricated.  Plaintiff presents no evidence that the evidence

16 against her presented at the preliminary hearing was fabricated,

17 i.e., made up.  The same testimonial and documentary evidence

18 that Plaintiff is critical of here was presented at the

19 preliminary hearing and Defendant Hutton's testimony at the

20 preliminary hearing was the same information that was reflected

21 in his written investigation report.  Consequently, Plaintiff is

22 collaterally estopped to claim that the charge of embezzlement

23 against her was not based on probable cause.  Defendants' motion

24 for summary judgment on this ground is GRANTED.

25              iv.  <u>Defendants Hutton and Spencer Not</u>

26 <u>Involved In Any Criminal Proceedings Against Plaintiff</u>.

Defendants move for summary judgment that neither Defendants Hutton or Spencer were involved in the decision to prosecute Plaintiff or the subsequent criminal proceedings, including any efforts that might have been made to restrict her liberty.

"A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.  There is no respondeat superior liability under section 1983."  *Taylor v. List*, 840 F.2d 1040, 1045 (9th Cir.1989).  As explained in *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir.2007):

> An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation.  *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir.1996).  '"[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation.'  *Boyd*, 374 F.3d at 780.  But it does require some fundamental involvement in the conduct that allegedly caused the violation.  *See id.*

As to Defendant Spencer, Plaintiff argues that summary judgment on this ground be denied because of evidence that "Spencer arranged the meeting between his friends the Abbates and the members of his office and thereby necessarily participated in the decision to bypass the ordinary means of recourse to them, i.e., the Merced Police Department;" "Spencer told the Abbates they were in "good hands" with his office even though he had not seen the financial evidence at that point, or even knew the magnitude of the alleged embezzlement;" "Spencer met with defense

counsel and his staff regarding the case against Plaintiff;"
"Spencer 'may have' had a role in retaining the Cassabon
defendants;" and Spencer, an "experienced defendant[]," "must
have known that plaintiff, in accordance with law, would be
booked and subject to conditions of release, even if she was
released on her own recognizance."

As to Defendant Hutton, Plaintiff refers to evidence that
"Hutton was the appointed lead investigator and was told an
embezzlement case was 'coming to the office' even before he knew
any of the facts;" "Hutton and Abbate personally investigated the
case against the plaintiff;" "Hutton testified at the preliminary
hearing;" "Hutton met with the Cassabon defendants and gave them
instruction;" "Hutton testified falsely at plaintiff's trial,
claiming he did not review the financial evidence before the
preliminary examination because an accountant had already been
arranged;" "Hutton wrote the only reports submitted in connection
with the plaintiff's being charged with embezzlement;" and
Hutton, an "experienced defendant[]," "must have known that
plaintiff, in accordance with law, would be booked and subjected
to conditions of release, even if she was released on her own
recognizance.

Plaintiff argues that, although Defendants Spencer and
Hutton did not personally seize Plaintiff and did not serve as
the charging Deputy District Attorney with respect to the
criminal complaint, direct participation in those events is not
required in order to be liable under Section 1983.  Plaintiff

cites *Malley v. Briggs*, 475 U.S. 335, 345 n.7 (1986):

> Petitioner has not pressed the argument that
> in a case like this the officer should not be
> liable because the judge's decision to issue
> the warrant breaks the causal chain between
> the application for the warrant and the
> improvident arrest.  It should be clear,
> however, that the District Court's 'no
> causation' rationale in this case is
> inconsistent with out interpretation of §
> 1983.  As we stated in *Monroe v. Pape*, 365
> U.S. 167, 187 ... (1961), § 1983 'should be
> read against the backdrop of tort liability
> that makes a man responsible for the natural
> consequences of his actions.'  Since the
> common law recognized the causal link between
> the submission of a complaint and an ensuing
> arrest, we read § 1983 as recognizing the
> same causal link.

Plaintiff also cites *Day v. Morgenthau*, 909 F.2d 75, 77-78 (2nd Cir.1990):

> Arrests and searches ... 'are normally police
> functions, and they do not become
> prosecutorial functions merely because a
> prosecutor has chosen to participate.'
> *Robinson*, 821 F.2d at 918; *see also Barr*, 810
> F.2d at 362 (recognizing a 'meaningful'
> distinction 'between filing the criminal
> information and procuring an arrest warrant,
> on the one hand, and executing the arrest
> warrant, on the other').  The original
> complaint alleges that Moscow 'directed'
> Murray to arrest Day without a warrant and
> without probable cause, while all three men
> were in the same courtroom.  Since this
> allegation suggests that Moscow may have
> participated in 'executing the arrest,' it
> cannot be found 'beyond doubt that the
> plaintiff can prove no set of facts in
> support of his claim which would entitle him
> to relief.

Plaintiff further cites cases holding that a complaining witness

who makes knowingly false or reckless statements to procure an

arrest and instigate criminal proceedings may be liable.

Plaintiff cites, *inter alia*, *Morley v. Walker*, 175 F.3d 756, 760 (9th Cir.1999)(in discussing qualified immunity, "[w]e have held that a plaintiff must make not only a substantial showing of deliberate falsehood or reckless disregard for the truth regarding an officer's statements in an affidavit for a warrant, but establish that 'without the dishonestly included or omitted information,' the warrant would not have issued").

As to Defendant Hutton, Plaintiff contends that the issuance of a criminal complaint under California law does not institute a criminal proceeding, but is simply a basis for conducting a hearing to determine if probable cause exists to hold a person for trial.  Plaintiff cites *People v. Case*, 105 Cal.App.3d 826 (1980).

In *Case*, the defendant raised the argument that an arrest warrant was invalid unless criminal proceedings have been "initiated" by the filing of a complaint in municipal court.  The argument rested on the assumption that the word "complaint" in the statute authorizing arrest warrants, California Penal Code § 813, was the same "complaint" which must be filed with a magistrate to commence a felony prosecution, California Penal Code § 806.  105 Cal.App.3d at 830-831.  *Case* disposed of defendant's claim by pointing out the word "complaint" for purposes of issuing an arrest warrant meant the attesting officer's affidavit, not the accusatory pleading filed with the magistrate in municipal court.  *Case* stated that "[t]he only method of *initiating a criminal proceeding* in California is the

65

filing of an accusatory pleading in the court having trial jurisdiction over the charged offense," which meant an indictment or information in felony cases.  *Id.* at 833.  "Neither the preliminary hearing nor the proceedings before a grand jury amount to the 'institution of criminal proceedings.'  They are, instead, inquiries into whether there is available sufficient evidence to warrant the institution of criminal proceedings."  *Id.* at 834.

Relying on *Case,* Plaintiff argues that Defendant Hutton's "direct involvement in other aspects of the criminal process, including the preliminary examination, is sufficient to render him liable."

In reply, Defendants focus on Plaintiff's false arrest/liberty restriction claim and argue that it is undisputed that neither Defendant was involved in the decision to prosecute Plaintiff or any efforts to restrict her liberty.  Plaintiff's argument that these Defendants would have known that her liberty would be restricted by a court even though she was released on her own recognizance is simply speculative argument unsupported by any evidence.

Plaintiff's contentions present no basis for imposition of liability upon Defendant Spencer.  Plaintiff's evidence that he arranged a meeting between the Abbates and Defendant Hutton, that he told the Abbates that they were in "good hands" with Defendant Hutton, that he met, apparently once, with Plaintiff's defense attorney at an unspecified time, and that he may have had a role

in retaining Cassabon & Associates as the prosecution's expert following the conclusion of the preliminary hearing, do not constitute the "integral" involvement in the alleged violation of Plaintiff's Fourth Amendment right to be free from unlawful arrest/restriction on liberty or criminal charges without probable cause.  Plaintiff's assertion that Defendant Spencer must have known that her liberty would be restricted notwithstanding her OR status, is merely speculative argument unsupported by any evidence.

Summary judgment for Defendant Spencer on this ground is GRANTED; there is no evidence that Defendant Spencer was involved in the decision to prosecute Plaintiff or the subsequent criminal proceedings.  Summary judgment for Defendant Hutton on this ground is DENIED; Defendant Hutton was involved in the investigation of the alleged embezzlement and prepared the investigative report for review by the District Attorney's Office that was the basis for the filing of the criminal charges and the preliminary hearing.  However, because summary judgment for Defendant Hutton is granted on the basis of collateral estoppel, *see supra*, this ruling is immaterial to the resolution of Plaintiff's claims under the Fourth Amendment.

b.  Malicious Prosecution under Section 1983.

Defendants move for summary judgment to the extent that Plaintiff's claim that Defendants prosecuted Plaintiff maliciously without probable cause.

In the Ninth Circuit, the general rule is that a claim for

67

malicious prosecution is not cognizable under Section 1983 if process is available within the state judicial system to provide a remedy.  *Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir.1987) (citing *Bretz v. Kelman*, 562 F.2d 1026, 1031 (9th Cir.1985); *Cline v. Brusett*, 661 F.2d 108, 112 (9th Cir.1981). However, "an exception exists to the general rule when a malicious prosecution action is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights."  *Cline*, 661 F.2d at 112.  In order to prevail on a claim for malicious prosecution under Section 1983, a plaintiff must demonstrate not only a deprivation of a constitutionally protected right, but also all of the elements of the tort under state law.  *Haupt v. Dillard*, *supra*, 17 F.3d at 289.  "To prove a claim of malicious prosecution in California, the plaintiff must prove that the underlying prosecution: '(1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice.'"  *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir.2006).  "Malicious prosecution actions are not limited to suits against prosecutors but may be brought ... against other persons who have wrongfully caused the charges to be filed."  *Awabdy v. City of Adelanto*, *supra*, 368 F.3d at 1066.

### i.   Initiation of Prosecution.

As to Defendant Spencer, Defendants argue that he is

68

entitled to summary judgment on the element of initiation of the criminal prosecution.  Defendants contend that Defendant Spencer did not make the decision that the District Attorney's Office investigations unit would conduct an investigation of the embezzlement allegations; he did not participate in or offer direction to any aspect of the investigation; he did not request that criminal charges be brought against Plaintiff, did not participate in the decision to file the charges, and did not give direction to any prosecutors in this regard; did not file the criminal complaint or participate in its filing; did not request a warrant for Plaintiff's arrest or that she otherwise be taken into custody; and that his sole involvement with the criminal prosecution was to facilitate a meeting between the Abbates and the investigations unit of the District Attorney's Office.

Plaintiff responds that the evidence described above suffices to raise a genuine issue of material fact that Defendant Spencer wrongfully caused the criminal charges to be brought.

Summary judgment for Defendant Spencer on this ground is GRANTED.  Plaintiff's evidence does not raise an inference that Spencer participated in the initiation of the criminal prosecution.  His action was to introduce the Abbates to the District Attorney's Office investigator.  There is no evidence provided that Defendant Spencer did anything else in connection with the decision to bring charges against Plaintiff.

As to Defendant Hutton, Defendants refer to evidence that Hutton did not request that criminal charges be filed against

Plaintiff or participate in any request that criminal charges be brought against her; did not speak to the deputy district attorney who filed the charges, did not participate in drafting the criminal complaint, and did not request that Plaintiff be arrested or otherwise taken into custody.  Defendant Hutton wrote a report based on his investigation and submitted it for review; the report reflected what had been reported to him by Defendant Abbate and recapped the videotaped statement of Aceves.

As to Defendant Hutton, Defendants argue that he is entitled to a presumption of the prosecutor's exercise of independent judgment.

The Ninth Circuit has long recognized that "[f]iling a criminal complaint immunizes investigating officers ... from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time."  *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir.1981)(*Smiddy I*).  In *Smiddy v. Varney*, 803 F.2d 1469, 1471 (9th Cir.1986)(*Smiddy II*), the Ninth Circuit held that Smiddy had not overcome this presumption because he produced no evidence "that the district attorney was subjected to unreasonable pressure by the police officers, or that the officers knowingly withheld relevant information with the intent to harm [him], or that the officers knowingly supplied false information."  As explained in *Newman v. County of Orange*, 457 F.3d 991, 994 (9th Cir.2006), *cert. denied*, 549 U.S. 1253 (2007):

70

Our later cases further explained the types of evidence necessary to overcome the presumption.  In *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir.1988), we affirmed an award of damages that included attorneys' fees incurred defending against criminal charges of which the plaintiffs were acquitted.  The prosecutor based the decision to prosecute solely on the information contained in the officers' reports, but the plaintiffs highlighted striking omissions in those reports as well as the fact that the officers themselves offered conflicting stories.  *Id.* On the basis of such evidence, '[t]he jury was entitled to find ... that [the officers] procured the filing of the criminal complaint by making misrepresentations to the prosecuting attorney.'  *Id.* ....

In *Barlow v. Ground*, 943 F.2d 1132 (9th Cir.1991), ... we held that a civil rights plaintiff seeking attorneys' fees had also produced sufficient evidence to overcome the *Smiddy* presumption.  There ... the prosecutor relied solely on the arresting officers' reports, which omitted critical information ... Further, an independent witness corroborated at least part of the plaintiff's version of events and the officers' accounts conflicted ....

*In contrast, we have stated that a plaintiff's account of* the incident in question, by itself, does not overcome the presumption of independent judgment.  *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir.1994).

*See also Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir.2008)(presumption "may be rebutted if the plaintiff shows that the independence of the prosecutor's judgment has been compromised").

Plaintiff argues that her evidence of Defendant Hutton's participation in the investigation suffices to withstand summary

71

judgment.  With regard to the presumption of prosecutorial judgment, Plaintiff refers to evidence that Defendant Hutton "failed to disclose Aceves' coercion and also acted in bad faith in testifying."  However, the transcript of the interview of Aceves by Abbate and Hutton negates any inference of coercion by Defendant Hutton.  The transcript of the interview establishes that neither Abbate nor Hutton named Plaintiff as a suspect; Aceves did.  This was not at Hutton's suggestion.  Plaintiff also asserts that "ample evidence" shows that Hutton "was willfully blind to the weaknesses of the case against plaintiff and also failed to do an independent investigation or scrutinize Abbate's suspect analysis and reports."[2]

Plaintiff cites no authority that an investigator's trial testimony is relevant to overcoming the presumption.  In addition, Plaintiff cites no authority that a an allegedly negligent failure to conduct an independent financial investigation, if revealed to the prosecutor, is even relevant to the presumption.

As Defendants reply, the evidence establishes that all Hutton did was document information provided to him by Abbate and Aceves, information substantiated by documentary proof submitted to the prosecuting attorney.  There is no evidence that Hutton testified falsely at the preliminary hearing; he testified to the

---

[2]Plaintiff cites *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-1227 (9th Cir.2002) and *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir.1997).  Both of these cases involved the sufficiency of pleading, not summary judgment.

same information contained in his report to the prosecutor.   The

analysis of the financial information provided by Abbate was the

duty of Plaintiff's criminal defense lawyer and the prosecutor.

As Defendants argue:

> Defendant HUTTON had no involvement in
> compiling the data and simply passed
> information on to the prosecutors.   The
> decision in determining whether there was
> sufficient evidence from the documentation
> that plaintiff embezzled was made by the
> prosecutor.   Had the prosecutor thought there
> were insufficient facts to file charges
> against plaintiff, he could have declined to
> do so and/or requested additional follow up
> investigation.   Neither occurred ...
> Defendant HUTTON should not be held to a
> higher standard than a deputy district
> attorney in determining whether there was
> sufficient cause to warrant charges against
> plaintiff.

It is undisputed that Hutton did not withhold any information in

his report or include any false information.   He did not

manipulate or falsify any Yosemite Chevron business records,

never spoke to the deputy district attorney who filed the

criminal complaint about his investigation, never requested any

specific charges against Plaintiff, and did not have any input,

other than his report, in the decision to file charges against

Plaintiff.

Summary judgment as to Defendant Hutton on this ground is

GRANTED.

### ii.   Malicious Motivation.

Defendants move for summary judgment on the malice element

of the Section 1983 malicious prosecution claim.

1          As explained in *Ayala v. KC Environmental Health*, 426

2    F.Supp.2d 1070, 1091 (E.D.Cal.2006), *aff'd*, 2007 WL 4553473 (9th

3    Cir.2007):

4                    Malice means 'actuated by a wrongful motive,
                     i.e., the party must have had in mind some
5                    evil or sinister purpose.' ... Malice is
                     established when 'the former suit was
6                    commenced in bad faith to vex, annoy or wrong
                     the adverse party.' ... Malice must be proven
7                    against a particular defendant to justify an
                     award of compensatory damages against that
8                    defendant ... Malice may be proved by direct
                     evidence or may be inferred from all
9                    circumstances in the case ... Malice may, but
                     need no necessarily, be inferred from want of
10                   probable cause ....

11        Defendants refer to evidence that Spencer did nothing with

12   respect to the investigation or prosecution of the criminal

13   charges except facilitate a meeting between the Abbates and

14   District Attorney's Office investigators, that he did not harbor

15   any ill-will, animosity or malicious intent against Plaintiff,

16   and did not know who she was.  Defendants also refer to evidence

17   that Hutton did not know the Abbates personally prior to the

18   investigation, did not know Plaintiff, and harbored no ill-will,

19   animosity or malicious intent against Plaintiff.

20        Plaintiff responds that there is ample evidence that

21   Defendants Spencer and Hutton failed to act in good faith and

22   submits that malice is a question of intent that can be proved

23   solely by circumstantial evidence.

24        Plaintiff's evidence does not permit an inference that any

25   actions of Defendant Spencer were motivated by malice against

26   Plaintiff.  Defendant Spencer merely facilitated a meeting

74

between Defendant Abbate and investigators of the District Attorney's Office.  There is no evidence that Defendant Spencer had any further involvement in the investigation or the decision by the assigned prosecuting attorney to bring charges against Plaintiff.  Summary judgment as to Defendant Spencer on this ground is GRANTED.

As to Defendant Hutton, Plaintiff's evidence does not support an inference that he acted with malice against Plaintiff. Hutton did not know Plaintiff and had no prior involvement with Defendants.  There is no evidence that Hutton knowingly included fabricated evidence in his investigative report and Plaintiff's claim that Aceves was coerced by Hutton is factually baseless. Summary judgment for Defendant Hutton on this ground is GRANTED.

iii.  **Probable Cause**.

*See discussion supra*.

c.  **Absolute Prosecutorial Immunity - Defendant Spencer**.

Defendant Spencer moves for summary judgment on the ground of absolute prosecutorial immunity.  Although Defendants contend that Spencer had no involvement in the criminal investigation or prosecution against Plaintiff, to the extent Spencer could be considered to have been involved, the evidence is clear that he never took on the role of an investigator or took any actions that would take him outside absolute prosecutorial immunity.

"[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor."  *Buckley v.*

*Fitzsimmons*, 509 U.S. 259, 273 (1993).  The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. *Id.* at 269.  "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486-487 (1991).

Prosecutorial immunity protects eligible government officials who perform functions "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).  "Such immunity applies even if it leaves the genuinely wronged [plaintiff] without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Ashelman v. Pope,* 793 F.2d 1072, 1075 (9th Cir. 1986).  Acts undertaken by a prosecutor "in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State," are entitled to the protection of absolute immunity. *Kalina v. Fletcher*, 522 U.S. 1128, 126 (1997).  "The intent of the prosecutor when performing prosecutorial acts plays no role in the immunity inquiry." *McCarthy v. Mayo*, 827 F.2d 1310, 1315 (9th Cir.1987).

In *Burns v. Reed, supra*, the Supreme Court held that absolute immunity applied to a prosecutor's "appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing.  500 U.S. at 492.  The Supreme Court reasoned that "appearing before a judge and presenting evidence in support of a motion for a search warrant

76

clearly involve the prosecutor's role as an advocate for the State, rather than his role as an administrator or investigative officer." *Id.* at 491.   The prosecutor was thus immune from liability based on the plaintiff's allegations that he had elicited false testimony during the hearing. *Id.* at 482.   The Supreme Court refused to grant absolute immunity for the prosecutor's act of providing legal advice to the police. *Id.* at 496.   The Supreme Court rejected the argument that giving legal advice is related to a prosecutor's role in screening cases for prosecution:

> That argument ... proves too much.  Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive.  Rather, as in *Imbler*, we inquire whether the prosecutor's actions are *closely associated with the judicial process*.

In *Buckley v. Fitzsimmons*, *supra*, the Supreme Court denied absolute immunity to prosecutors who were sued for fabricating evidence "during the early stages of the investigation" where "police officers and assistant prosecutors were performing essentially the same investigative function."  509 U.S. at 262-263.   The Supreme Court reasoned:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.  When a prosecutor performs the

77

> investigative functions normally performed by
> a detective or police officer, it is 'neither
> appropriate nor justifiable that, for the
> same act, immunity should protect the one but
> not the other.'

*Id.* at 273.  The Supreme Court ruled that "[a] prosecutor neither

is, nor should consider himself to be, an advocate before he has

probable cause to have anyone arrested."  *Id.* at 274.

   In *Kalina v. Fletcher, supra*, the Supreme Court denied

absolute prosecutorial immunity to a prosecutor who filed the

equivalent of an affidavit in support of a motion for an arrest

warrant.  The prosecutor had filed an information charging

burglary, a motion for an arrest warrant, and a "Certification

for Determination of Probable Cause."  The Supreme Court

reasoned:

> [P]etitioner's activities in connection with
> the preparation and filing of two of the
> three charging documents - the information
> and the motion for an arrest warrant - are
> protected by absolute immunity.  Indeed,
> except for her act in personally attesting to
> the truth of the averments in the
> certification, it seems equally clear that
> the preparation and filing of the third
> document in the package was part of the
> advocate's function as well.

*Id.* at 129.  However, in personally attesting, "petitioner

performed an act that any competent witness might have

performed,' and was thus not entitled to absolute immunity.  *Id.*

at 129-130.  "Even when the person who makes the constitutionally

required 'Oath or affirmation' is a lawyer, the only function

that she performs in giving sworn testimony is that of a

witness."  *Id.* at 131.

Plaintiff argues that Defendant Spencer is not entitled to summary judgment on this ground:

> It is undisputed that the District Attorney's Office bypassed the law enforcement agency with primary jurisdiction, the Merced Police Department, and did all of the investigation itself. The evidence is further undisputed that Spencer was involved in the original investigative meeting and consulted with his staff members during the investigation stage and further participated in the decision to retain the Cassabon firm. Furthermore, Spencer acted as the supervisor of his office during the investigation stage and the evidence shows he specifically placed the Abbates in Hutton's 'good hands.'

Plaintiff asserts that Spencer is being sued for his investigative acts, "both direct and supervisorial." As explained in *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991):

> Supervisor liability is imposed against a supervisory official in his individual capacity for his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' ...; for his '"acquiesce[nce] in the constitutional deprivations of which [the] complaint is made,"' ...; or for conduct that showed a '"reckless or callous indifference to the rights of others."' ....

As Defendants reply, there is no admissible, factual support for Plaintiff's contention that "the District Attorney's Office bypassed the law enforcement agency with primary jurisdiction, i.e., the Merced Police Department" and instead handled the investigation itself. There is no evidence that the Merced Police Department had "primary jurisdiction" over a claim of embezzlement, nor is there any evidence that it was uncommon for

the District Attorney's Office to be the primary investigative agency for financial crimes in the City and/or County of Merced. Plaintiff's reliance on Hutton's deposition testimony is misplaced because Hutton did not so testify at the cited portion of his deposition. Plaintiff's contention is irrelevant because, although Defendant Abbate could have complained of the suspected embezzlement to the City of Merced Police Department, that does not mean it was outside "normal procedure" for the District Attorney's Office to handle such an investigation when it received the initial complaint. There is evidence that a former City of Merced Police Officer, Marty Clair, referred Jim Abbate to the District Attorney's Office, rather than to the City of Merced Police Department. The response to Mr. Little's 2006 email to the District Attorney's Office is hearsay, there is no evidence who responded to the email, and the email was sent three years after the investigation leading to the filing of criminal charges against Plaintiff. Further, Defendant Spencer testified:

> BY MR. LITTLE: [¶] Q.  Back in 2003, was the Merced County District Attorney's Office the primary investigating agency regarding any other embezzlement matter?
>
> ...
>
> THE WITNESS: We have a long history of investigating embezzlement cases.  That specific time frame, were we investigating a case at that moment, I can't tell you.
>
> BY MR. LITTLE: [¶] Q.  When you first heard this information from Jim Abbate, as you already described, did you consider this to be a theft case or an embezzlement case or you didn't know?

1    A.  It sounded like it was theft by an
     employee.  That was the description.

2

3    Q.  Back in 2003, did the Merced D.A.'s
     office serve as the primary investigating
     agency in any employee theft cases?

4

5    ...

6    THE WITNESS: We have - I believe I've
     answered that.  We have a long history of
     investigating cases involving that type of

7    crime.

8    BY MR. LITTLE: [¶] Was it the same - and I
     just want to be clear.  So if a business

9    owner came to the Merced D.A.'s office in
     2003 with a complaint of theft by an

10   employee, that's something that your office
     would take on as the primary investigating

11   agency?

12   ...

13   THE WITNESS: We had done that and we did do
     it.

14

15   BY MR. LITTLE: [¶] Q.  Can you give me an
     average per year of how many employee theft
     cases the D.A.'s office was involved in as

16   the primary investigating agency?

17   MR. ARENDT: For what period of time?

18   BY MR. LITTLE: [¶] Q.  The last five years of
     your tenure.

19

20   A.  No.

21   Q.  Can you tell me about any specific cases
     where the Merced D.A.'s office was the
     primary investigating agency in the last five

22   years of your tenure other than this one?
     And I just want to make sure.  Operating

23   under an assumption - I just want to make
     sure I'm not loading my question. [¶] Do you

24   agree that your office was the primary
     investigating agency regarding the claim that

25   Ms. Fenters stole from Yosemite Chevron?

26   A.  Yes.  You want examples?  Do you want a

                          81

1        couple of examples?

2        Q.  Any one.

3        A.  There was an embezzlement from a dress
         shop and that person to my knowledge had no
4        contact at all with the district attorney's
         office, approached an investigator and
5        investigation was launched.  And, frankly, I
         didn't want to do that investigation, but -
6        because the daughter of that woman went to
         school with my son, same grade, same class,
7        but we did it.  Another case involving -

8        Q.  Okay.  So in that case, the alleged
         victim, her son, went to school with your
9        son?

10       A.  No.  The alleged responsible.

11       Q.  Do you remember the last name of the
         defendant in that case?
12
         A.  I remember but not right at this moment.
13
         Q.  Well, if it pops into your head at any
14       time during today's deposition or even when
         you're reviewing the transcript or at any
15       time, you can either tell me or -

16       A.  Okay.

17       Q.  Make a notation in the transcript or tell
         Mr. Arendt, okay?
18
         A.  Mr. Hutton worked on that case too.  He
19       may remember the name.

20       Q.  Laudate?

21       A.  That's the name.

22       Q.  L-a-d-o-t-t-i?

23       A.  I have no idea.

24       Q.  Can you tell me about any other specific
         incidents in the last five years where the
25       D.A.'s office has served as the primary
         investigating agency in a case involving
26       allegations of employee theft?

                        82

1          **A.   Theft from a cattle auction company.**

2          **Q.   Okay.**

3          **A.   Theft from the county, theft from the**
        **Sheriff's office at the county.  I know there**
4          **are others.  None come to mind at the moment,**
        **but there are plenty.**

5

6  **[Spencer Depo., 34:17-38:6]   Spencer's deposition testimony does**

  **not support Plaintiff's contention that Spencer could only**
7
  **provide two examples of employee embezzlement cases, other than**
8
  **plaintiff's, where the District Attorney's Office investigated in**
9
  **the last five years of Spencer's tenure as District Attorney.**
10
  **Spencer asked Mr. Little if he wanted a couple of examples, and**
11
  **Mr. Little responded "any one."**
12
    **As to Plaintiff's contention that Defendant Spencer was**
13
  **involved in the investigation of the Yosemite Chevron employee**
14
  **embezzlement complaint, the evidence is that Spencer's only**
15
  **involvement in the investigation was to introduce Hutton, and**
16
  **Chief Murphy to the Abbates at the May 14, 2003 meeting.**
17
  **Although Plaintiff disputes this evidence, contending that,**
18
  **because Spencer might have been at this meeting for a longer**
19
  **period of time than initially recalled, there would have been no**
20
  **reason to remain at the meeting if this was his only purpose,**
21
  **Plaintiff presents no evidence that Spencer had any involvement**
22
  **in the investigation other than facilitating the May 14, 2003**
23
  **meeting and perhaps sitting in during some portion of that**
24
  **meeting.  Plaintiff's assertion that Defendant Hutton testified**
25
  **at his deposition that Hutton recalls having contact with Spencer**
26

1  after the initial May 14, 2003 meeting with Hutton, Murphy and

2  the Abbates is not substantiated by the cited portion of Hutton's

3  deposition:

4              BY MR. LITTLE: [¶] Q.  Do you know whether or
             not you spoke with Gordon Spencer prior to
5              this May 14ᵗʰ meeting?

6              MR. ARENDT: With respect to?

7              BY MR. LITTLE: [¶] Q.  This matter.

8              A.  Correctly answered, it would be yes, I
             know, but I did not speak with him prior to.
9
[Hutton Depo. 11:16-22]   Plaintiff's contention that Spencer had
10
input in the decision to retain Cassabon & Associates after the
11
preliminary hearing is not evidence that Spencer participated in
12
the investigation leading to the filing of criminal charges
13
against Plaintiff.  Defendant Spencer testified at his
14
deposition:
15
             BY MR. LITTLE: [¶] Q.  Now, did you have any
16              input in whether or not to retain a forensic
             accounting firm after the preliminary
17              hearing?

18              A.  You know, that's entirely possible.

19              Q.  Why do you say that?

20              A.  Because, you know, there was a practice,
             I suppose, is that if they want to hire
21              somebody, they say, hey, we want to hire
             somebody for this, and I'd say okay.
22
             Q.  And you would typically have to approve
23              the disbursement of funds for that purpose?

24              A.  I don't actually know if I had to
             actually approve it, but I usually got asked.
25
             Q.  Do you have a belief one way or the other
26              whether that was the situation here?

```
        A.  If there was a firm that was hired,
        somebody probably asked me if they could hire
        a firm.

        Q.  You don't recall any specific
        conversation in that regard, however?

        A.  No.
```

[Spencer Depo.66:7-67:2]

As to Plaintiff's contention that Defendant Spencer was

involved in the investigation of the criminal case against

Plaintiff because of Spencer's deposition testimony that Spencer

was updated about the case by Deputy District Attorney Bacciarini

and Defendant Hutton on at least one occasion, Defendant Spencer

testified, in the context of Mr. Little's questions whether an

attempt was made by the District Attorney's Office to obtain a

statement from Plaintiff:

```
        Q.  You believed that you knew during the
        pendency of this case - by that, I'm talking
        about what you just testified to, you believe
        there was some effort to contact her to set
        up an interview first directly and then by
        the Police Chief of Gustine?

        ...

        THE WITNESS: I believe that - frankly believe
        I learned of that after this lawsuit was
        filed.

        BY MR. LITTLE: [¶] Q.  From who?

        A.  Hutton and Bacciarini, one or the other
        or both.

        Q.  Have you had any conversations with Mr.
        Hutton and/or Mr. Bacciarini outside the
        presence of counsel in this case?

        A.  I think I had a brief conversation with
        one or both of them.
```

1      Q.  What do you recall –

2      A.  Well –

3      Q.  – about those conversations?

4      A.  During the period of time when I was
       working on another case, I was down in the
5      investigator's office when [sic] Mr.
       Bacciarini and Mr. Hutton worked, and I think
6      there was a conversation, very short
       conversation because it was done and over.  I
7      think it was related to the press coverage of
       the matter.

8
       Q.  Do you recall any specifics?
9
       A.  I think I asked or we discussed if we had
10     tried to contact her to get her version of
       the case, and I was told that those efforts
11     had been made.

12     Q.  And the time frame that I'm assuming
       you're talking about in your previous answer
13     was contacting her before the filing of
       charges.
14
       ...
15
       A.  That's what I understood.
16
[Spencer Depo. 70:6-71:18]
17
       As to Plaintiff's contention that there is circumstantial
18
evidence that Defendant Spencer intended to prosecute Plaintiff
19
for embezzlement from Yosemite Chevron regardless of the facts,
20
Defendants refer to Defendant Hutton's deposition testimony
21
relied upon by Plaintiff:
22
       Q.  How did you learn anything about this
23     matter?  What was your source of information?

24     A.  Initially, my chief investigator Dan
       Murphy told me that there was an embezzlement
25     case that was coming to our office, asked me
       to sit in on a meeting, and like I said, I
26     don't recall if that was the day before.  It

                                   86

1      could have been within a couple of days or
that morning.

2

3      Q.  To the best of your recollection, what
information did you receive from Mr. Murphy
regarding the alleged embezzlement case?

4

5      A.  That a couple of employees from Yosemite
Chevron were alleged to have embezzled funds
and that - I believe at that time I was told

6      that both employees were no longer with the
company.  I either learned that from Dan

7      prior to or at the meeting, and that was
really about it.

8

9      Q.  Okay.  When you first were contacted by
Mr. Murphy, did he tell you what his source
of information was?

10

11     A.  Initially, I don't know.  I know that
Gordon had brought - Gordon Spencer had
brought the information to Dan, but I don't

12     know if Dan told me that initially or
subsequent to our - or when we met with

13     Robert Abbate on that morning of May 14th.

14     ...

15     Q.  Did you become aware at any time prior to
the preliminary hearing that Mr. Spencer had

16     some familiarity with the Abbate family?

17     ...

18     THE WITNESS: From my recollection of the May
14th meeting, the Abbates had gone to Mr.

19     Spencer with their allegation, and then he
had asked Chief Investigator Murphy to set up

20     a meeting.  So there was an assumption on my
part that Gordon knew them somehow because

21     they went to him instead of directly to us.

22     ...

23     Q.  Did Mr. Spencer ever provide you with any
information that corroborated that suspicion

24     of yours?

25     A.  I believe his purpose in being at the May
meeting was to introduce people, but other

26     than making the introductions, I don't know

1                what his relationship is with the Abbates.  I
don't think a discussion of their
2                relationship with him was part of that
meeting.
3

                Q.  At any point during the pendency of this
4                case, did Mr. Spencer provide you with
information indicating that he was familiar
5                with the Abbate family before they approached
him to set up this meeting?
6

                ...
7

                THE WITNESS: Other than that May 14th
8                meeting, I never spoke to Mr. Spencer about
this investigation.
9

[Hutton Depo. 8:2-9:1, 35:18-36:23].  There is also Defendant
10
Spencer's deposition testimony, relied upon by Plaintiff:
11
                Q.  In the instances where you say, okay,
12                we'll set up a meeting, do you always attend
those meetings or at least a part of it?
13
                A.  More often than not.
14
                Q.  But sometimes when people come to you
15                with complaints of alleged criminal activity,
you tell them just to write it down?
16
                A.  Well, if it's a - yeah.  You wouldn't
17                tell somebody to write down an embezzlement
thing.  It would be a book.  You wouldn't do
18                that.
19
                Q.  But when you were first told about this,
20                you wouldn't know whether it was an
embezzlement or a theft, correct?
21
                A.  I consider thefts by employees from
22                employers embezzlement.  That's just
generically what I think about.
23
                Q.  But you didn't know if it was small in
24                magnitude or great?

25                ...

                THE WITNESS: I knew that it would be easier
26                explained and talked about and questioned in

1              a meeting rather then write.

2              Q.  But the answer to my question was yes,
               when you first heard about this from Jim,
3              whether that initial conversation was in
               person or on the phone, you didn't know at
4              that point what the alleged magnitude was?

5              ...

6              THE WITNESS: Whenever the allegation is
               embezzlement, it's better spoken about in
7              person.

8    [Spencer Depo. 52:5-53:10].  Defendants also refer to Spencer's

9    deposition testimony, relied upon by Plaintiff:

10             Q.  Now, did you provide any input during
               that meeting that was attended by Jim and Bob
11             Abbate and Mr. Hutton and yourself?

12             MR. ARENDT: Vague.

13             BY MR. LITTLE: [¶] Q.  Well, did you say
               anything during that meeting?
14
               A.  I'm sure I did.
15
               Q.  Do you recall anything in particular that
16             you said?

17             A.  Well, it was listening to what they said
               and excusing myself when I left.  And I might
18             have said something, you guys are in good
               hands.
19
     [Spencer Depo. 54:10-22].
20
          As to Plaintiff's reliance on the deposition testimony of
21
     Virgil Fenters that James Swanson, the Deputy District Attorney
22
     handling the case against Plaintiff after the preliminary hearing
23
     until just before it went to trial, allegedly told Plaintiff's
24
     criminal defense attorney, Mr. Sousa, that he, Mr. Swanson, was
25
     not permitted to resolve the case via a misdemeanor petty theft
26

                                   89

plea, this testimony is inadmissible as hearsay and for lack of foundation.  Even if admissible, a decision regarding plea bargaining is clearly a prosecutorial action entitled to absolute immunity.  Finally, Virgil Fenters admitted in his deposition that he had no information that Defendant Spencer had any involvement with respect to this conversation.

Summary judgment for Defendant Spencer on the ground of absolute prosecutorial immunity is GRANTED.

### d.   Qualified Immunity.

Defendants move for summary judgment on the ground that Defendants Spencer and Hutton are entitled to qualified immunity from liability for damages under Section 1983.  Because summary judgment for Defendant Spencer is granted on the ground of absolute prosecutorial immunity, it is only necessary to address qualified immunity as to Defendant Hutton.

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009), the Supreme Court summarized the purpose of qualified immunity:

> Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified

immunity applies regardless of whether the
government official's error is "a mistake of
law, a mistake of fact, or a mistake based on
mixed questions of law and fact." *Groh v.
Ramirez*, 540 U.S. 551 (2004) (Kennedy, J.,
dissenting) (citing *Butz v. Economou*, 438
U.S. 478, 507 (1978) (noting that qualified
immunity covers "mere mistakes in judgment,
whether the mistake is one of fact or one of
law")).

Because qualified immunity is "an immunity
from suit rather than a mere defense to
liability ... it is effectively lost if a
case is erroneously permitted to go to
trial." *Mitchell v. Forsyth*, 472 U.S. 511,
526 (1985) (emphasis deleted). Indeed, we
have made clear that the "driving force"
behind creation of the qualified immunity
doctrine was a desire to ensure that
"'insubstantial claims' against government
officials [will] be resolved prior to
discovery." *Anderson v. Creighton*, 483 U.S.
635, 640, n. 2 (1987). Accordingly, "we
repeatedly have stressed the importance of
resolving immunity questions at the earliest
possible stage in litigation." Hunter v.
Bryant, 502 U.S. 224, 227 (1991) (per
curiam).

Deciding qualified immunity normally entails a two-step analysis.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, "taken in the

light most favorable to the party asserting the injury, do the

facts alleged show the officers' conduct violated a

constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201

(2001).  If the court determines that the conduct did not violate

a constitutional right, the inquiry is over and the officer is

entitled to qualified immunity.  However, if the court determines

that the conduct did violate a constitutional right, *Saucier*'s

second prong requires the court to determine whether, at the time

of the violation, the constitutional right was "clearly

1    established." *Id.* "The relevant, dispositive inquiry in
2    determining whether a right is clearly established is whether it
3    would be clear to a reasonable officer that his conduct was
4    unlawful in the situation he confronted." *Id.* at 202.  This
5    inquiry is wholly objective and is undertaken in light of the
6    specific factual circumstances of the case. *Id.* at 201.   Even
7    if the violated right is clearly established, *Saucier* recognized
8    that, in certain situations, it may be difficult for a police
9    officer to determine how to apply the relevant legal doctrine to
10   the particular circumstances he faces.  If an officer makes a
11   mistake in applying the relevant legal doctrine, he is not
12   precluded from claiming qualified immunity so long as the mistake
13   is reasonable.  If "the officer's mistake as to what the law
14   requires is reasonable, ... the officer is entitled to the
15   immunity defense." *Id.* at 205.  In *Pearson*, the Supreme Court
16   ruled that "while the sequence set forth [in *Saucier*] is often
17   appropriate, it should no longer be regarded as mandatory."
18   *Pearson, id.* at 818.  "The judges of the district courts and the
19   courts of appeal should be permitted to exercise their sound
20   discretion in deciding which of the two prongs of the qualified
21   immunity analysis should be addressed first in light of the
22   circumstances in the particular case at hand." *Id.*   In *Brosseau*
23   *v. Haugan*, 543 U.S. 194 (2004), the Supreme Court reiterated:

24              Qualified immunity shields an officer from
                suit when she makes a decision that, even if
25              constitutionally deficient, reasonably
                misapprehends the law governing the
26              circumstances she confronted. *Saucier v.*

*Katz*, 533 U.S., at 206 (qualified immunity operates 'to protect officers from the sometimes "hazy border between excessive and acceptable force"'). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' *Id.*, at 201. As we previously said in this very context:

'[T]here is no doubt that *Graham v. Connor, supra*, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, that is not enough. Rather, we emphasized in *Anderson* [*v. Creighton*] "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.' ... The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' ...

The Court of Appeals acknowledged this statement of law, but then proceeded to find fair warning in the general tests set out in *Graham* and *Garner* ... In so doing, it was mistaken. *Graham* and *Garner,* following the lead of the Fourth Amendment's text, are cast

93

1    at a high level of generality.  See *Graham v. Connor*, *supra*, at 396 ('"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application"').  Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.'

543 U.S. at 198-199.  However, as explained in *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom. Scarrot v. Wilkins*, 543 U.S. 811 (2004):

> Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.  *See Saucier*, 533 U.S. at 216 ... (Ginsberg, J., concurring)('Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official.').

Even if summary judgment is denied on the ground that neither Defendants Spencer or Hutton violated Plaintiff's constitutional rights as alleged, based upon the information presented to Defendant Hutton by Defendant Abbate and Aceves, a reasonable investigator would conclude there was probable cause to believe Plaintiff embezzled funds from Yosemite Chevron.

Probable cause to arrest exists if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the plaintiff] had committed a crime.  *Beier v. City of Lewiston*, 354 F.2d 1058, 1065 (9th Cir.2004).  The proper inquiry where an officer is claiming qualified immunity for a false

arrest claim is "whether a reasonable officer could have believed that probable cause existed to arrest the plaintiff." *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir.2002).  Qualified immunity does not depend on whether probable cause actually existed.

Plaintiff argues that summary judgment on the ground of qualified immunity should be denied: "[T]he record is replete with evidence that these defendants disregarded the lack of proof and acted in bad faith in bypassing the Merced Police Department and instead performing [sic] a result oriented investigation that ended with plaintiff's being charged with embezzlement."

Plaintiff presents no evidence that Hutton knew of any alleged coercion by Abbate of Aceves to get Aceves to implicate Plaintiff.  The tape of the interview of Aceves by Abbate and Hutton demonstrates no coercion; Aceves testified in his deposition that he was not coerced and that he first initiated mention of Plaintiff to Abbate.  There is evidence from which it could be inferred that Defendant Hutton relied solely on the financial evidence prepared by Abbate and did not conduct an independent investigative report.  However, Abbate's financial report was ruled inadmissible at the preliminary hearing; nonetheless, the state court nonetheless found probable cause to hold Plaintiff to answer.

Summary judgment as to Defendant Hutton on the ground of qualified immunity is GRANTED.

4.  <u>CONSPIRACY</u>.

Defendants move for summary judgment to the extent Plaintiff

95

claims that Defendants Spencer and Hutton conspired with the
Abbate Defendants and the Cassabon Defendants to violate
Plaintiff's constitutional rights.

To prove a conspiracy, Plaintiff must show "an agreement or
'meeting of the minds' to violate constitutional rights."
*Franklin v. Fox*, *supra*, 312 F.3d at 441.  Each individual does
not need to know the plan; sharing the common purpose of the
conspiracy is sufficient.  *Id*.  A private individual may be
liable if he conspired with a state actor.  *Id.*

"The defendants must have, by some concerted action,
intended to accomplish some unlawful objective for the purpose of
harming another which results in damage."  *Mendocino Envtl. Ctr.
v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir.1999).  This
agreement or meeting of the minds may be inferred on the basis of
circumstantial evidence, such as the actions of the defendants.
*Id*.  A showing that defendants committed acts that 'are unlikely
to have been undertaken without an agreement' may support the
inference of a conspiracy.  *Id*.  Nonetheless, Plaintiff is
"required to produce 'concrete evidence' of an agreement or
'meeting of the minds" between Defendants Spencer and Hutton and
the Abbate and Cassabon Defendants to violate Plaintiff's
constitutional rights.  *Radcliffe v. Rainbow Const. Co.*, 254 F.3d
772, 782 (9th Cir.), *cert. denied*, 534 U.S. 1020 (2001).

Defendants argue that Plaintiff has not provided evidence
from which it may be inferred that Defendant Spencer conspired
with any of the other defendants to prosecute Plaintiff for

96

embezzlement without probable cause: "Defendant SPENCER literally had no involvement in the investigation or prosecution of Plaintiff other than facilitating the original meeting between the ABBATES and defendant HUTTON."  As to Defendant Hutton, Defendants contend that the evidence establishes that Hutton simply conducted an investigation, documented his work and submitted it to the prosecuting attorneys.

Plaintiff responds that summary judgment for either Defendants Spencer or Hutton is not appropriate:

> The evidence shows that the Abbates contacted their personal Friend [sic], Spencer, who thereafter set up a meeting to begin an investigation without scrutiny into suspicious and unsupported aspects of embezzlement.  The evidence shows that this was uncommon and that the Merced Police department [sic] would have normally investigated.  The evidence also shows that Abbate's false and fabricated allegations went purposefully unscrutinized by all of the other participants in the criminal case and that a felony disposition as well as custody time and full restitution, were at all times insisted upon against a young woman with no criminal record and against whom the evidence was thin, even after Aceves recanted his coerced allegations.  In sum, the evidence shows that all of the participants shared a goal of disregarding the truth and good faith investigation and proceeded to attempt to railroad the plaintiff, only after she had quit her employment at Yosemite Chevron due to wage and hour and sex harassment issues.  This evidence is sufficient for a jury to find a conspiracy existed.

None of the evidence against Defendant Spencer suffices to establish his involvement in the alleged conspiracy.  Jim Abbate, the brother of Defendant Abbate, was advised by Marty Clair, a

97

former detective with the Merced Police Department, to bring the claim of embezzlement to the District Attorney's Office.   There is no evidence that Defendant Spencer had any participation in Clair's advice.   The evidence about "friendship" between Spencer and Abbate is sparse.   No consistent pattern of socializing, vacations, mutual gift-giving, or other inter-personal or inter-familial relationships are shown.   That two individuals belong to the same country club is not enough.   There is no evidence that Abbate was a political contributor to Spencer or had other financial dealings with him.

There is no evidence that Defendant Spencer was involved in the investigation or prosecution of Plaintiff after he introduced the Abbates to the District Attorney's Office investigators.   The fact that the District Attorney's Office investigated the Abbates' charge of embezzlement against Plaintiff instead of the City of Merced Police Department is irrelevant, absent a showing that the District Attorney did not have the legal authority to conduct the investigation or an enforceable agreement that the District Attorney ceded jurisdiction to the Merced Police Department.   There is no evidence that Defendant Hutton agreed with the Abbate Defendants and/or the Cassabon Defendants to investigate the claimed embezzlement, or to conduct a superficial and/or allegedly incompetent investigation, or to submit his investigative report to the prosecutors for review and determination to bring charges.   Hutton did not know Plaintiff nor is there evidence of animus against her.   That his

98

1   investigation was ineffective, if not incompetent, does not make

2   him a conspirator.

3        D.   **DEFENDANT COUNTY OF MERCED**.

4        Defendants move for summary judgment as to the County of

5   Merced.

6        As to the First Cause of Action for violation of Section

7   1983, Defendants assert that Plaintiff has not established

8   liability of the County under *Monell v. Department of Social*

9   *Services,* 436 U.S. 658, 691 (1978).  Defendants refer to

10  Plaintiff's response to the County's interrogatory requesting

11  Plaintiff to state with particularity all customs and policies of

12  the County giving rise to Plaintiff's constitutional violation

13  claims: "Plaintiff contends, upon information and belief, that

14  the law enforcement of Merced County acceded to the wrongful acts

15  of District Attorney Spencer who himself is a state actor."

16  Defendants contend that the County cannot be liable for any

17  policy decisions of Defendant Spencer because he is a state

18  policymaker under *McMillan v. Monroe County, Alabama*, 520 U.S.

19  781, 785 (1997) and *Pitts v. County of Kern*, 17 Cal.4th 340

20  (1998).  Defendants further contend that there is no evidence of

21  any other unconstitutional custom or policy that would give rise

22  to the County's liability under *Monell*.

23       Plaintiff "does not disagree with the defendants'

24  arguments."  Plaintiff therefore concedes that Defendant County

25  is not liable for damages for any violation by Defendants Spencer

26  or Hutton of Plaintiff's constitutional rights under the First

1  Cause of Action.

2      Defendants' motion for summary judgment as to the First

3  Cause of Action for violation of Section 1983 on the basis of

4  *Monell* liability against the County of Merced is GRANTED.

5      Defendants move for summary judgment for the County as to

6  the Second Cause of Action.  The Second Cause of Action is for

7  declaratory relief pursuant to 28 U.S.C. § 2201 against the

8  County of Merced and seeks "a declaration from this Court that,

9  based on the factual transactions underlying this proceeding, her

10  rights under the Fourth Amendment not to have her liberty

11  restricted without legal basis, to be arrested without probable

12  cause, and to be prosecuted maliciously without probable cause

13  were violated."  The Second Cause of Action alleges that the

14  County "is the appropriate defendant for this cause of action

15  since it has the power, either directly or indirectly, or through

16  one of its law enforcement agencies, to expunge the records of

17  Tiffany's arrest and prosecution and to thus eliminate the many

18  adverse consequences of such records."

19      28 U.S.C. § 2201(a) provides in pertinent part:

20          In a case of actual controversy within its
            jurisdiction ... any court of the United
21          States, upon the filing of an appropriate
            pleading, may declare the rights and other
22          legal relations of any interested party
            seeking such declaration, whether or not
23          further relief is or could be sought.  Any
            such declaration shall have the force and
24          effect of a final judgment or decree and
            shall be reviewable as such.
25

26      "The Declaratory Judgment Act embraces both constitutional

1   and prudential concerns.  A lawsuit seeking federal declaratory

2   relief must first present an actual case or controversy within

3   the meaning of Article III, section 2 of the United States

4   Constitution."  *Government Employees Ins. Co. v. Dizol*, 133 F.3d

5   1220, 1222 (9th Cir.1998).  "It must also fulfill statutory

6   jurisdictional prerequisites."  *Id*. at 1222-1223.  "If the suit

7   passes constitutional and statutory muster, the district court

8   must also be satisfied that entertaining the action is

9   appropriate.  This determination is discretionary, for the

10  Declaratory Judgment Act is 'deliberately cast in terms of

11  permissive, rather than mandatory, authority.' ... The Act 'gave

12  the federal courts competence to make a declaration of rights; it

13  did not impose a duty to do so.' ....."  *Id*. at 1223.

14      Defendants contend that, because Plaintiff was not arrested,

15  *see discussion supra*, Plaintiff is not entitled to declaratory

16  relief as to her claim of false arrest and must rely solely on

17  her claim of malicious prosecution pursuant to Section 1983.

18  Citing *Ashelman v. Pope*, 793 F.2d 1072, 1075 (9th Cir.1986),

19  Defendants argue that "appropriate relief has already been

20  granted because the allegedly malicious prosecution has been

21  terminated."

22      Defendants reliance on *Ashelman v. Pope* is misplaced; the

23  case involved absolute judicial and prosecutorial immunity.

24      Defendants argue that the Second Cause of Action should be

25  dismissed because Plaintiff is not seeking a declaration of the

26  rights and duties of the parties.  Rather, all of the acts

1  alleged in the Complaint have already occurred and the granting

2  of declaratory relief will not prevent further damages or further

3  the purposes of the Declaratory Judgment Act.

4      In *United States v. Doherty*, 786 F.2d 491, 498 (2nd

5  Cir.1986):

6          The purpose of the [Declaratory Judgment Act]
           has been expressed in a variety of ways:
7          'Essentially, a declaratory relief action
           brings an issue before the court that
8          otherwise might need to await a coercive
           action brought by the declaratory relief
9          defendant.' ...; the fundamental purpose of
           the DJA is to 'avoid accrual of avoidable
10         damages to one not certain of his rights and
           to afford him an early adjudication without
11         waiting until his adversary should see fit to
           begin suit, after damages have accrued,' ...;
12         the primary purpose of the DJA is to have a
           declaration of rights not already determined,
13         not to determine whether rights already
           adjudicated were adjudicated properly, ...;
14         the declaratory judgment procedure 'creates a
           means by which rights and obligations may be
15         adjudicated in cases involving an actual
           controversy that has not reached the stage at
16         which either party may seek a coercive
           remedy, or in which the party entitled to
17         such a remedy fails to sue for it,' ...; the
           declaratory judgment procedure 'enable[s] a
18         party who is challenged, threatened or
           endangered in the enjoyment of what he claims
19         to be his rights, to initiate the proceedings
           against his tormentor and remove the cloud by
20         an authoritative determination of the
           plaintiff's legal right, privilege and
21         immunity and the defendant's absence of
           right, and disability,' ....

22      Plaintiff contends that even where an equitable relief claim

23  involves past exposure to illegal conduct, a present case or

24  controversy exists if there are continuing, present adverse

25  effects, *see O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974),

26

and that summary judgment on the Second Cause of Action "on the grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection it sought." *Adarand Constructors, Inc. v. Slater*, 528 U.S.C 216, 224 (2000).

Plaintiff argues that the existence of records of an unconstitutional arrest is a sufficient adverse consequence to warrant declaratory relief, citing among other cases, *Maurer v. Individually and As Members of Los Angeles County Sheriff's Dept.*, 691 F.2d 434 (9th Cir.1982).

In *Maurer*, a state prisoner brought a civil rights action alleging that his arrest was invalid on federal constitutional grounds and seeking a permanent injunction prohibiting dissemination of his arrest record.  The Ninth Circuit held that the district erred in dismissing Mauer's expungement action:

> It is well-settled that the federal courts have inherent equitable power to order 'the expungement of local arrest records as an appropriate remedy in the wake of police action in violation of constitutional rights.' ... Contrary to the district court's conclusion, Maurer has no adequate remedy under state law for his claim.  The state statute upon which the district court relied provides for the destruction of arrest records only where the court determines after an acquittal that the defendant is 'factually innocent of the charge.'  California Penal Code § 851.85.  Mauer seeks a declaratory judgment that his arrest violated the Fourth Amendment.  There is no adequate remedy at law for that claim.

691 F.2d at 437.  *See also Shipp v. Todd*, 568 F.2d 133, 134-135 (9th Cir.1978):

103

1
2
3
4

>           Although appellant has served the sentences
>           imposed for his burglary convictions, the
>           maintenance of his criminal records continues
>           to operate to his detriment ... 'It is
>           established that the federal courts have
>           inherent power to expunge criminal records
>           when necessary to preserve basic rights.'

5      *Shipp* noted:

6
7
8
9
10

>           The power to order expungement of a state
>           arrest record is a narrow one and should be
>           reserved for unusual of extreme cases, or
>           example, 'where the arrest itself was an
>           unlawful one, or where the arrest represented
>           harassing action by the police, or where the
>           statute under which the arrestee was
>           prosecuted was itself unconstitutional.'
>           *United States v. Linn*, 513 F.2d 925, 927
>           (10th Cir.1975).

11

12          Plaintiff further argues that there is also the possibility

13     that she could be disadvantaged in terms of credibility,

14     promotions, or future employment as a result of having a serious

15     felony arrest on her record.   Therefore, the Second Cause of

16     Action is not moot.

17          "In ruling on requests for expungement, federal courts must

18     balance the legitimate need of the government to maintain

19     criminal record information with the resulting harm to the

20     individual who is the subject of the records."   *United States v.*

21     *Vasquez*, 74 F.Supp.2d 964, 966 (S.D.Cal.1999), *disapproved on*

22     *other grounds*, *United States v. Sumner*, 226 F.3d 1005 (9th

23     Cir.2000).

24          Plaintiff, referring to the Second Cause of Action for

25     declaratory relief, argues that the County may be liable under

26     Section 1983 for prospective injunctive relief even if the

constitutional violation was not the result of an official custom
or policy.  Plaintiff cites *Chaloux v. Killeen*, 886 F.2d 247,
250-251 (9th Cir.1989).  In *Chaloux*, the Ninth Circuit held that
*Monell* did not apply to any "official policy or custom"
requirement to foreclose a suit for prospective relief against a
county or its officials for enforcing allegedly unconstitutional
state laws.  Plaintiff asserts that, because she seeks
prospective equitable relief, i.e., expungement of her arrest,
charging, and prosecution records, the County is a proper
defendant in this action.

Defendants reply that it is Plaintiff's burden to produce
evidence that she has sought expungement of her records and that
the County has the ability to do so.

Defendants contention is legitimate.  Plaintiff was not
arrested.  The records of the criminal complaint and her
prosecution are those of the Merced County Superior Court which
is an arm of the State of California.  California Penal Code §
851.8 provides:

> (e) Whenever any person is acquitted of a
> charge and it appears to the judge presiding
> at the trial at which the acquittal occurred
> that the defendant was factually innocent of
> the charge, the judge may grant the relief
> provided in subdivision (b).

However, Section 851.8(k) provides that provides that no records
may be destroyed pursuant to subdivisions (b) or (e) if a civil
action is filed, until the civil action is resolved.  Plaintiff
herself must request expungement of the record of her criminal

105

prosecution from the Merced County Superior Court; the County cannot do so.  The action is premature.  If Plaintiff prevails, she can make a demand under Penal Code § 851.8.  If Plaintiff is denied, she will have appropriate remedies in the state court by way of administrative mandamus.

Summary judgment for the County of Merced as to the Second Cause of Action is GRANTED WITHOUT PREJUDICE.

<u>CONCLUSION</u>

For the reasons stated:

1.  The motion for summary judgment by Defendants County of Merced, Gordon Spencer, and Merle Wayne Hutton is GRANTED.

2.  Counsel for the County Defendants shall prepare and lodge a form of order that the rulings set forth in this Memorandum Decision within five (5) days following the date of service of this decision.

IT IS SO ORDERED.

Dated:   December 29, 2010            /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE

106