1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT FOR THE

7                  EASTERN DISTRICT OF CALIFORNIA

8

9  TIFFANY FENTERS,                )      No. CV-F-05-1630 OWW/DLB
                                    )
10                                  )
                                    )
11          Plaintiff,              )      MEMORANDUM DECISION GRANTING
                                    )      IN PART AND DENYING IN PART
                                    )      DEFENDANTS YOSEMITE CHEVRON,
12       vs.                        )      ABBCO INVESTMENTS, LLC, AND
                                    )      ROBERT ABBATE'S MOTION FOR
13                                  )      SUMMARY JUDGMENT (Doc. 137)
   YOSEMITE CHEVRON, et al.,        )
14                                  )
                                    )
15          Defendants.            )
                                    )
16 _____ )

17        Before the Court is the motion for summary judgment filed by

18 Defendants Yosemite Chevron, Abbco Investments, LLC, and Robert

19 Abbate (hereafter the "Abbate Defendants").[1]

20        A.   ABBATE DEFENDANTS' OBJECTIONS TO BETTANCOURT EXPERT

21 REPORT.

22        Submitted in opposition to the Abbate Defendants' motion for

23 summary judgment is what is characterized by Mr. Little as "the

24 _____

25        [1]The motions for summary judgment filed by the County
   Defendants and the Cassabon Defendants will be resolved by separate
26 memorandum decisions.

                                    1

declaration report" of John Bettancourt.  Mr. Bettancourt avers:

> 1.  I am a certified public accountant.  My current curriculum vitae has been provided separately.
>
> 2.  I have been retained on behalf of plaintiff Tiffany Fenters in this proceeding.
>
> 3.  My opinions regarding the accounting aspects of this case are set forth in my testimony in the criminal case, People v. Tiffany Fenters, which I incorporate herein by reference.  Those opinions remain unchanged.  I based those opinions on a review of the accounting materials provided and made available by the prosecution in the underlying criminal case.  I reviewed those materials at length, and I understand that my related work product has also been produced by plaintiff's counsel.
>
> 4.  The spreadsheets provided by defendant Robert Abbate is indicative of false, fabricated and misleading work product for the reasons previously stated in my trial testimony and as reflected in my work product.  The accounting work done by defendants Cassabon & Associates and Victor Fung is also indicative of false, fabricated and/or misleading work product for the reasons largely expressed in my trial testimony and reflected in my work product.  The defendants' accounting work is not merely substandard or negligent but instead is reflective of false, fabricated and/or misleading work.

The Abbate Defendants object to Mr. Bettancourt's declaration on several grounds.

Defendants object to consideration of Mr. Bettancourt's declaration because it fails to set forth Mr. Bettancourt's qualifications.

Rule 702, Federal Rules of Evidence, provides:

> If scientific, technical, or other

1
2
3
4

**specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.**

5 **"Whether a witness is qualified as an expert can only be**

6 **determined by comparing the area in which the witness has**

7 **superior knowledge, skill, experience, or education with the**

8 **subject matter of the witness's testimony.** *Carroll v. Otis*

9 *Elevator Co.*, **896 F.2d 210, 212 (7th Cir.1990).**

10        **Defendants complain that Mr. Bettancourt's declaration does**

11 **not set forth his qualifications, other than to aver that he is a**

12 **certified public accountant.**

13        **Plaintiff responds that "the totality of the materials**

14 **submitted to the Court, which include Bettancourt's trial**

15 **testimony in the underlying criminal case and his deposition,**

16 **more than amply set forth his qualifications as an experienced**

17 **forensic accountant and certified fraud examiner, as well as the**

18 **materials he reviewed in support of his opinion in this case,"**

19 **citing Bettancourt's trial testimony at p. 516-531 and his**

20 **deposition testimony at p. 1-23.  Plaintiff cites** *Miller v.*

21 *Corrections Corp. of America*, **375 F.Supp.2d 889, 896 (D.Alaska**

22 **2005), in contending that "an expert report may, as do**

23 **plaintiff's expert's reports, include or make reference to**

24 **attachments reflecting the expert's opinions."**

25        **Defendants' objections to Mr. Bettancourt's declaration on**

26 **the ground that he is unqualified to render the opinion is**

3

baseless.   Defendants do not point to any specific evidence that Mr. Bettancourt is not qualified to give his expert opinion as to the accounting methods utilized by Defendants.

Defendants object that Mr. Bettancourt provides no foundation for his opinion in that he does not set forth any of the data he reviewed or any investigation that he undertook in reaching his conclusions; that it does not set forth his methodology; and that his testimony is speculative and conjectural.

However, as Plaintiff notes, Mr. Bettancourt's methodology and foundation is set forth in his trial testimony in the underlying criminal action.   While certain of Mr. Bettancourt's conclusions are conjectural and speculative, these are matters going to the weight of his opinion, not its admissibility.

B.   <u>GOVERNING STANDARDS</u>.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.   A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.   *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).   Materiality is determined by the substantive law governing a claim or a defense.   *Id*.   The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.   *Id*.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id.*  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint."  *Id.*  The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff."  *Id.*  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment."  *Id.*  As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099 (9th Cir.2000):

The vocabulary used for discussing summary judgments is somewhat abstract.  Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to plaintiff and defendant.  Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather than to plaintiff and defendant.  Finally, we distinguish among the initial burden of production and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

A moving party without the ultimate burden of persuasion at trial - usually, but not always, a defendant - has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment ... In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial ... In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact ....

If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial ... In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything ... If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense ... If the

1    
2    nonmoving party fails to produce enough
     evidence to create a genuine issue of
3    material fact, the moving party wins the
     motion for summary judgment ... But if the
4    nonmoving party produces enough evidence to
     create a genuine issue of material fact, the
     nonmoving party defeats the motion.

5    **210 F.3d at 1102-1103.**

6          C.    <u>ABBATE DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED</u>

7    <u>FACTS</u>.

8          1.    <u>Issue No. 1: Plaintiff Cannot Maintain a Claim</u>

9    <u>for Violation of Section 1983 Because She Cannot Meet the</u>

10   <u>Requisite Elements</u>.

11         <u>DUF 1</u>:   Tiffany Fenters ("Fenters" or "Plaintiff")

12   worked for defendant Yosemite Chevron between June 2002 to March

13   2003.

14         *Plaintiff's Response*: UNDISPUTED.

15         <u>DUF 2</u>:   Alejandro Aceves ("Aceves") also worked for

16   Yosemite Chevron between April 2002 to March 2003.

17         *Plaintiff's Response*: UNDISPUTED.

18         <u>DUF 3</u>:   Defendant Robert Abbate ("Abbate") has managed

19   and operated Yosemite Chevron from 1999 to the present.

20         *Plaintiff's Response*: UNDISPUTED.

21         <u>DUF 4</u>:   On March 27, 2003, Fenters quit her employment

22   with Yosemite Chevron and submitted her written resignation on

23   March 28, 2003.

24         *Plaintiff's Response*: UNDISPUTED.

25         <u>DUF 5</u>:   On March 31, 2003, Abbate caught Aceves

26   stealing from Yosemite Chevron by falsely voiding actual

transactions and then stealing the overage in cash from the register at the end of his shift.

*Plaintiff's Response*: UNDISPUTED.

<u>DUF 6</u>:  On March 31, 2003, Aceves confessed to Abbate that he was stealing by falsely voiding actual transactions and then taking the overage from the register.

*Plaintiff's Response*: UNDISPUTED.

<u>DUF 7</u>:   On March 31, 2003, Aceves also told Abbate that Fenters taught him how to steal through the voiding transaction scheme.   Supporting Evidence: Exh. F, Aceves Depo. 98:918, 99:9-102:3, 103:3-22, 105:2-12, 106:20-108:21, 110:2-112::23, 129:13-23, 176:5-22, 194:4-196:2; Exh. B, Aceves trial testimony 267:3-12.

*Plaintiff's Response*:  Disputed. During his trial testimony, Aceves testified that he learned how to do illegal voids himself, in order to obtain extra money. See Trial Transcript, pp. 266-267, 276, 285, 287. Aceves never told Abbate he had seen Fenters do any illegal voids or steal any money from the store.  Trial Transcript, pp. 275. In connection with his firing of Aceves, Abbate first brought up Fenters' name, saying that "he knew Tiffany was in it." Trial Transcript, p. 291. Aceves thereafter only implicated Fenters and other employees in an attempt to deflect blame from himself and also because Abbate seemed to focus on her.  See Trial Transcript, pp. 272-273, 291-292.  Aceves also mentioned Fenters at the subsequent June 4, 2003 meeting because she was first suggested by Abbate himself.

See Trial Transcript, p 268, 270, 272.  Abbate indicated that
Aceves could receive a shorter sentence if he helped make the
case against Fenters easier. See Trial Transcript, p. 294. The
prosecution echoed this offer. Bacciarini Deposition, p. 64.
Abbate also told Aceves that if Aceves could get evidence to
convict Fenters that he could benefit in his own case. See Trial
Transcript, pp. 295. Bacciarini recalls that Aceves may have told
him that he was pressured by Abbate to implicate Fenters.
Bacciarini Deposition, p. 48-49. There is thus ample evidence
that Abbate suggested Fenters as a possible embezzler and that
Aceves never implicated her of his own accord.  Aceves provided
similar and more extensive testimony during his deposition.  In
addition to confirming that the subject events were fresher in
his mind at the time of his criminal testimony, see Aceves
Deposition, p. 168, Aceves confirmed that Abbate was the first
person to suggest Tiffany Fenters. Aceves Deposition, p.
170, 171, 172, 182.  Aceves was never pressured for additional
information about anyone else who was identified as a possible
embezzler, just Tiffany. Aceves Deposition, p. 173, 178. Despite
the focus on Fenters, no one ever asked Aceves to provide details
regarding any alleged conversations he had with Fenters, identify
any dates where the two of them met, provide any phone records,
identify any shift records where the two of them worked together,
review any videotapes from the cash register area where the
illicit instruction allegedly took place, or provide any bank
records or other evidence of his obtaining illicit funds. See

9

Aceves Deposition, p. 175-177, 187-188. Aceves testified "that's why it was kind of easy to lie because nobody actually went into detail." Aceves Deposition, p. 175. It seemed that the objective of Abbate and Hutton was to pursue Fenters and have him testify against her.  Aceves Deposition, p. 178, 181. This evidence further demonstrates that Abbate and Hutton's entire object was to construct a case against Fenters, even if it meant disregarding the truth.

*Court Ruling*: DISPUTED.  Although Aceves testified at his deposition that he told Abbate on March 21, 2003 that Plaintiff taught him how to steal through the voiding transaction scheme, Aceves testified differently and inconsistently at Plaintiff's criminal trial.

DUF 8:  On March 31, 2003, Abbate did not threaten or coerce Aceves into confessing that he stole from Yosemite Chevron.

*Plaintiff's Response*: UNDISPUTED, but Plaintiff asserts that Abbate's coercion pertained to having Aceves falsely implicate Plaintiff.

DUF 9:  On or about May 14, 2003, Abbate made a complaint to the Merced County District Attorney's Office (District Attorney"), including its investigators, that he believed Fenters and Aceves were stealing from Yosemite Chevron through the voiding transaction scheme.  Supporting Evidence: Exh. A, Abbate Dec. ¶ 5; Exh. G, Spencer Depo. 47:6-12, 73:1-8; Exh. H, Hutton Investigation Report.

*Plaintiff's Response*: Disputed, as the evidence shows that Abbate never had any good faith belief that Fenters was stealing. Abbate misrepresented to Hutton that only one employee worked on the cash register in a given shift, although he knew the opposite was true on a daily basis. Hutton Deposition, p. 20, 74; Abbate Deposition, p. 81, 99. Indeed, employees' log-on codes to the cash register were typically the last four digits of their phone numbers, and the phone numbers of employees were posted in the store.  Abbate Deposition, p. 85.  Abbate did not expect employees to review their shift reports on a line by line basis to ensure they were responsible for each transaction. Abbate Deposition, p. 90-91. Abbate also never told Bacciarini that more than one employee could have worked on the cash register during a given shift. Bacciarini Deposition, p. 16. Abbate reiterated this misrepresentation at trial, only later acknowledging during trial on cross examination that voids could not necessarily be linked to a particular employee, as opposed to a particular shift.  See Preliminary hearing Transcript, p. 8, 17; Trial Transcript, p. 242. Hutton would have considered it important to know that actually multiple employees could work on the register in a given shift. Hutton Deposition, p. 21. Hutton would have considered this important because it would have made the task of identifying a particular employee who committed wrongdoing more difficult. Hutton Deposition, p. 22.  Abbate conceded on cross-examination at the preliminary hearing that the voids attributable to Fenters

11

were overstated in his spreadsheet. See Preliminary Hearing
Transcript, pp. 52-59. Abbate also conceded that certain entries
in his spreadsheet appeared to be entered wrongly, and he spent
no time reviewing the initial draft spreadsheet he prepared.  See
Preliminary hearing Transcript, pp. 60-61; Abbate Deposition, p.
60, 64. Abbate also attributed certain shifts to Fenters, even
though the underlying pay point reports did not contain her
genuine signature. See Trial Transcript, pp. 491-492.  Abbate
also represented to Hutton that he had contact with another
anonymous employee, who turned out to be Robert Wilson, around
the time of Tiffany's separation from employment who first
provided information regarding the alleged embezzlement, but
Abbate did not tell Hutton that Wilson had been fired in
December 2002 for stealing from Fenters.  Hutton Deposition, p.
72, 92-94; Trial Transcript, p. 488. Abbate continued his
pattern of misrepresentation at the preliminary hearing and trial
by again merely referring to Wilson as an "ex-employee." See
Preliminary Hearing Transcript, p. 41; Trial Transcript, p. 213.
There never was an anonymous employee, and Abbate was aware of
Wilson's firing at all pertinent times. See Abbate Deposition, p.
44-45, 97. Hutton would have considered this information
important to include in his investigation report. Hutton
Deposition, p. 90-91.  Abbate also initially told Hutton that he
has cut Fenters hours beginning in January 2003 because he
suspected she was stealing from his business. See Hutton's
Investigative Report, Exh. B to Fung. Decl., pp. 2. Abbate did

12

1  not concede until trial that Fenters' hours had not been cut

2  during this time period. See Trial Transcript, pp. 235-236.

3  Indeed, even after Aceves first admitted stealing in March 2003,

4  Abbate only believed that he was dealing with a petty issue.

5  Abbate Deposition, p. 102.  Abbate also did not provide any tax

6  returns or other financial documents reflecting a drop in

7  revenues during the time when the embezzlement was allegedly

8  occurring. Hutton Deposition, p. 22. Abbate also did not provide

9  Hutton with any videotapes from the register area.  Hutton

10  Deposition, p. 23. This is further circumstantial evidence of his

11  intent to conceal the truth and unduly influence the criminal

12  proceedings against Fenters.

13           *Court Ruling*: UNDISPUTED; Plaintiff's evidence

14  does not contradict DUF 9 as stated among other things.

15           <u>DUF 10</u>:  The District Attorney's Office, including

16  its investigators, were in charge of the investigation in

17  Fenters' case.  Exh. I, Bacciarini Depo. 74:6-75:1; Exh. G,

18  Spencer Depo. 36:13-16; Exh. B, Jury Trial Transcript 30:6-18;

19  Exh. J, Souza Depo. 94:7-16, 144:22-145:12; Exh. K, Vernon

20  Fenters Depo. 51:10-13, 66:7-11, 69:7-10.

21           *Plaintiff's Response*: Disputed, as the evidence

22  shows the District Attorney's Office was unduly influenced by

23  Abbate's misrepresentations.  The prosecution relied on Abbate's

24  operating in good faith in proceeding to a preliminary hearing

25  and trial. Bacciarini Deposition, p. 87-88. However, Abbate

26  misrepresented to Hutton that only one employee worked on the

cash register in a given shift, although he knew the opposite
was true on a daily basis.  Hutton Deposition, p. 20, 74; Abbate
Deposition, p. 81, 99. Indeed, employees' log on codes to the
cash register were typically the last four digits of their phone
numbers, and the phone numbers of employees were posted in the
store. Abbate Deposition, p. 85. Abbate did not expect employees
to review their shift reports on a line by line basis to ensure
they were responsible for each transaction. Abbate Deposition, p.
90-91. Abbate also never told Bacciarini that more than one
employee could have worked on the cash register during a given
shift. Bacciarini Deposition, p. 16. Abbate reiterated this
misrepresentation at trial, only later acknowledging during trial
on cross examination that voids could not necessarily be linked
to a particular employee, as opposed to a particular shift.  See
Preliminary hearing Transcript, p. 8, 17; Trial Transcript, p.
242. Hutton would have considered it important to know that
actually multiple employees could work on the register in a given
shift. Hutton Deposition, p. 21. Hutton would have considered
this important because it would have made the task of identifying
a particular employee who committed wrongdoing more difficult.
Hutton Deposition, p. 22.  Until the time the Cassabon firm was
retained after the preliminary hearing, the District Attorney's
Office relied on Abbate to review the financial information
pertinent to the case against Fenters.  Hutton Deposition, p. 33-
34. Abbate's financial analysis was one of the reasons that
Hutton submitted the case against Fenters for filing. Hutton

14

Deposition, p. 82.   Indeed, the Abbate spreadsheet was the only financial evidence then available in a prospective financial crime case. Hutton Deposition, pp. 82-83.   Abbate conceded on cross-examination at the preliminary hearing that the voids attributable to Fenters were overstated in his spreadsheet. See Preliminary Hearing Transcript, pp. 52-59. Abbate also conceded that certain entries in his spreadsheet appeared to be entered wrongly, and he spent no time reviewing the initial draft spreadsheet he prepared.   See Preliminary hearing Transcript, pp. 60-61; Abbate Deposition, p. 60, 64. Abbate also attributed certain shifts to Fenters, even though the underlying pay point reports did not contain her genuine signature. See Trial Transcript, pp. 491-492.   Abbate also represented to Hutton that he had contact with another anonymous employee, who turned out to be Robert Wilson, around the time of Tiffany's separation from employment who first provided information regarding the alleged embezzlement, but Abbate did not tell Hutton that Wilson had been fired in December 2002 for stealing from Fenters.   Hutton Deposition, p. 72, 92-94; Trial Transcript, p. 488. Abbate continued his pattern of misrepresentation at the preliminary hearing and trial by again merely referring to Wilson as an "exemployee."   See Preliminary Hearing Transcript, p. 41; Trial Transcript, p. 213.   There never was an anonymous employee, and Abbate was aware of Wilson's firing at all pertinent times. See Abbate Deposition, p. 44-45, 97. Hutton would have considered this information important to include in his investigation

report. Hutton Deposition, p. 90-91.  Abbate also initially told
Hutton that he has cut Fenters hours beginning in January 2003
because he suspected she was stealing from his business. See
Hutton's Investigative Report, Exh. B to Fung. Decl., pp. 2.
Abbate did not concede until trial that Fenters' hours had not
been cut during this time period. See Trial Transcript, pp. 235-
236. Indeed, even after Aceves first admitted stealing in March
2003, Abbate only believed that he was dealing with a petty
issue. Abbate Deposition, p. 102.  Abbate also did not provide
any tax returns or other financial documents reflecting a drop in
revenues during the time when the embezzlement was allegedly
occurring. Hutton Deposition, p. 22. Abbate also did not provide
Hutton with any videotapes from the register area.  Hutton
Deposition, p. 23. This is further circumstantial evidence of his
intent to conceal the truth and unduly influence the criminal
proceedings against Fenters.  The record also shows that the
District Attorney's Office did no independent investigation that
would have permitted it to exercise its discretion in any genuine
and autonomous manner. Spencer acknowledged, although it was not
done in this case, that his office commonly sought the assistance
of a forensic accountant or fraud examiner during the
investigation stage of a case. Spencer Deposition, p. 56. Indeed,
Hutton conceded at trial that he did nothing to corroborate
Aceves' statement and Abbate's spreadsheet, even though he knew
Abbate was not an accountant and that confessions are not always
the full truth. See Trial Transcript, pp. 377-378, 401-404.

16

Hutton never did an independent analysis of the Abbate spreadsheets. Bacciarini Deposition, p. 22; Abbate Deposition, p. 108. Hutton also never tested the store surveillance system himself, even though the system would depict money taken from the register by an employee. Hutton Deposition, p. 24.  Hutton never took any steps to obtain any financial information pertaining to Fenters.  Hutton Deposition, p. 28-29; Trial Transcript, pp. 443. Hutton did not attempt to speak with Fenters' parents as part of his investigation, even though there was an allegation that Fenters had been "cut off" by them and therefore had a motive to steal. Hutton Deposition, p. 30. (Fenters' father, Virgil Fenters, refuted this allegation at trial. See Trial Transcript, p. 418.)  Hutton also never obtained any shift records that corroborated the allegation that Fenters' hours were cut in February 2003 due to her being suspected of stealing. Hutton Deposition, p. 71. Hutton "assumed there was a friendly connection between Fenters and Aceves but made no effort to confirm that through investigation, i.e., phone records, or other Yosemite Chevron employees, Hutton Deposition, p. 31. Hutton also never asked for specifics regarding where Aceves and Fenters were when Fenters allegedly taught him to do illegal voiding. Hutton Deposition, p. 31-32. Hutton never investigated any information suggesting that Abbate was a drug user, although it was provided by the defense during discovery and Hutton acknowledges that such matters can have a bearing on a witness' credibility in a case involving alleged financial loss. Hutton Deposition, p. 83-

84; Bacciarini Deposition, p. 88.  Hutton never asked Aceves if
he had prior cash register experience. Trial Transcript, p. 391.
Hutton never investigated how many employees worked or could use
the register in a given shift. Trial Transcript, p. 393.  The
evidence also shows that Abbate was part of the District
Attorney's investigative team for purposes of Fenters' criminal
case. Hutton acknowledges that Abbate was assisting in the
District Attorney's investigation of the Fenters matter between
May 14 and June 4, 2003.  Hutton Deposition, p. 43. Abbate also
acknowledges he assisted in the investigation and had his most
extensive contacts with Hutton during the investigative phase of
the Fenters criminal case. Abbate Deposition, p. 104, 124.
Hutton testified an interview protocol was set up between Abbate
and himself with respect to the June 4, 2003 interview of Aceves.
Hutton Deposition, p. 42-43.  Abbate also set up the June 4, 2003
interview with Aceves. Hutton Deposition, p. 44. Abbate actually
conducted the first part of that interview, which was done in
conformity with guidelines provided by Hutton. Hutton Deposition,
pp. 44-45; Abbate Deposition, p. 109-110.  Abbate provided an
additional eight months of financial analysis at the District
Attorney's request. Hutton Deposition, p. 44; Abbate Deposition,
p. 79. Hutton spent approximately 20 hours doing his work on the
Fenters case, while Abbate worked 35 hours, not including time he
spent assisting in interviews at Hutton's direction. Hutton
Deposition, p. 57; Abbate Deposition, p. 61-62. All of Hutton's
investigation is reflected in his initial and follow up reports.

Hutton Deposition, p. 57.  Bacciarini, the lead prosecutor at the preliminary hearing and at trial, has as many contacts with Abbate as he did Hutton in preparation for the preliminary hearing. Bacciarini Deposition, pp. 10-11.  Additionally, James Swanson, who was the prosecutor handling the case against Fenters after the preliminary hearing until just before it went to trial, told Fenters' attorney that he was not permitted to resolve the case via a misdemeanor petty theft plea. See Virgil Fenters Deposition, pp. 32, 35-36. This is further circumstantial evidence of the District Attorney's compromised status in the Fenters criminal case.

> *Court Ruling*: DISPUTED.

> **DUF 11**:  The District Attorney's Office, including its investigators, controlled the investigation into Fenters' alleged embezzlement.  Supporting Evidence: see DUF 10.

> *Plaintiff's Response*: Disputed on identical grounds set forth in response to DUF 10.

> *Court Ruling*: Disputed.

> **DUF 12**:  Wayne Hutton was the lead investigator for the District Attorney's office in the criminal case against Fenters.

> *Plaintiff's Response*: UNDISPUTED, although for reasons stated in response to DUF 10, Abbate was functionally the lead investigator.

> **DUF 13**:  Hutton had not met Abbate prior to the criminal action.

> *Plaintiff's Response*: UNDISPUTED.

19

1       **DUF 14**:  **Abbate prepared a spreadsheet recording**
2  **average voided transactions and the dollar amount of those**
3  **transactions, of Fenters, Aceves, and other employees in the gas**
4  **station (the "Abate Spreadsheet"), which was attached to Hutton's**
5  **investigation report.**

6              *Plaintiff's Response*:  **Disputed as to the good**
7  **faith and completeness of the spreadsheet document. Until the**
8  **time the Cassabon firm was retained after the preliminary**
9  **hearing, the District Attorney's Office relied on Abbate to**
10 **review the financial information pertinent to the case against**
11 **Fenters. Hutton Deposition, p. 33-34. Abbate's financial analysis**
12 **was one of the reasons that Hutton submitted the case against**
13 **Fenters for filing. Hutton Deposition, p. 82. Indeed, the Abbate**
14 **spreadsheet was the only financial evidence then available in a**
15 **prospective**
16 **financial crime case. Hutton Deposition, pp. 82-83.Abbate**
17 **conceded on crossexamination at the preliminary hearing that the**
18 **voids attributable to Fenters were  overstated in his**
19 **spreadsheet. See Preliminary Hearing Transcript, pp. 52-59.**
20 **Abbate also conceded that certain entries in his spreadsheet**
21 **appeared to be entered wrongly, and he spent no time reviewing**
22 **the initial draft spreadsheet he prepared.  See Preliminary**
23 **hearing Transcript, pp. 60-61; Abbate Deposition, p. 60, 64.**
24 **Abbate also attributed certain shifts to Fenters, even though the**
25 **underlying pay point reports did not contain her genuine**
26 **signature. See Trial Transcript, pp. 491- 492.  Abbate also did**

not provide any tax returns or other financial documents reflecting a drop in revenues during the time when the embezzlement was allegedly occurring. Hutton Deposition, p. 22. Abbate also did not provide Hutton with any videotapes from the register area.  Hutton Deposition, p. 23. This is further circumstantial evidence of his intent to conceal the truth and unduly influence the criminal proceedings against Fenters.

*Court Ruling*: DUF 14 is UNDISPUTED; Plaintiff's evidence does not contradict the fact that Abbate prepared the spreadsheet attached to Hutton's investigative report.

**DUF 15**:  On June, 4, 2003, Aceves met Abbate at his office.

*Plaintiff's Response*: UNDISPUTED.

**DUF 16**:  On June 4, 2003, Aceves again confessed to Abbate that he had been stealing through a voiding transaction scheme.

*Plaintiff's Response*:  Disputed. During his trial testimony, Aceves testified that he learned how to do illegal voids himself, in order to obtain extra money. See Trial Transcript, pp. 266-267, 276, 285, 287. Aceves never told Abbate he had seen Fenters do any illegal voids or steal any money from the store.  Trial Transcript, pp. 275. In connection with his firing of Aceves, Abbate first brought up Fenters' name, saying that "he knew Tiffany was in it." Trial Transcript, p. 291. Aceves thereafter only implicated Fenters and other employees in an attempt to deflect blame from himself and also

because Abbate seemed to focus on her.  See Trial Transcript, pp.
272-273, 291-292.  Aceves also mentioned Fenters at the
subsequent June 4, 2003 meeting because she was first suggested
by Abbate himself.  See Trial Transcript, p 268, 270, 272.
Abbate indicated that Aceves could receive a shorter sentence if
he helped make the case against Fenters easier. See Trial
Transcript, p. 294. The prosecution echoed this offer. Bacciarini
Deposition, p. 64. Abbate also told Aceves that if Aceves could
get evidence to convict Fenters that he could benefit in his own
case. See Trial Transcript, pp. 295. Bacciarini recalls that
Aceves may have told him that he was pressured by Abbate to
implicate Fenters.  Bacciarini Deposition, p. 48-49. There is
thus ample evidence that Abbate suggested Fenters as a possible
embezzler and that Aceves never implicated her of his own accord.
Aceves provided similar and more extensive testimony during his
deposition.  In addition to confirming that the subject events
were fresher in his mind at the time of his criminal testimony,
see Aceves Deposition, p. 168, Aceves confirmed that Abbate was
the first person to suggest Tiffany Fenters. Aceves Deposition,
p. 170, 171, 172, 182. Aceves was never pressured for additional
information about anyone else who was identified as a possible
embezzler, just Tiffany. Aceves Deposition, p. 173, 178. Despite
the focus on Fenters, no one ever asked Aceves to provide details
regarding any alleged conversations he had with Fenters, identify
any dates where the two of them met, provide any phone records,
identify any shift records where the two of them worked together,

review any videotapes from the cash register area where the illicit instruction allegedly took place, or provide any bank records or other evidence of his obtaining illicit funds. See Aceves Deposition, p. 175-177, 187-188. Aceves testified "that's why it was kind of easy to lie because nobody actually went into detail." Aceves Deposition, p. 175. It seemed that the objective of Abbate and Hutton was to pursue Fenters and have him testify against her. Aceves Deposition, p. 178, 181. This evidence further demonstrates that Abbate and Hutton's entire object was to construct a case against Fenters, even if it meant disregarding the truth.

*Court Ruling*: DUF 16 is UNDISPUTED.  The record establishes that on June 4, 2003, Aceves again confessed to Abbate that he had been stealing through a voiding transaction scheme; that Aceves changed his position at trial does not contradict this fact.

DUF 17:  On June 4, 2003, Aceves again told Abbate that Fenters was the person that had taught him how to steal through the voiding transaction scheme.

*Plaintiff's Response*: Disputed on identical grounds stated in response to DUF 16.

*Court Ruling*: DUF 17 is UNDISPUTED; Plaintiff's evidence does not contradict what Aceves told Abbate on June 4, 2003.

DUF 18:  Aceves testified in deposition that he was not under any threats or coercion when he went to meet with Abbate on

23

June 4, 2003, and told him how he was stealing.   Supporting Evidence:   Supporting Evidence: Exh. F, Aceves Depo. 98:918, 99:9-102:3, 103:3-22, 105:2-12, 106:20-108:21, 110:2-112::23, 129:13-23, 176:5-22, 194:4-196:2; Exh. B, Aceves trial testimony 267:3-12.

*Plaintiff's Response*: Disputed on identical grounds stated in response to DUF 16.

*Court Ruling*: DUF 18 is UNDISPUTED; Aceves so testified under oath in his deposition.   Further, Plaintiff does not dispute DUF 8.

DUF 19:   Aceves testified in deposition that he was not under any threats or coercion when he went to meet with Abbate on June 4, 2003, and told him that Fenters taught him how to steal. Supporting Evidence: Exh. F, Aceves Depo., 50:11-51:5, 111:8-115:21, 117:7-119:14, 129:13-132:17, 159:4-160:13.

*Plaintiff's Response*: Disputed on identical grounds stated in response to DUF 16.

*Court Ruling*: DUF 19 is UNDISPUTED; Aceves so testified under oath at his deposition.   Plaintiff has not provided evidence Aceves was under any threat or coercion when he gave his deposition testimony.

DUF 20:   Aceves ultimately pled no contest to felony embezzlement for stealing from Yosemite Chevron.

*Plaintiff's Response*: UNDISPUTED.

DUF 21:   Aceves readily admits that he stole from Yosemite Chevron through voiding transactions.

24

1        *Plaintiff's Response*: UNDISPUTED.

2        <u>DUF 22</u>:  On June 23, 2003, the District Attorney

3   filed a Complaint against Fenters for Embezzlement titled the

4   People of the State of California v. Tiffany Michelle Fenters,

5   Merced County Superior Court Case No. MF36082.

6        *Plaintiff's Response*: UNDISPUTED.

7        <u>DUF 23</u>:  Abbate did not participate in or control the

8   decision to file the Complaint.  Supporting Evidence: Exh. O,

9   Criminal Complaint; Exh. P, Bacciarini Decl, ¶ 5; Exh. M, Abbate

10  Depo., 121:7-16; Exh. A, Abbate Decl., ¶ 7.

11       *Plaintiff's Response*: Disputed on identical

12  grounds stated in response to DUF 10.

13       *Court Ruling*: DISPUTED.  There is evidence from

14  which it may be inferred that Abbate influenced the filing

15  decision in the criminal case.

16       <u>DUF 24</u>:  Mark Bacciarini ("Bacciarini") was the

17  Deputy District Attorney for the District Attorney's Office that

18  conducted the preliminary hearing and jury trial.

19       *Plaintiff's Response*: UNDISPUTED.

20       <u>DUF 25</u>:  It was the District Attorney's decision to

21  take the matter to preliminary hearing.  Supporting Evidence:

22  Exh. I, Bacciarini Depo., 74:15-75:22.

23       *Plaintiff's Response*: Disputed on identical

24  grounds stated in response to DUF 10.

25       *Court Ruling*: DUF 25 is UNDISPUTED; Plaintiff's

26  evidence does not contradict that the District Attorney made the

                              25

1  decision to proceed to a preliminary hearing, even if influenced
2  by Abbate.

3          **DUF 26**:  On July 30, 2004, a preliminary hearing
4  was held in People v. Fenters.

5              *Plaintiff's Response*: UNDISPUTED.

6          **DUF 27**:  Judge Ronald R. Hansen ruled at the
7  preliminary hearing that the Abbate Spreadsheet was inadmissible.

8              *Plaintiff's Response*: UNDISPUTED.

9          **DUF 28**:  Judge Hansen also ruled at the preliminary
10 hearing there was sufficient evidence to show the alleged felony
11 was committed by Fenters.

12             *Plaintiff's Response*: UNDISPUTED, although
13 Plaintiff contends this finding was based on false and fabricated
14 evidence.

15         **DUF 29**:  On August 12, 2004, the District Attorney
16 filed the Information in People of the State of California v.
17 Tiffany Michelle Fenters, Merced County Superior Court Case No.
18 29142.

19             *Plaintiff's Response*: UNDISPUTED.

20         **DUF 30**:  Abbate did not participate in or control the
21 decision to file the Information.  Supporting Evidence: Exh. Q,
22 Criminal Information; Exh. P, Bacciarini Decl., ¶ 4; Exh. I,
23 Bacciarini Depo. 74:15-75:22; Exh. A, Abbate Decl., ¶ 8.

24             *Plaintiff's Response*: Disputed on identical
25 grounds stated in response to DUF 10.

26             *Court Ruling*: DUF 30 is UNDISPUTED; Plaintiff's

                              26

evidence does not negate the absence of evidence that Abbate did not participate in or control the decision to file the Information, even if he influenced the decision.

**DUF 31**:  After the preliminary hearing, the District Attorney hired an outside accounting expert, Cassabon & Associates, as a witness for the prosecution.

*Plaintiff's Response*: UNDISPUTED.

**DUF 32**:  The District Attorney hired Cassabon & Associates based on its prosecutorial discretion.  Supporting Evidence: Exh. G, Spencer Depo., 66:7-24, 77:17-78:3; Exh. P, Bacciarini Decl., ¶ 2.

*Plaintiff's Response*: Disputed on the identical grounds stated in response to DUF 10.

*Court Ruling*: DUF 32 is UNDISPUTED.  Plaintiff's evidence does not contradict that the District Attorney hired Cassabon & Associates to provide expert services and testimony for the prosecution and provides no evidence that Abbate had any participation in that decision.

**DUF 33**:  Cassabon & Associates' assignment was to analyze daily register records to determine if anything was suspicious with the transactions taking place at Yosemite Chevron.  Supporting Evidence: Exh. T, Fung Depo., 20:9-19; Exh. B, Jury Trial Transcript, 320:19-22.

*Plaintiff's Response*: Disputed.  As defendant Fung testified at the criminal trial, his assignment was to "to determine whether there [were] assets misappropriated at the

1  Yosemite Chevron gas station, and if any, estimate the amount of
2  . . . embezzlement." Trial Transcript, p. 320. In his deposition,
3  Fung described his assignment as "[t]racing the money." Fung
4  Deposition, p. 12.

5            *Court Ruling*: DISPUTED.  Defendants'
6  characterization of the employment of Cassabon & Associates is
7  too limited; it included a fraud investigation, calculating the
8  amount of loss, and tracing the money.

9            **DUF 34**:  Cassabon & Associates went through the daily
10 register records (Pay Point Reports) to analyze the frequency of
11 voided transactions in relationship to the total amount of sales
12 transactions among the various employees.

13           *Plaintiff's Response*: UNDISPUTED.

14           **DUF 35**:  Victor Fung ("Fung"), of Cassabon &
15 Associates, performed an analysis of Yosemite Chevron's daily
16 register records (Pay Point Reports) and determined that Fenters
17 embezzled cash from Yosemite Chevron, as memorialized in his
18 Report of October 31, 2004.  Supporting Evidence: Ex. B, Jury
19 Trial Transcript, 320:23:321:9. 322:1-10, 344:3-10

20           *Plaintiff's Response*:  Disputed. Fung did not
21 "determine" anything, but merely reached an opinion that cash was
22 taken.  Additionally, Fung reached this opinion without
23 considering a number of factors, including how voids could occur,
24 whether multiple employees worked on the register during a given
25 shift, the internal controls of the business, and the videotapes
26 that would have shown what the ordinary course of business was.

28

Trial Transcript, pp. 345-354. Fung attributed all of the voids on the shifts Fenters worked to her, even though there was preceding trial testimony that established that multiple employees worked and used the register each shift. See Trial Testimony, pp. 242, 347, 349.  During the criminal trial, plaintiff's accounting expert, John Bettercourt, testified that it was necessary for a forensic accountant under the circumstances presented to evaluate the internal controls of the subject business, as well as its cash register policies, both as written and practiced. See Trial Transcript, p. 521-522. Bettencourt visited Yosemite Chevron posing as a customer five times and found internal controls lacking, with multiple employees working the cash register during a given shift. See Trial Transcript, pp. 528. As many as eight people were found to use a register during a two shift period. See Trial Transcript, pp. 537-538. Bettencourt also found that Fung's reliance on an "acceptable void" figure to be specious because nine of the twelve employees exceeded that average, and, under Fung's criteria, would have been stealing. See Trial Transcript, pp. 544.  In his deposition, Fung acknowledged that he was not trained as a forensic accountant and had only been a CPA for two months at the time he was assigned the Fenters case. Fung Deposition, pp. 14, 17. Fung was not attempting to follow any accounting standards or protocols in this case. Fung Deposition, p. 15. Fung did not contact Abbate or anyone else affiliated with Yosemite Chevron. Fung Deposition, p. 23. Fung

never visited the business location, reviewed the model cash
register used at the business, or reviewed any surveillance
videos from the business. Fung Deposition, p. 23-24.  Fung also
did not review any financial or profit/loss statements of
Yosemite Chevron. Fung Deposition, p. 24. No one ever offered
these documents to Fung, and he did not request them. Fung
Deposition, p. 25, 62. Fung also did not receive a list of
Yosemite Chevron employees. Fung Deposition, p. 25.  Fung
described his approach to his assignment as figuring out the
frequency of void transactions in relation to the total sales
transactions and then make an employee by employee comparison.
Fung Deposition, p. 30. Fung only reviewed the pay point reports
and the criminal report, which included Abbate's spreadsheet.
Fung Deposition, p. 23, 31. Fung assumed that an employee who
signed a pay point report was responsible for every transaction
reflected therein, even though he never tested that assumption.
Fung Deposition, p. 40. Fung considered the possibility that a
pay point report might reflect more than one employee's work
product but discounted it in his methodology, based on the
further assumption that "that chance is the same for all
employees." Fung Deposition, p. 41,43. Fung felt this variable
could be discounted even if certain employees were intentionally
stealing and were therefore trying to conceal their identities.
Fung Deposition, p. 42-43. Fung did not take any action in an
attempt to validate this assumption, such as sampling reports or
interviewing employees. Fung Deposition, p. 45. Fung also did not

consider that different numbers of people worked different
shifts. Fung Deposition, p. 46-47.  Fung did not consider the
days and shifts on which inventory was recorded in his
analysis. Fung Deposition, p. 52. Fung also did nothing to assess
the quality of the controls in place at Yosemite Chevron,
although he recognized that this could affect the reliability of
the records he reviewed. Fung Deposition, p. 53-54.  Overall,
Fung's approach was similar to the Abbate's spreadsheet approach.
Bacciarini Deposition, p. 14.  In Bettencourt's expert report, he
declared that the spreadsheet provided by defendant Robert Abbate
and the work product of Cassabon were indicative of false,
fabricated and/or misleading work product Bettencourt opined that
the defendants' accounting work was not merely substandard or
negligent but instead is reflective of false, fabricated, and/or
misleading work. See Bettencourt Report, Exhibit A.  In his
deposition, Bettencourt confirmed his report and further
testified that Abbate's and Cassabon's work product
was misleading and misstated the evidence. See Bettencourt
Deposition, pp.  33, 38, 78, 97. Bettencourt testified that it
was not reasonable or in good faith actions to attribute all of
the voids on a particular shift to a specific employee.
Bettencourt Deposition, p. 157-158, 161. Both Abbate's
spreadsheet and Fung's report were similar in this respect.
Bettencourt Deposition, p. 160, 161. Bettencourt is of the
opinion that these actions could raise an inference of bad faith
that could be found by a jury. Bettencourt Deposition, p. 163.

*Court Ruling*: DUF 35 is UNDISPUTED that Fung analyzed the daily register records (Pay Point Reports) and opined that Fenters embezzled cash from Yosemite Chevron, as memorialized in his Report of October 31, 2004.  That Plaintiff claims her evidence shows that Fung's analysis was incomplete, dishonest and incompetent, does not contradict this fact.

DUF 36:  Fung did not rely upon the spreadsheet or analysis of Robert Abbate in preparing his Report in the criminal action.  Supporting Evidence: Exh. B, Jury Trial Transcript, 320-321:9; Exh. T, Bettancourt Depo., 85:7-11, 121:6-8; Exh. S, Fung Decl. ¶ 16.

*Plaintiff's Response*: Disputed. Fung testified in his deposition that the first thing he did after Cassabon's retention was to meet with defendant Hutton and the then assigned prosecutor, James Swanson. Fung Deposition, p. 18.  During a one hour meeting, Fung was told that the prosecution suspected that Fenters was stealing money by voiding transactions. Fung Deposition, p. 18.  Fung was told the prosecution wanted him to analyze the pay point reports, a box of which he received on that occasion. Fung Deposition, p. 20. Fung also received Hutton's report which had Abbate's spreadsheet as an attachment. Fung Deposition, pp. 19, 22. Fung was told the attachment was a spreadsheet prepared by Abbate himself. Fung Deposition, p. 22. Overall, Fung's approach was similar to the Abbate's spreadsheet approach.  Bacciarini Deposition, p. 14.

*Court Ruling*: DUF 36 is DISPUTED.  Plaintiff's

evidence raises a question of fact that Fung relied on or analyzed Abbate's spreadsheet and attached to Hutton's report.

**DUF 38:**  Fung decided on the methodology to be utilized for his analysis.  Supporting Evidence: Exh. T, Fung Depo., 30:10-15, 35:15-17, 36:5-11; Exh. S, Fung Decl. ¶ 6; Exh. U, Bettancourt Depo. 45:4-10

*Plaintiff's Response*: Disputed on the identical grounds stated in response to DUF 37.

*Court Ruling*: DUF 38 is DISPUTED.  Plaintiff's evidence permits the inference that Fung was so inexperienced and incompetent as to raise a question of fact that Fung decided the methodology utilized for his analysis.

**DUF 39:**  Cassabon & Associates, including Fung, had no contact with Abbate at any time regarding the criminal action.

*Plaintiff's Response*: UNDISPUTED.

**DUF 40:**  Fung was not told anything about the individual who was the principal for the victim, Yosemite Chevron, during the course of his work in the criminal action. Supporting Evidence: Exh. T, Fung Depo., 60:16-19.

*Plaintiff's Response*: Disputed on the identical grounds stated in response to DUF 37.

*Court Ruling*: DUF 40 is UNDISPUTED.  Plaintiff's evidence does not contradict Fung's deposition testimony that he was not told anything about Abbate.

**DUF 41:**  Cassabon & Associates, including Fung, never went to Yosemite Chevron as part of their work in

1    People v. Fenters.

2              *Plaintiff's Response*: UNDISPUTED.

3         DUF 42:  Cassabon & Associates, including Fung, never

4    contacted any employees from Yosemite Chevron as part of their

5    work in People v. Fenters.

6              *Plaintiff's Response*: UNDISPUTED.

7         DUF 43:  Fung never contacted any accountant or

8    bookkeeper that had any relationship with Yosemite Chevron.

9              *Plaintiff's Response*: UNDISPUTED.

10        DUF 44:  Bacciarini never discussed the Abbate family

11   with Fung or Cassabon & Associates.

12             *Plaintiff's Response*: UNDISPUTED.

13        DUF 45:  Fung did not have any contact with members of

14   the Abbate family during the course of his work in the criminal

15   action.

16             *Plaintiff's Response*: UNDISPUTED.

17        DUF 46:  Fung never asked to review any materials that

18   were not provided to him.

19             *Plaintiff's Response*: UNDISPUTED.

20        DUF 47:  The criminal trial in People v. Fenters

21   took place between October 5 to 13, 2005.

22             *Plaintiff's Response*: UNDISPUTED.

23        DUF 48:  Bacciarini did not mention or reference

24   the Abbate Spreadsheet in his Opening Statement at the criminal

25   trial.  Supporting Evidence: Exh. B, Jury Trial Transcript, 171-

26   181; Exh. I, Bacciarini Depo., 72:6-25.

1      ***Plaintiff's Response***:  Disputed. As the transcript
2  of the opening statement at trial shows, Bacciarini argued for
3  Fenters' guilt based on several factors, not merely the financial
4  analysis performed by Cassabon. Bacciarini also recalls that
5  Abbate's financial analysis was part of his presentation at both
6  the preliminary hearing and at trial. Bacciarini Deposition,.
7  83-84.

8      ***Court Ruling***: DUF 48 is UNDISPUTED.  Plaintiff's
9  evidence does not contradict that Bacciarini did not mention or
10 refer to the Abbate Spreadsheet in his opening statement.
11 Bacciarini's deposition testimony cited by Plaintiff does not
12 state that Bacciarini relied on Abbate's analysis at trial.

13     <u>DUF 49</u>:  In his Opening Statement, Bacciarini argued
14 Fenters was guilty based on Fung's Report.  Supporting Evidence:
15 Exh. B, Jury Trial Transcript, 171-181.

16     ***Plaintiff's Response***: Disputed on identical
17 grounds stated in response to DUF 48.

18     ***Court Ruling***: DUF 49 is DISPUTED to the extent
19 that Bacciarini relied on other factors as well as the report
20 prepared by Fung; but UNDISPUTED that Bacciarini did not refer to
21 the Abbate Spreadsheet.

22     <u>DUF 50</u>:  At the criminal trial, Bacciarini relied
23 upon Cassabon & Associates' analysis of Yosemite Chevron's daily
24 register records.  Supporting Evidence: Exh. B, Jury Trial
25 Transcript, 171-181, 318-363, 642-657, 694, 697, 198-224, 222:22-
26 255, 245-250; Exh. I, Bacciarini Depo., 72:2-19.

1   **_Plaintiff's Response_: Disputed on identical
2   grounds stated in response to DUF 48.**

3   **_Court Ruling:_ DUF 50 is UNDISPUTED.  Plaintiff's
4   evidence does not contradict that Bacciarini relied, at least in
5   part, on Fung's report.**

6   **DUF 51:  The District Attorney did not mark or
7   introduce the Abbate Spreadsheet into evidence at the criminal
8   trial.**

9   **_Plaintiff's Response_:  Disputed.  Bacciarini
10  recalls that Abbate testified at both the preliminary hearing
11  and the criminal trial regarding his financial analysis.
12  Bacciarini Deposition, p. 83-84.  Overall, Fung's approach was
13  similar to the Abbate's spreadsheet approach.  Bacciarini
14  Deposition, p. 14.**

15  **_Court Ruling_: DUF 51 is UNDISPUTED.  Abbate's
16  testimony at the preliminary hearing is irrelevant to DUF 51
17  because his spreadsheet was ruled inadmissible at the preliminary
18  hearing.  More importantly, DUF 51 pertains to the introduction
19  of Abbate's spreadsheet at the criminal trial.  Plaintiff
20  presents no evidence that the Abbate Spreadsheet was introduced
21  at the criminal trial.**

22  **DUF 52:  During the criminal trial, the District
23  Attorney did not ask Abbate to testify about his analysis or
24  findings from the Abbate Spreadsheet.  Supporting Evidence: Exh.
25  B, Jury Trial Transcript 198-224, 222:22-255, 245-250; Exh. I,
26  Bacciarini Depo., 72:6-19.**

*Plaintiff's Response*: Disputed. Bacciarini recalls that Abbate testified at both the preliminary hearing and the criminal trial regarding his financial analysis. Bacciarini Deposition, p. 83-84.  Abbate testified about his investigation into Fenters' and Aceves' voided transactions on pages 221-222 of the criminal trial transcript. Even though he did not make specific reference to his spreadsheet, Abbate did testify about his findings and underlying methodology.  It is because of this direct examination testimony that the defense was able to question Abbate about the spreadsheet itself on cross examination.  See Trial Transcript, pp. 236-241. Even Hutton acknowledges this took place. Hutton Deposition, p. 82.

*Court Ruling*: DISPUTED.

<u>DUF 53</u>:  During the criminal trial, Fung did not testify about the calculations or analysis made by Abbate.

*Plaintiff's Response*: Disputed, as Bacciarini recalls that Fung's approach was similar to the Abbate's spreadsheet approach. Bacciarini Deposition, p. 14.

*Court Ruling*: DUF 53 is UNDISPUTED.  Plaintiff points to no testimony by Fung, which speaks of itself, pertaining to the calculations or analysis made by Abbate; that the Cassabon Defendants' analysis was similar to that of Abbate does not negate that Fung did not testify about Abbate's calculations or analysis.

<u>DUF 54</u>:  Bacciarini did not mention or reference the Abbate Spreadsheet in his Closing Statement at the criminal

37

trial.

> *Plaintiff's Response*:  Disputed. As the transcript of the trial shows, Bacciarini argued for Fenters' guilt based on several factors, not only the financial analysis performed by Cassabon.  Bacciarini also recalls that Abbate's financial analysis was part of his presentation at both the preliminary hearing and at trial. Bacciarini Deposition, 83-84.

> *Court Ruling*: DUF 54 is UNDISPUTED.  Plaintiff's evidence does not contradict that Bacciarini did not mention or reference the Abbate Spreadsheet during his closing argument.

DUF 55:  In his Closing Statement, Bacciarini argued Fenters was guilty based on the Fung Report and Aceves statements.  Supporting Evidence: Exh. B, Jury Trial Transcript 642-657, 694-697.

> *Plaintiff's Response*: Disputed on identical grounds stated in response to DUF 54.

> *Court Ruling*: DUF 55 is UNDISPUTED that Bacciarini relied primarily on the Fung report and the Aceves statements in his closing argument.

DUF 56:  The first time Aceves told anyone from the District Attorney's office that Fenters was not involved in the voiding transaction scheme was during the criminal trial. Supporting Evidence: Exh. I, Bacciarini Depo., 47:6-48:5; Exh. B, Jury Trial Transcript 648:9-17; Exh. F, Aceves Depo., 69:11-25, 70:13-20, 185:23-186:15, 129:13-132:18.

1           *Plaintiff's Response*:  Disputed. Defendant Hutton

2    was present at the June 4, 2003 meeting when Aceves only

3    mentioned Fenters because she was first suggested by Abbate

4    himself. See Trial Transcript, p 268, 270, 272. Abbate indicated

5    that Aceves could receive a shorter sentence if he helped make

6    the case against Fenters easier. See Trial Transcript, p. 294.

7    The prosecution echoed this offer. Bacciarini Deposition, p.

8    64. Abbate also told Aceves that if Aceves could get evidence to

9    convict Fenters that he could benefit in his own case, in part in

10   order to "lure him in." See Trial Transcript, pp. 295; Abbate

11   Deposition, p. 107. There is thus ample evidence that Abbate

12   suggested Fenters as a possible embezzler and that Aceves never

13   implicated her of his own accord. There is thus evidence that

14   Hutton, who was present for the interview, was on notice of

15   these facts as of June 2003.

16          *Court Ruling*: DUF 56 is UNDISPUTED.  The

17   transcript of the June 4, 2003 interview between Aceves, Abbate

18   and Hutton does not support Plaintiff's assertions.  The

19   transcript is clear that Aceves was the first person to mention

20   Fenters as a participant in Aceves' scheme to embezzle from

21   Yosemite Chevron.  Further, Plaintiff's evidence does not

22   contradict the evidence that the first time Aceves told anyone

23   from the District Attorney's office that Fenters was not involved

24   in the voiding transaction scheme was during the criminal trial

25          <u>DUF 57</u>:  Aceves never told Abbate that he was not

26   telling the truth when he said Fenters had taught him how to

steal.   Supporting Evidence: Exh. F, Aceves Depo. 69-11:25, 70:13-20, 185:23-186:15, 129:13-132:18.

*Plaintiff's Response*: Disputed on identical grounds stated in response to DUF 16.

*Court Ruling*: DUF 57 is UNDISPUTED.  Plaintiff's evidence does not contradict Aceves deposition testimony that he did not tell Abbate that he was lying about Plaintiff.

DUF 58:  Abbate was not in charge of the investigation of the criminal case against Fenters.  Supporting Evidence: Exh. I, Bacciarini Depo. 74:15-17.

*Plaintiff's Response*: Disputed on identical grounds stated in response to DUF 10.

*Court Ruling*: DUF 58 is UNDISPUTED as there is not evidence that Abbate was in charge of the investigation of the criminal case, even though there is evidence from which it may be inferred that Abbate influenced the investigation.

DUF 59:  It was within the District Attorney's Office, including its investigators, discretion to determine what evidence to gather to prosecute Fenters.

*Plaintiff's Response*: Disputed on identical grounds stated in response to DUF 10.

*Court Ruling*: DUF 59 is UNDISPUTED.  Although there is evidence that Abbate sought to influence the prosecution and trial of Plaintiff, those decisions were made by the prosecution.

DUF 60:  From commencement of the criminal action until

40

its conclusion, the District Attorney's office had the discretion whether to file the complaint and information, prosecute, dismiss or plea bargain.

**Plaintiff's Response**: Disputed on identical grounds states in response to DUF 10.

**Court Ruling**: DUF 60 is UNDISPUTED.  Although there is evidence that Abbate sought to influence the prosecution and trial of Plaintiff, those decisions were made by the prosecution.

**DUF 61**:  Deputy District Attorney Bacciarini did not prosecute the case any differently because the victim was a member of the Abbate family.

**Plaintiff's Response**:  Disputed. Bacciarini testified that he did not know why Abbate's complaint did not go to the Merced Police Department first.  Bacciarini Deposition, p. 55. Hutton acknowledges that Abbate could have taken his allegations to the Merced Police Department instead of the District Attorney's Office. Hutton Deposition, p. 45. Moreover, the District Attorney's Office has directed similar potential cases to the Merced PD. See Exhibit B, Email communication from the Merced DA's Office re: a potential embezzlement case in the City of Merced. Spencer could not provide only two examples of embezzlement cases in the last five years of his tenure where his officer was the lead investigating agency. Spencer Deposition, p. 35-38.

**Court Ruling**: DUF 63 is UNDISPUTED.  Plaintiff's

41

1  evidence does not show whether Baccarini's prosecution of the

2  criminal case was different from other cases he prosecuted.

3          DUF 62:  Abbate did not control the District Attorney's

4  decision to proceed to trial.

5          *Plaintiff's Response*: Disputed on identical

6  grounds stated in response to DUF 10.

7          *Court Ruling*: DUF 62 is UNDISPUTED. Plaintiff's

8  evidence does not raise an inference that Abbate controlled the

9  District Attorney's decision to proceed to trial, although there

10  is evidence that Abbate sought to influence the prosecution.

11          DUF 63:  The District Attorney did not prosecute or

12  take the criminal case to trial due to pressure from Robert

13  Abbate or the Abbate family.  Supporting Evidence: Exh. G,

14  Spencer Depo. 73:1-8; Exh. J, Souza Depo., 31:8-12, 126:19-

15  127:13, 158:16-22, 40:14-18, 102:15-20; Exh. W, Hutchins Depo.,

16  25:21-25, 29:20-30:1, 44:23-45:17, 46:16-48:15; Exh. U,

17  Bettancourt Depo., 26:25-27:4, 28:13-17, 31:6-10, 33:16-21, Exp.

18  P, Bacciarini Decl. ¶ 5; Exh. E, Plaintiff Depo., 14:14-17,

19  16:19-17-25.

20          *Plaintiff's Response*: Disputed on identical

21  grounds stated in response to DUF 10.

22          *Court Ruling*: DUF 65 is UNDISPUTED.  Plaintiff's

23  evidence does not contradict that Plaintiff was not prosecuted

24  only because of pressure from Abbate or the Abbate family,

25  although there is evidence from which it may be inferred that

26  Abbate sought to influence the prosecution.

1    **DUF 64**:  The District Attorney relied upon Aceves'
2    confession and statements in prosecuting Fenters.

3           *Plaintiff's Response*: Disputed on identical
4    grounds stated in response to DUF 10 and DUF 48.

5           *Court Ruling*: DUF 64 is UNDISPUTED.  Plaintiff's
6    evidence does not contradict that the prosecution relied on and
7    used the Aceves' statements in prosecuting Plaintiff.

8           **DUF 65**:  The District Attorney also relied upon the
9    forensic accounting performed by Cassabon & Associates to
10   prosecute Fenters.

11          *Plaintiff's Response*: Disputed on identical
12   grounds stated in response to DUF 48.

13          *Court Ruling*: DUF 65 is UNDISPUTED that the
14   prosecution relied on Cassabon's Fung Report and work in
15   prosecuting Plaintiff.

16          **DUF 66**:  Bacciarini would have prosecuted and taken
17   this matter to trial based alone on the statements of Aceves and
18   evaluation done by Cassabon & Associates.

19          *Plaintiff's Response*: Disputed on identical
20   grounds stated in response to DUF 10.

21          *Court Ruling*: DISPUTED based on Abbate's
22   participation in the investigation.

23          **DUF 67**:  If Abbate never would have prepared a
24   spreadsheet, Bacciarini would still have prosecuted and taken
25   this matter to trial based on the statement of Aceves and Report
26   of Cassabon & Associates.

43

1          *Plaintiff's Response*: Disputed on identical
2   grounds stated in response to DUF 10.

3          *Court Ruling*: DISPUTED.

4          <u>DUF 68</u>:  The only post-verdict contract Bacciarini had
5   with Robert Abbate was when he called Abbate and told him about
6   the not guilty verdict, to which Abbate had no specific reaction.

7          *Plaintiff's Response*: UNDISPUTED.

8          <u>DUF 69</u>:  Bacciarini never spoke to any member of the
9   Abbate family in relation to the criminal matter other than
10  Robert Abbate.

11         *Plaintiff's Response*: UNDISPUTED.

12         <u>DUF 70</u>:  Bacciarini did not know Robert Abbate, or any
13  Abbate family member, prior to becoming involved in the criminal
14  action.

15         *Plaintiff's Response*: UNDISPUTED.

16         <u>DUF 71</u>:  Bacciarini was not aware of any relationship
17  between Gordon Spencer and Robert Abbate or the Abbate family
18  during the criminal action.  Supporting Evidence: Exh. I,
19  Bacciarini Depo., 39:11-19.

20         *Plaintiff's Response*:  Disputed. Plaintiff saw
21  Abbate, Bacciarini and Spencer having conversations outside
22  of court in connection with her court appearances. Plaintiff's
23  Deposition, p. 32-34.

24         *Court Ruling*: DUF 71 is UNDISPUTED.  Plaintiff
25  merely saw the District Attorney, the prosecutor and Robert
26  Abbate conversing outside the courtroom during her criminal

1  trial.   Plaintiff does not testify as to the content of those

2  conversations; this evidence does not contradict Bacciarini's

3  testimony that he was unaware of any relationship between Spencer

4  and Abbate during the criminal trial.

5       **DUF 72**:  Bacciarini was never told by anyone to

6  prosecute the case differently because the victim was Robert

7  Abbate or a member of the Abbate family.   Supporting Evidence:

8  Exh. I, Bacciarini Depo., 70:19-22; 71:7-10, 67:8-17.

9       *Plaintiff's Response*:   Disputed, as there is ample

10 circumstantial evidence that this case was not handled in the

11 normal manner. Disputed. Bacciarini testified that he did not

12 know why Abbate's complaint did not go to the Merced Police

13 Department first. Bacciarini Deposition, p. 55. Hutton

14 acknowledges that Abbate could have taken his allegations to the

15 Merced Police Department instead of the District Attorney's

16 Office. Hutton Deposition, p. 45. Moreover, the District

17 Attorney's Office has directed similar potential cases to the

18 Merced PD. See Exhibit B, Email communication from the Merced

19 DA's Office re: a potential embezzlement case in the City of

20 Merced.   Spencer could not provide only two examples of

21 embezzlement cases in the last five years of his tenure where his

22 officer was the lead investigating agency.   Spencer Deposition,

23 p. 35-38.

24      *Court Ruling*: DUF 72 is UNDISPUTED.  Plaintiff's

25 evidence relates to the investigation of Abbate's complaint, not

26 to the prosecution of the criminal charge eventually brought

against her.   Plaintiff presents no evidence of what statement,
if any, was made to Bacciarini about prosecuting the case.

 **DUF 73**:  No one ever told Bacciarini to fabricate
evidence to support the charges against Fenters.   Supporting
Evidence: Exh. I, Bacciarini Depo., 71:3-6, 73:2-4.

 *Plaintiff's Response*: Disputed on identical
grounds stated in response to DUF 10.

 *Court Ruling*: DUF 73 is UNDISPUTED.   Plaintiff's
evidence pertains to the investigation conducted by Abbate and
Hutton and does not evidence that Bacciarini was told to
fabricate evidence to support the criminal charge against
Plaintiff.

 **DUF 74**:  Abbate did not fabricate any Pay Point
Reports to show embezzlement.

 *Plaintiff's Response*:  Disputed, as the evidence
shows the bad faith of the spreadsheet document.   Until the time
the Cassabon firm was retained after the preliminary hearing, the
District Attorney's Office relied on Abbate to review the
financial information pertinent to the case against Fenters.
Hutton Deposition, p. 33-34. Abbate's financial analysis was one
of the reasons that Hutton submitted the case against Fenters
for filing. Hutton Deposition, p. 82.   Indeed, the Abbate
spreadsheet was the only financial evidence then available in a
prospective financial crime case. Hutton Deposition, pp. 82-83.
Abbate conceded on cross-examination at the preliminary hearing
that the voids attributable to Fenters were overstated in his

spreadsheet. See Preliminary Hearing Transcript, pp. 52-59.
Abbate also conceded that certain entries in his spreadsheet
appeared to be entered wrongly, and he spent no time reviewing
the initial draft spreadsheet he prepared.  See Preliminary
hearing Transcript, pp. 60-61; Abbate Deposition, p. 60, 64.
Abbate also attributed certain shifts to Fenters, even though the
underlying pay point reports did not contain her genuine
signature. See Trial Transcript, pp. 491-492.  Abbate also did
not provide any tax returns or other financial documents
reflecting a drop in revenues during the time when the
embezzlement was allegedly occurring. Hutton Deposition, p.
22. Abbate also did not provide Hutton with any videotapes from
the register area. Hutton Deposition, p. 23. This is further
circumstantial evidence of his intent to conceal the truth and
unduly influence the criminal proceedings against Fenters.

    *Court Ruling*: DISPUTED.  This is a matter for
resolution by the trier of fact.

    <u>DUF 75</u>:  Plaintiff's Accounting Expert, John
Bettencourt ("Bettencourt"), testified that he has performed no
analysis on the Abbate Spreadsheet since the preliminary
hearing because it was ruled inadmissible.

    *Plaintiff's Response*: UNDISPUTED.

    <u>DUF 76</u>:  Bettencourt testified that he found
numerical error in the Abbate Spreadsheet which may all be
innocent mistakes.  Supporting Evidence: Exh. U, Bettancourt
Depo., 56:3-6, 75:10-77:11.

1    *Plaintiff's Response*:  Disputed.  In Bettencourt's

2  expert report, he declared that the spreadsheet provided by

3  defendant Robert Abbate and the work product of Cassabon were

4  indicative of false, fabricated and/or misleading work product.

5  Bettencourt opined that the defendants' accounting work was not

6  merely substandard or negligent but instead is reflective of

7  false, fabricated, and/or misleading work. See Bettencourt

8  Report, Exhibit A.   In his deposition, Bettencourt confirmed

9  his report and further testified that Abbate's and Cassabon's

10  work product was misleading and misstated the evidence. See

11  Bettencourt Deposition, pp. 33, 38, 78, 97. Bettencourt testified

12  that it was not reasonable or in good faith actions to attribute

13  all of the voids on a particular shift to a specific employee.

14  Bettencourt Deposition, p. 157-158, 161. Both Abbate's

15  spreadsheet and Fung's report were similar in this respect.

16  Bettencourt Deposition, p. 160, 161. Bettencourt is of the

17  opinion that these actions could raise an inference of bad faith

18  that could be found by a jury. Bettencourt Deposition, p.

19  **163.**

20         *Court Ruling*: DISPUTED.

21         <u>DUF 77</u>:  Bettencourt testified that he is offering

22  an opinion that Abbate made numerical errors in the Abbate

23  Spreadsheet, but he is not offering an opinion that Abbate

24  deliberately fabricated the Spreadsheet.  Supporting Evidence:

25  Exh. U, Bettancourt Depo., 99:2-19, 123:5-10, 123:5-125:12.

26         *Plaintiff's Response*: Disputed on identical

1  grounds stated in response to DUF 76.

2  *Court Ruling*: DISPUTED.

3  **DUF 78**:  Bettencourt has no knowledge that Abbate

4  deliberately fabricated any numbers in his analysis or

5  spreadsheet.  Supporting Evidence: Exh. U, Bettancourt Depo.

6  99:2-19, 114:1-5, 146:10-20, Exh. E., Plaintiff Depo. 68:23-69:3.

7  *Plaintiff's Response*: Disputed on identical

8  grounds stated in response to DUF 76.

9  *Court Ruling*: DISPUTED.

10  **DUF 79**:  Bettencourt did not perform any analysis of

11  the errors in the Abbate Spreadsheet that would show a pattern of

12  bias indicating that Abbate was attempting to falsify charges of

13  embezzlement against Fenters.  Supporting Evidence: Exh. U,

14  Bettancourt Depo., 101:3-108:13, 109:5-110:5, 126:16-128:7.

15  *Plaintiff's Response*: Disputed on identical

16  grounds stated in response to DUF 76.

17  *Court Ruling*: DISPUTED.

18  **DUF 80**:  Bettencourt did not perform any analysis of

19  the materiality of the errors in the Abbate Spreadsheet that

20  would indicate that the errors had a greater tendency to show

21  embezzlement.  Supporting Evidence: Exh. U, Bettancourt Depo.,

22  101:3-108:13, 109:5-111:3, 115:9-117:23, 118:16-119:5.

23  *Plaintiff's Response*: Disputed on identical

24  grounds stated in response to DUF 76.

25  *Court Ruling*: DISPUTED.

26  **DUF 81**:  Bettencourt did not perform any analysis to

49

1  determine if a different conclusion should have been reached as
2  to embezzlement if the purported errors made by Abbate had been
3  corrected in the Abbate Spreadsheet.  Supporting Evidence: Exh.
4  U, Bettancourt Depo., 126:16-128:7, 129:1-5.

5          *Plaintiff's Response*: Disputed on identical
6  grounds stated in response to DUF 76.

7          *Court Ruling*: DUF 81 is UNDISPUTED; Plaintiff's
8  evidence does not contradict Bettancourt's deposition testimony.

9       <u>DUF 82</u>:  Bettencourt did not perform any analysis on
10  whether Abbate's purported error of listing no midshift, where
11  there was a dual shift, had a material impact or was indicative
12  of misleading work.  Supporting Evidence: Exh. U, Bettancourt
13  Depo., 102:9-103:24.

14          *Plaintiff's Response*: Disputed on identical
15  grounds stated in response to DUF 76.

16          *Court Ruling*: DUF 82 is UNDISPUTED; Plaintiff's
17  evidence does not contradict Bettancourt's deposition testimony.

18       <u>DUF 83</u>:  Bettencourt testified that he has not formed
19  an opinion as to whether the Abbate Spreadsheet was false or
20  fabricated because that goes to state of mind.  Supporting
21  Evidence: Exh. U, Bettancourt Depo., 96:6-97:17.

22          *Plaintiff's Response*: Disputed on identical
23  grounds stated in response to DUF 76.

24          *Court Ruling*: DUF 83 is UNDISPUTED; Plaintiff's
25  evidence does not contradict Bettancourt's deposition testimony.

26          2.    <u>Issue No. 2: Plaintiff Cannot Maintain a Claim for</u>

50

1   **Malicious Prosecution Because She Cannot Meet the Requisite**

2   **Elements**.

3          **DUF 84**:  The Abbate Defendants incorporate by

4   reference Fact Nos. 1-83 and 87-103.

5                *Plaintiff's Responses and Court Rulings*: See

6   *supra.*

7          3.   **Issue No. 3: Plaintiff Cannot Maintain a Claim for**

8   **Violation of Civil Code § 52.1 Because She Cannot Meet the**

9   **Requisite Elements**.

10          **DUF 85**:  The Abbate Defendants incorporate by

11   reference Fact Nos. 1-83.

12                *Plaintiff's Responses and Court Rulings*: See

13   *supra.*

14          **DUF 86**:  Abbate never threatened, coerced, or

15   intimidated Fenters.  Supporting Evidence: Exh. E, Plaintiff

16   Depo., 156:2-6; Exh. F, Aceves Depo., 144:14-22; Exh. U,

17   Bettancourt Depo., 138:24-139:11; Exh. X, Plaintiff's Responses

18   to Robert Abbate's Special Interrogatories, Set One, No. 5.

19                *Plaintiff's Response*: Disputed. As a result of

20   Abbate's and the other defendants' misconduct, Fenters was

21   threatened with the prospect of conviction and incarceration. See

22   Plaintiff's Deposition, p. 401-402. Indeed, the lead prosecutor

23   testified that he would have indeed sought to incarcerate and

24   seek full restitution against Fenters had she been convicted. See

25   Bacciarini Deposition, p. 64-66.

26                *Court Ruling*: UNDISPUTED.  There is no direct or

1  circumstantial evidence that Abbate threatened or coerced
2  Plaintiff.

3          **4.   Issue No. 4: Plaintiff Cannot Maintain a Claim for**
4  **Violation of 29 U.S.C. § 215 Because She Cannot Meet the**
5  **Requisite Elements**.

6          DUF 87:  The Abbate Defendants incorporate by
7  reference Fact Nos. 1-87 and 99-103.

8          *Plaintiff's Responses and Court Rulings*: See
9  *supra*.

10         DUF 88:  Abbate brought a complaint to the District
11  Attorney's office based on a good faith suspicion and belief that
12  Fenters had been stealing from Yosemite Chevron.  Supporting
13  Evidence: Exh. A, Abbate Decl. ¶ 6; Exh. B, Bettancourt Trial
14  Testimony, 573:6-10.

15         *Plaintiff's Response*: Disputed on grounds stated
16  in response to DUF 10.

17         *Court Ruling*: Disputed.

18         DUF 89:  Abbate never consulted with an attorney about
19  potential work-related complaints that could be brought by
20  Plaintiff.  Supporting Evidence: Exh. A, Abbate Decl. ¶ 10.

21         *Plaintiff's Response*:  Disputed. Abbate was not
22  permitted to testify on this subject during his deposition
23  on privilege grounds and must now abide by that assertion of
24  privilege. See Abbate Deposition, p. 140. A party can not invoke
25  and waive privileges at his convenience, thereby using them as
26  both swords and shields in the same case. See United States v.

Rylander, 460 U.S. 752, 759 (1983); Williams v. Florida, 399 U.S. 78, 83-84 (1970).

*Court Ruling*: DISPUTED.

DUF 90:  Fenters admitted her allegations, that Abbate's motive to accuse her of embezzlement was because of her potential harassment lawsuit, is based on speculation. Supporting Evidence: Exh. E, Plaintiff Depo. 162:6-11, 185:15-19, 186:10-189:5.

*Plaintiff's Response*:  Disputed, as Fenters clarified in her deposition testimony that she was only testifying based on her personal knowledge and did not intend to characterize the entirety of her evidence.  See Plaintiff's Deposition, p. 400-401. The evidence set forth above shows Abbate's bad faith motive independent of what Fenters personally has knowledge of.

*Court Ruling*: DISPUTED.

DUF 91:  Fenters did not have any conversations with Abbate about her feeling that Ed Montes was harassing her at work.  Supporting Evidence: Exh. E, Plaintiff Depo., 191;16-19.

*Plaintiff's Response*:  Disputed. Fenters told Abbate about Montes' misconduct, and Abbate spoke with Montes about it thereafter. Abbate Deposition, p. 70-71. Abbate claims he thereafter did his best to ensure that Montes and Fenters did not work the same shift. Abbate Deposition, p. 72.

*Court Ruling*: DUF 91 is UNDISPUTED.  Plaintiff testified that she had no conversations with Abbate that Montes

53

was harassing Plaintiff at work; Plaintiff's evidence relates to an incident reported by Plaintiff to Abbate that occurred at Montes' residence.

DUF 92:  There is no evidence that Abbate was aware that Fenters had made any complaints about Montes or any other employees harassing her at work.  Supporting Evidence: Exh. E, Plaintiff Depo., 191:16-19.

*Plaintiff's Response*: Disputed on grounds stated in response to DUF 91.

*Court Ruling*: DUF 92 is UNDISPUTED.  Plaintiff testified that she had no conversations with Abbate that Montes was harassing Plaintiff at work; Plaintiff's evidence relates to an incident reported by Plaintiff to Abbate that occurred at Montes' residence.

DUF 93:  Fenters never mentioned to Abbate that she intended to bring a lawsuit against him.  Supporting Evidence: Exh. E, Plaintiff Depo., 163:8-14.

*Plaintiff's Response*:  Disputed, as Fenters complained about overtime, salary and sexual harassment issues to Abbate and Yosemite management, even if she made no specific threat of a lawsuit. See Plaintiff's Deposition, p. 164-166, 167-168, 169-170, 172-174, 177-178, 179-180, 181-183, 188-192.

*Court Ruling*: DUF 93 is UNDISPUTED; Plaintiff never told Abbate that she intended to file a lawsuit against him.

1    **DUF 94**:  **Fenters never mentioned to any Yosemite**
2    **Chevron employee that she intended to bring a lawsuit against**
3    **Abbate or Yosemite Chevron.**

4         *Plaintiff's Response*: Disputed on grounds stated
5    in response to DUF 93.

6         *Court Ruling*: DUF 94 is UNDISPUTED for the same
7    reason as DUF 93.

8    **DUF 95**:  **Bacciarini never heard or talked to Bruce**
9    **Sousa or Abbate about any potential civil lawsuit against Abbate**
10   **by Fenters.**

11        *Plaintiff's Response*: UNDISPUTED.

12   **DUF 96**:  **Aceves testified that Fenters never complained**
13   **to him about specific problems with working at Yosemite Chevron.**
14   **Supporting Evidence: Exh. F, Aceves Depo., 34:24-35:24.**

15        *Plaintiff's Response*:  Disputed, as this fact is
16   of no significance.  Aceves and Fenters were merely coworkers and
17   had no contact outside of the workplace. See Aceves Deposition,
18   pp. 23-27. There is nothing suggesting that Fenters would have
19   told such a person about the subject matters at issue.

20        *Court Ruling*: DUF 96 is UNDISPUTED as Plaintiff
21   admits no such conversation.

22   **DUF 97**:  **Aceves testified that Fenters never**
23   **complained to him about any of the coworkers at Yosemite Chevron.**

24        *Plaintiff's Response*: Disputed on grounds stated
25   in response to DUF 96.

26        *Court Ruling*: DUF 97 is UNDISPUTED.

1    **5.   Issue No. 5: Plaintiff Cannot Maintain a Claim for**

2    **Violation of 29 U.S.C. § 201 Because She Cannot Meet the**

3    **Requisite Elements**.

4    **DUF 98**:  The Abbate Defendants incorporate by

5    reference Fact Nos. 1-98.

6    *Plaintiff's Responses and Court Rulings*: See

7    *supra*.

8    **DUF 99**:  Yosemite Chevron paid all required overtime

9    under the laws of California based on the time cards submitted by

10   Fenters.  Supporting Evidence: Exh. A, Abbate Decl. ¶ 11.

11   *Plaintiff's Response*:  Disputed. Fenters

12   testified that she was not paid time and a half for overtime,

13   even if she could not at her deposition provide a calculation as

14   to that time. See Plaintiff's Deposition, p. 305, 355-356.

15   *Court Ruling*: DISPUTED.

16   **DUF 100**:  Fenters has no evidence to show that

17   Yosemite Chevron's timecards are inaccurate.  Supporting

18   Evidence: Exh. E, Plaintiff Depo. 349:16-355:10.

19   *Plaintiff's Response*: Disputed on grounds stated

20   in response to DUF 99.

21   *Court Ruling*: DISPUTED as per Plaintiff's

22   deposition testimony.

23   **DUF 101**:  At deposition, Fenters could not identify any

24   specific date that she was not paid for overtime.  Exh. E,

25   Plaintiff Depo., 163:24-164:18, 349:16-355:10, 355:20-357:3.

26   *Plaintiff's Response*: Disputed on grounds stated

56

1  in response to DUF 99.

2           *Court Ruling*: DUF 101 is UNDISPUTED.

3           DUF 102:  At deposition, Fenters could not identify any

4  specific hour of overtime that she has not been paid for by

5  Yosemite Chevron.  Supporting Evidence: Exh. E, Plaintiff Depo.,

6  305:1-18, 349:16-355:10, 355:20-357:3.

7           *Plaintiff's Response*: Disputed on grounds stated

8  in response to DUF 99.

9           *Court Ruling*: DUF 102 is UNDISPUTED.

10          DUF 103:  At deposition, Fenters testified that there

11 could be zero hours of overtime that have been unpaid.

12 Supporting Evidence: Exh. E, Plaintiff Depo., 305:1-18.

13          *Plaintiff's Response*: Disputed on grounds stated

14 in response to DUF 99.

15          *Court Ruling*: DUF 103 is UNDISPUTED; Plaintiff so

16 testified at her deposition.

17     D.   FIRST CLAIM FOR RELIEF FOR VIOLATION OF SECTION 1983.

18     The first claim for relief in the FAC alleges violations of

19 42 U.S.C. § 1983 against all Defendants:

20          34.  The defendants' intentional and reckless
            acts, as described above, constitute a
21          deprivation of Tiffany's ... rights under the
            Fourth Amendment not to have her liberty
22          restricted without legal basis, to be
            arrested without probable cause, and not to
23          be prosecuted maliciously without probable
            cause.  With respect to these constitutional
24          violations, as alleged hereinabove,
            defendants Yosemite Chevron, Abbco, Abbate,
25          Fung, McIlhatton, and Cassabon were acting in
            joint activity with and/or conspiring with
26          Spencer and Hutton.

The Abbate Defendants move for summary judgment on the grounds that the District Attorney's Office acted with independent discretion to prosecute; that Plaintiff cannot show that Abbate controlled the investigation or decision to prosecute; and that the Abbate Defendants are entitled to absolute witness immunity.

     1.   _Smiddy_ **Presumption.**

The Ninth Circuit has long recognized that "[f]iling a criminal complaint immunizes investigating officers ... from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir.1981)(*Smiddy I*). In *Smiddy v. Varney*, 803 F.2d 1469, 1471 (9th Cir.1986)(*Smiddy II*), the Ninth Circuit held that Smiddy had not overcome this presumption because he produced no evidence "that the district attorney was subjected to unreasonable pressure by the police officers, or that the officers knowingly withheld relevant information with the intent to harm [him], or that the officers knowingly supplied false information."[2] As explained in *Newman v. County of Orange*, 457 F.3d 991, 994 (9th Cir.2006), *cert. denied*, 549 U.S. 1253 (2007):

        Our later cases further explained the types

---

[2]Defendants cited *Alvarez-Machain v. United States*, 331 F.3d 604(9th Cir.2002), as authority supporting their claim for summary judgment. The Ninth Circuit's decision was reversed by the Supreme Court in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

of evidence necessary to overcome the presumption.  In *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir.1988), we affirmed an award of damages that included attorneys' fees incurred defending against criminal charges of which the plaintiffs were acquitted.  The prosecutor based the decision to prosecute solely on the information contained in the officers' reports, but the plaintiffs highlighted striking omissions in those reports as well as the fact that the officers themselves offered conflicting stories.  *Id.* On the basis of such evidence, '[t]he jury was entitled to find ... that [the officers] procured the filing of the criminal complaint by making misrepresentations to the prosecuting attorney.'  *Id.* ....

In *Barlow v. Ground*, 943 F.2d 1132 (9th Cir.1991), ... we held that a civil rights plaintiff seeking attorneys' fees had also produced sufficient evidence to overcome the *Smiddy* presumption.  There ... the prosecutor relied solely on the arresting officers' reports, which omitted critical information ... Further, an independent witness corroborated at least part of the plaintiff's version of events and the officers' accounts conflicted ....

*In contrast, we have stated that a plaintiff's account of* the incident in question, by itself, does not overcome the presumption of independent judgment.  *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir.1994).

*See also Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir.2008)(presumption "may be rebutted if the plaintiff shows that the independence of the prosecutor's judgment has been compromised").

Plaintiff argues that summary judgment is not appropriate because of evidence that the Abbate Defendants fabricated allegations against Plaintiff and brought them to the District

1   Attorney's Office through "unconventional channels" based on a

2   preexisting personal relationship between the Abbate family and

3   Defendant Spencer; that Aceves was coerced by Abbate and

4   Defendant Hutton into falsely implicating Plaintiff; that Abbate,

5   "and to a lesser extent, Hutton," withheld exculpatory

6   information in the spreadsheet and reports that caused the

7   prosecution against Plaintiff to be initiated; and that these

8   incidents of misconduct followed closely in time Plaintiff's

9   resignation after complaining about wage and hour, reimbursement,

10  and sexual harassment issues.

11       Defendants reply that the evidence shows that Abbate, before

12  reporting suspected embezzlement to law enforcement, caught

13  Aceves stealing money from Yosemite Chevron by falsely voiding

14  transactions.  Aceves testified that he implicated Plaintiff when

15  he was first caught stealing because he wanted to put the blame

16  on someone else, not because of any threats or coercion, and that

17  he was not under any threats or coercion when he later implicated

18  Plaintiff during the June 4, 2003 meeting with Abbate and

19  Defendant Hutton.  Defendants argue that the only evidence that

20  can be offered of Abbate's involvement in the criminal case was

21  the initial reporting of the suspected crime, providing business

22  records, participating in Defendant Hutton's interview of Aceves,

23  and his testimony at the preliminary hearing.  The fact that

24  Abbate prepared a spreadsheet with a record of voided

25  transactions that Plaintiff's expert opines contained numerical

26  errors does not raise an inference of liability under Section

1983.  Defendants contend that Plaintiff does not refute that
Abbate's spreadsheet was ruled inadmissible at the preliminary
hearing, that the prosecuting attorney did not rely on Abbate's
spreadsheet during the criminal trial, and that the District
Attorney's Office retained Cassabon & Associates after the
preliminary hearing to evaluate Yosemite Chevron's business
records and that Victor Fung was the only witness to testify at
the trial.  Defendants argue that there is no evidence to suggest
that the District Attorney's Office proceeded with the
prosecution or trial due to pressure from Abbate or based on
fabricated evidence.  Defendants refer to the prosecuting
attorney's testimony that he would have prosecuted Plaintiff even
if Abbate had not prepared the spreadsheet.

     The Abbate Defendants' motion for summary judgment on the
ground of the *Smiddy* presumption is DENIED.

               2.  Control of Investigation or Prosecution.

     Defendants argue that summary judgment is appropriate
because Plaintiff cannot show that the Abbate Defendants
controlled the District Attorney's Office investigation or the
prosecution of Plaintiff.

     The Abbate Defendants cite *Arnold v. Intern. Business
Machines*, 637 F.2d 1350 (9th Cir.1981).  There, Arnold brought an
action against IBM and various of its employees for alleged
violations of Arnold's civil rights.  The Ninth Circuit affirmed
the grant of summary judgment for defendants, holding that in the
absence of evidence that IBM and its employees controlled the

police investigation, which led to Arnold's arrest on charges of
stealing corporate documents and trade secrets and the search of
Arnold's residence, the involvement of IBM and the employees in
the investigation was not the proximate cause of Arnold's
injuries and Arnold could not recover under statutes authorizing
civil actions for deprivation of rights under color of law and
conspiracy to defraud persons of their civil rights.  In so
holding, the Ninth Circuit stated:

> ... It is clear that 'but for' IBM's
> involvement, there would have been no
> investigation, and Arnold never would have
> been arrested or indicted or had his
> residence searched.
>
> There is nothing in the record, however, to
> indicate that defendants exerted any control
> over the decision making of the Task Force.
> Deputy District Attorney Bender testified
> that the Task Force used the information
> supplied by IBM to determine which companies
> might be in possession of IBM documents, but
> that the Task Force conducted a full and
> independent investigation.  Bender and
> Sergeant Frechette both testified that
> neither Callahan nor IBM controlled the
> investigation.  Arnold has pointed to no
> facts that indicate that IBM in any way
> controlled the police investigation or that
> the Task Force was in any sense a mere
> conduit for carrying out IBM's will.

637 F.2d at 1357.  The Abbate Defendants also cite *Mann v. City
of Tucson Dept. of Police*, 782 F.2d 790, 793 (9th Cir.1986), a
case involving dismissal, wherein the Ninth Circuit held in
pertinent part:

> [D]ismissal of these claims against
> defendants other than the Tucson police
> defendants was proper for other reasons.  The
> substantive constitutional violation charged

1       consisted of two unlawful searches of Mann's
        apartment.  The search was performed by the
2       Tucson police officers.  All but two of the
        other defendants are private persons who
3       allegedly instigated, aided, or participated
        in the searches.  Under *Arnold v. IBM Corp.,*
4       *...* in order to establish the requisite
        proximate cause between the conduct of
5       private persons and searches in violation of
        section 1983, a plaintiff must prove the
6       private individuals exercised control over
        the decisionmaking in a police investigation.
7       Mann has failed to allege that these other
        defendants controlled the investigation or
8       directed that the searches be conducted, and
        the facts alleged would not support such a
9       claim.   For this reason, the section 1983
        claims against these private defendants were
10      properly dismissed.

11  782 F.2d at 793.

12      In *King v. Massarweh*, 782 F.2d 825, 829 (9th Cir.1986), the

13  district court's dismissal of a Section 1983 claim against the

14  defendant landlord was affirmed.  Citing *Arnold*, the Ninth

15  Circuit affirmed:

16      ... Massarweh's involvement with the police
        is even more attenuated [than the involvement
17      of IBM in *Arnold*].  Massarweh's sole act was
        to call the police.  Nothing in the record
18      indicates that Massarweh exerted any control
        over the officers' decision to search
19      appellants' apartments or to arrest the
        appellants.  On the facts alleged by the
20      appellants, Massarweh sought the appellants'
        removal as trespassers, but the police
21      conduct that allegedly violated the
        plaintiffs' Fourth Amendment rights took
22      place on the officers' own initiative.

23  782 F.2d at 829.  In *Franklin v. Fox*, 312 F.3d 423 (9th

24  Cir.2002), the Ninth Circuit affirmed the district court's grant

25  of summary judgment in favor of Franklin-Lipsker, the daughter of

26  plaintiff, who plaintiff alleged conspired with state prosecutors

63

in violation of his civil rights:

>           Furthermore, to the extent that Franking aims
>           to hold his daughter responsible for
>           [District Attorney] Murray's facilitation of
>           the visit or trial prosecutor Tipton's use of
>           his jailhouse silence against him at trial,
>           his claim fails.  In order for a private
>           individual to be liable for a § 1983
>           violation when a state actor commits the
>           challenged conduct, the plaintiff must
>           establish that the private individual was the
>           proximate cause of the violation ....
>
>           *Arnold* ... is instructive.  There a task
>           force including law enforcement officials,
>           the district attorney, and an IBM security
>           manager investigated trade secret leaks from
>           within IBM.  After his arrest and indictment
>           and the search of his home, the plaintiff
>           sued IBM under § 1983 based on his
>           involvement with the investigation.  We held
>           that, although IBM provided the task force
>           with its security manager, information,
>           funding, and grand jury witnesses, the
>           company was not the proximate cause of the
>           plaintiff's injuries because it did not
>           direct the task force to take action against
>           him ....
>
>           Here, there is no evidence that Murray and
>           Tipton were under Franklin-Lipsker's control
>           or that they failed to exercise their own
>           independent judgment when they violated
>           Franklin's rights.  Murray's response to
>           Franklin-Lipsker's request for help to visit
>           her father and to offer her advise as to the
>           advisability of a visit did not turn
>           Franklin-Lipsker into a facilitator or a
>           cause of the state's violation.  With respect
>           to the violation at trial, one of the bases
>           upon which Franklin's conviction was
>           overturned, there is no evidence that
>           Franklin-Lipsker was even aware of Tipton's
>           decision to allude to Franklin's silence
>           during the jail visit as evidence of guilt.

312 F.3d at 445-446.  In *Crowe v. County of San Diego*, the

district court granted summary judgment for defendant Blum, a

psychologist in private practice who consulted with the Escondido Police Department during the murder investigation because Blum did not participate in the arrests of the boys or the searches of their residences and "there is absolutely no evidence that defendant Blum had any control over the other defendants' decision to conduct the challenged searches and arrests."  303 F.Supp.2d at 1063-1064.

Plaintiff responds by citing *Allen v. Woodford*, 2006 WL 1748587 (E.D.Cal.2006):

> 'Actions taken by a private individual may be "under color of state law" where there is a significant state involvement in the action." *Franklin v. Fox*, 312 F.3d 423, 444 (9th Cir.2002); *Johnson v. Knowles*, 113 F.3d 1114, 1118 (9th Cir.1997) ... The extent of state involvement in the action is a question of fact ... The Supreme Court has articulated four distinct tests for determining whether the actions of private individuals amount to state action: 1) the public function test; 2) the joint action test; 3) the state compulsion test; and 4) the governmental nexus test.  *Franklin*, 312 F.3d at 444-445 ....
>
> Under the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been 'traditionally the exclusive prerogative of the state.' ... Under the joint action test, state action is found where a private person is a 'willful participant in joint activity with the State or its agents' that effects a constitutional deprivation ... Under the state compulsion test, a private party is fairly characterized as a state actor when the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of

1
2
3
4

the State ... Lastly, under the governmental
nexus test, the issue is whether there is a
sufficiently close nexus between the State
and the challenged action of the regulated
entity so that the action of the latter may
be fairly treated as that of the State itself
....

5
6
7
8
9

While these factors are helpful in
determining the significance of state
involvement, 'there is no specific formula
for defining state action.' ... The extent of
state involvement remains a factual inquiry.
'Only by sifting facts and weighing
circumstances can the non-obvious involvement
of the state in private conduct be attributed
its true significance.'

10   Plaintiff argues that evidence of Abbate's involvement in the

11   criminal investigation suffices to raise a question of fact that

12   he was a state actor under any of the four distinct tests.

13        The parties are talking apples and oranges.  Defendants move

14   for summary judgment that Abbate did not control the

15   investigation, i.e., he was not the proximate cause of the

16   decision to bring criminal charges against Plaintiff.  The Abbate

17   Spreadsheet was ruled inadmissible at the preliminary hearing and

18   played no part in the decision by the Superior Court to hold

19   Plaintiff to answer.  Although Plaintiff makes much of Aceves'

20   trial testimony, Aceves testified at his deposition that he lied

21   to Abbate and Hutton about Plaintiff's involvement in the

22   embezzlement and did not recant his statements until the trial.

23   There is evidence that Hutton's investigation may have been

24   incomplete and there is evidence that Hutton relied on Abbate to

25   provide the financial evidence, i.e., the Abbate Spreadsheet, to

26   substantiate the alleged embezzlement.  There is evidence that

1  Abbate provided misleading and inaccurate information to Hutton

2  and that Abbate encouraged the prosecution.  The link between

3  Abbate and the prosecutor is less clear.  This is an extremely

4  close call better resolved by the trier of fact.

5      Summary judgment for the Abbate Defendants on the issue

6  whether they controlled the District Attorney's investigation or

7  prosecution of Plaintiff is DENIED.

8              3.  <u>Witness Immunity</u>.

9      Defendants move for summary judgment as to Plaintiff's cause

10  of action for violation of Section 1983 on the grounds of

11  absolute witness immunity.

12      In *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983), the Supreme

13  Court held that a witness has absolute immunity from liability

14  for civil damages under Section 1983 for giving perjured

15  testimony at trial.  In *Franklin v. Terr*, 201 F.3d 1098 (9th

16  Cir.2000), the Ninth Circuit applied *Briscoe's* immunity to Terr,

17  a psychiatrist called by the prosecution who testified in

18  Franklin's criminal trial based on charges by his daughter,

19  Franklin-Lipsker, that Franklin had murdered a childhood friend

20  twenty years earlier, and who was later sued by Franklin under

21  Section 1983.  Franklin alleged that Terr had conspired with

22  others to present perjured testimony at the criminal trial.  The

23  Ninth Circuit held:

24              In the instant case, Franklin is attempting
                to circumvent Terr's absolute witness
25              immunity by alleging that Terr conspired with
                others to present false testimony.  We are
26              persuaded that allowing a plaintiff to

                            67

circumvent the *Briscoe* rule by alleging a conspiracy to present false testimony would undermine the purposes served by granting witnesses absolute immunity from liability for damages under § 1983.  Absolute witness immunity is based on the policy of protecting the judicial process and is 'necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.' ... As the Court stated in *Briscoe*, '[a] witness's apprehension of subsequent damages liability might induce two forms of self censorship. First, witnesses might be reluctant to come forward to testify.  And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability.' ... Moreover, as the district court correctly observed, '[a]ny other holding would eviscerate absolute immunity since a witness rarely prepares her testimony on her own.'

Franklin alleges that Terr conspired with Franklin-Lipsker by interviewing her before Franklin's trial and by then incorporating information obtained from those interviews into her own testimony.  Franklin also alleges that Terr provided Franklin-Lipsker 'with a description of the sort of details that would make her testimony more persuasive, which Franklin-Lipsker then incorporated into her continually evolving "recollection" of the Nason murder.'  The ostensible purpose of this conspiracy was to ensure that one person's testimony did not contradict the other's testimony.  But because Terr's alleged conspiratorial behavior is inextricably tied to her testimony, we find that she is immune from damages.  We are not presented with, and do not decide, the question whether § 1983 provides a cause of action against a defendant who conspired to present the perjured testimony of another but did not testify as a witness herself.

201 F.3d at 1101-1102.  *See also Paine v. City of Lompoc*, 265 F.3d 975, 983 (9th Cir.2001):

Our cases and *Spurlock* [*v. Satterfield*, 167

68

1
2
3
4

> F.3d 995 (6th Cir.1999)], demonstrate that
> ... absolute witness immunity does not shield
> an out-of-court, pretrial conspiracy to
> engage in non-testimonial acts such as
> fabricating or suppressing physical or
> documentary evidence of suppressing the
> identities of potential witnesses.

In *Grey v. Poole*, 275 F.3d 1113 (D.C.Cir. 2002), a social worker submitted a statement to the court in connection with a child neglect action.  The District of Columbia Circuit held that Poole was entitled to absolute witness immunity, concluding that "[i]t does not matter whether Poole's sworn statement was given in oral or written form; what matters is that her statement was the equivalent of sworn testimony in a judicial proceeding."  275 F.3d at 1118; *see also Morstad v. Dept. of Corrections & Rehab.*, 147 F.3d 741, 744 (8th Cir.1998)("Because the court directed Veenestra to evaluate Morstad and to testify at Morstad's probation revocation hearing, we conclude that Veenstra was performing functions essential to the judicial process ... and affirm the district court's determination that Veenstra was entitled to absolute immunity."  In *Buckley v. Fitzsimmons*, 919 F.2d 1230 (7th Cir.1990), *reversed on other grounds*, 509 U.S. 259 (1993), the Seventh Circuit addressed whether three expert witnesses had absolute immunity for their pretrial activities of evaluating the bootprint, writing reports, discussing the case with prosecutors, and preparing to testify.  509 U.S. at 1244-1245.  The Seventh Circuit held:

> ... We agree with the district court that
> they do.  *Briscoe* holds that the presentation
> of testimony may not be the basis of

liability, even if the witness deliberately misleads the court.  It would be a hollow immunity if the aggrieved party could turn around and say, in effect: 'True, your *delivery* of bad testimony is immunized, but preparing to deliver that testimony is not, so I can litigate the substance of your testimony.'  Substance is exactly what *Briscoe* puts off limits.

As expert could violate a suspect's rights independently of the litigation.  The expert might, for example, break into the suspect's home to obtain samples for analysis.  Absolute immunity would not apply to that theft, for the same reason it does not apply to prosecutorial infliction of punishment without trial.  A non-testimonial expert could violate a suspect's rights by 'cooking' a laboratory report in a way that misleads the testimonial experts.  Experts, like the police, 'cannot hide behind [the immunity of] the officials whom they have defrauded.' ...  But nothing in the complaint suggests that the three experts hid evidence, as opposed to misinterpreting it.

Discussions between the prosecutors and the experts violated none of Buckley's rights.  Preparing to commit slander or perjury is not actionable.  The testimony itself is covered by immunity.  Buckley makes it clear that the testimony is the real gravamen of his complaint.  Olsen, he submits, 'wrongfully changed his initial opinion'; Robbins was an 'utterly disreputable witness-for-hire.'  Maybe so, but cross-examination rather than a suit for damages is the right way to establish these things.  Junk science is a plague of contemporary litigation, but the peddlers of poorly supported theories do not expose themselves to liability by doing research out of court or appearing in more than one case.

*White v. Frank*, 855 F.2d 956 (2ⁿᵈ Cir.1988) holds that *Briscoe* does not apply to 'complaining witnesses'.  Buckley contends that the three experts are in this category, because but for their opinions the State's Attorney would not have obtained an

70

indictment.  The parallel is not apt.  None
of the experts invented the report of a crime
or brought the fable to the state's
attention.  Jeanine Nicarico is dead.  Each
expert was brought into the case by the
prosecutors, who sought to evaluate the
strength of the evidence against Buckley.  We
therefore need not decide whether to follow
*White*.

**919 F.2d at 1245.**

Defendants argue that summary judgment on this ground is

appropriate because there is no evidence that the Abbate

Defendants created false ledgers, receipts, daily register

reports or any other records to set up Plaintiff.  All Plaintiff

will be able to argue is that Abbate provided false testimony as

the complaining witness, which is insufficient to circumvent

*Briscoe*.

Plaintiff refers to the Order denying the Abbate Defendants'

motion to dismiss the Complaint, that "[t]he Abbate Defendants

are not entitled to dismissal of the First Cause of Action on

this ground to the extent that the Complaint can be construed as

alleging that the Abbate Defendants fabricated evidence or

conspired to do so."  Plaintiff contends:

There is evidence that the Abbate defendants
fabricated allegations against Fenters and
brought them to the District Attorney's
Office through unconventional channels based
on a preexisting personal relationship
between the Abate [sic] family and defendant
Spencer.  The record also suggests that
Aceves was coerced by Abbate and Hutton into
falsely implicating Fenters and that these
two defendants acted in bad faith in doing
so.  The evidence also shows that Abbate,
and, to a lesser extent, Hutton, withheld
exculpatory information in the spreadsheet

1
2
3
4
5

> and reports that caused the prosecution
> against Fenters to be initiated.  Finally,
> the evidence shows that these incidents of
> misconduct closely in time followed Fenters'
> resignation after complaining about wage and
> hour, reimbursement, and sexual harassment
> issues.  These actions are more than
> sufficient to deprive Abbate and the related
> entity defendants of witness immunity.

There is no evidence that Abbate *fabricated* any evidence

against Plaintiff.  The evidence is that the financial support in

the Abate Spreadsheet for the alleged embezzlement was incomplete

and did not account for certain factors that Plaintiff's expert

considers necessary to consider.  There is some evidence that

Abbate may have withheld exculpatory information; he provided all

of the business records to Hutton and, eventually, to the

Cassabon Defendants.  Aceves' deposition testimony and the record

of his interview with Abbate and Hutton establishes that Aceves

lied to Abbate and Hutton and that he was not coerced or

intimidated by Abbate in any way.  Aceves testified at his

deposition that he did not tell Abbate or Hutton about his lies

and that he only recanted his statements during the trial.

However, there is evidence that Abbate did not provide complete

information to Hutton in his investigation.  Drawing inferences

in favor of Plaintiff, Abbate had a motive to discredit and deter

Plaintiff.  He sought to influence Hutton.  If Bettancourt's

testimony is believed, Abbate's incomplete and inaccurate

information faciliated what Bettancourt opines was a false,

misleading or fabricated financial analysis by Fung.  The Abbate

Defendants' motion for summary judgment on the ground of absolute

witness immunity is DENIED.

E.  <u>CONSPIRACY</u>.

Defendants move for summary judgment on the ground that Plaintiff has no evidence to support her claim that the Abbate Defendants conspired with the other defendants to violate Plaintiff's constitutional rights.

To prove a conspiracy, Plaintiff must show "an agreement or 'meeting of the minds' to violate constitutional rights." *Franklin v. Fox*, *supra*, 312 F.3d at 441.  Each individual does not need to know the plan; sharing the common purpose of the conspiracy is sufficient.  *Id*.  A private individual may be liable if he conspired with a state actor.  *Id.*

"The defendants must have, by some concerted action, intended to accomplish some unlawful objective for the purpose of harming another which results in damage."  *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir.1999).  This agreement or meeting of the minds may be inferred on the basis of circumstantial evidence, such as the actions of the defendants. *Id*.  A showing that defendants committed acts that 'are unlikely to have been undertaken without an agreement' may support the inference of a conspiracy.  *Id.*  Nonetheless, Plaintiff is "required to produce 'concrete evidence' of an agreement or 'meeting of the minds" between Defendants Spencer and Hutton and the Abbate and Cassabon Defendants to violate Plaintiff's constitutional rights.  *Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 782 (9th Cir.), *cert. denied*, 534 U.S. 1020 (2001).

1        Plaintiff argues that Defendants are not entitled to summary

2   judgment as to the alleged conspiracy:

3            The record ... shows that there was a
             preexisting and extensive personal
4            relationship between the Abbates and
             defendant Spencer, consisting of personal,
5            financial and political ties.  The evidence
             also shows that Abbate defendants brought
6            their claim to the District Attorney's Office
             through unconventional channels, instead of
7            proceeding to the Merced Police Department.
             The evidence further shows that, contrary to
8            common practice, the District Attorney did
             not utilize a forensic accountant or fraud
9            examiner in the investigation stage but
             relied upon Abbate's misleading analysis with
10           no scrutiny or even review.  The evidence
             further shows that Hutton and Abbate worked
11           together to obtain a misleading statement
             from Aceves as to Fenters' alleged
12           embezzlement, failing to report or otherwise
             bring out the exculpatory fact that Fenters'
13           involvement was suggested first by Abbate and
             that Aceves was 'lured in' to adopting this
14           version.  The evidence further shows that the
             prosecution took on the embezzlement case
15           against Fenters without testing the facts or
             even knowing the magnitude of her alleged
16           embezzlement, only after a brief meeting.
             The evidence also shows contact between the
17           various principals during the course of the
             prosecution, as well as their extensive
18           cooperation with a non-law enforcement and
             involved individual, Abbate himself, during
19           the investigation stage.

20       In *Radcliffe, supra*, 254 F.3d at 783, the Ninth Circuit

21   explained:

22           The plaintiff's point to Massini's subsequent
             zeal in prosecuting and her lack of research
23           or discussion with her deputies who had dealt
             with the earlier cases, as evidence of
24           conspiracy.  The plaintiffs also suggest that
             one motive of Massini was to curry
25           Richardson's support for Massini's upcoming
             re-election bid.  But zealous prosecution, is
26           not sufficient to raise a triable issue of

74

conspiracy with the citizen complainant.  A
relationship of cause and effect between the
complaint and the prosecution is not
sufficient, or every citizen who complained
to a prosecutor would find himself in a
conspiracy.  The plaintiffs must provide
evidence of 'an agreement or meeting of the
minds to violate constitutional rights.'

Plaintiff's argument that the prosecutor relied on Abbate's
spreadsheet as evidence of conspiracy to prosecute Plaintiff
without probable cause is unsupported.  Abbate's spreadsheet was
ruled inadmissible at the preliminary hearing.  It was the
Cassabon report that was admitted at trial.  There is no evidence
that Abbate and Hutton worked together to obtain a false
statement from Aceves; Aceves' deposition testimony and the
report of the interview of Aceves by Abbate and Hutton establish
the contrary.  Hutton's report to the prosecutor contained
Hutton's report and the transcript of the meeting between Aceves,
Abbate and Hutton, which shows that Aceves mentioned Plaintiff
first, not Abbate.  The fact that the District Attorney's Office
decided to investigate the claim of embezzlement after a brief
meeting and without knowing the magnitude of the embezzlement
means is not wrongful given that Aceves had told Abbate that
Aceves had been embezzling from Yosemite Chevron and that Fenters
had told him how to do it.

Summary judgment for Defendants is GRANTED as to Plaintiff's
claim of conspiracy.

F.   THIRD CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CIVIL

1    CODE § 52.1.[3]

2        **The Third Cause of Action is pursuant to California Civil**

3    **Code § 52.1 against the Abbate Defendants and the Cassabon**

4    **Defendants and alleges in pertinent part:**

5            **45.  The defendants' intentional and reckless
             acts, as described above, constitute a**

6            **deprivation of plaintiff['s] ... rights,
             privileges and immunities under both article**

7            **I of the California Constitution and the
             Fourth Amendment, specifically, her rights**

8            **not to have her liberty restricted without
             legal basis, to be arrested without probable**

9            **cause, and to be prosecuted maliciously
             without probable cause.  The defendants'**

10           **interference with these constitutional rights
             was accomplished by means of force, coercion,**

11           **and intimidation, and/or the threat thereof.
             Plaintiff clarifies that the defendants'**

12           **liability under this cause of action is not
             based on the privileged acts of reporting**

13           **criminal activity and/or testifying in court,
             but, rather, fabricating evidence used to**

14           **justify the filing and continuation of
             baseless criminal charges, as set forth**

15           **hereinabove.**

16       **Defendants move for summary judgment as to the Third Cause**

17   

18       [3]**California Civil Code § 52.1(b) provides that "[a]ny
     individual whose exercise or enjoyment of rights secured by the**

19   **Constitution or laws of the United States, or of rights secured by
     the Constitution or laws of this state, has been interfered with,**

20   **or attempted to be interfered with, as described in subdivision
     (b), may institute and prosecute ... a civil action for damages,**

21   **including, but not limited to, damages under Section 52, injunctive
     relief, and other appropriate equitable relief to protect the**

22   **peaceable exercise or enjoyment of the right or rights secured."
     Section 52.1(a) provides for an action by the Attorney General,**

23   **district attorney or city attorney "[i]f a person or persons,
     whether or not acting under color of law, interferes by threats,**

24   **intimidation, or coercion, or attempts to interfere by threats,
     intimidation, or coercion, with the exercise or enjoyment by any**

25   **individual ... of rights secured by the Constitution or laws of the
     United States, or the rights secured by the Constitution or laws of**

26   **this state ...."**

of Action on the grounds that the cause of action is barred by the statute of limitations; there is no evidence that Abbate threatened, intimidated or coerced Plaintiff; and the cause of action is barred by the litigation privilege set forth in Civil Code § 47(b).

>    1.   <u>Statute of Limitations</u>.

Defendants contend that the Third Cause of Action is barred by the one year statute of limitations applicable to Section 52.1, citing *Gatto v. County of Sonoma*, 98 Cal.App.4th 744 (2002).  In *Gatto*, the Court ruled:

>    Gatto's complaint relies entirely on allegations of the denial of full and equal access to public accommodations guaranteed under section 51, subdivision (b) [of the Civil Code] and free speech guaranteed under article I, section 2 of the California Constitution, which Gatto seeks to enforce under section 52.1.  As we have seen, the first claim clearly derives from common law principles and is for that reason subject to the one-year statute.  The second is analogous to a federal claim for personal injury under 42 United States Code section 1983 which ... sounds in tort ... and this claim is therefore also subject to the one-year claim.

The July 14, 2006 Order re Defendants' motions to dismiss the Complaint, notes:

>    In their brief, these defendants refer to the "two-year" statute of limitations set forth in CCP § 340.  However, Section 340 sets forth the one-year statute of limitations.  Because *Gatto* also refers to the one-year statute of limitations applicable to actions under Section 1983 as being the limitations applicable to claims under Civil Code § 52.1, it is apparent that the reference in the brief to CCP § 340 is a typographical error.

> Effective January 1, 2003, California Code of Civil Procedure § 335.1 provides for a two-year statute of limitations for "an action for assault, battery, or injury to, or for the death of an individual caused by the wrongful act or neglect of another."  For actions under 42 U.S.C. § 1983, the Ninth Circuit applies the forum state's statute of limitations for personal injury actions. *Jonas v. Blanas*, 393 F.3d 918, 927 (9th Cir.2004).  Therefore, the Abbate Defendants should have referred to the two-year statute of limitations set forth in CCP § 335.1.

Consequently, Defendants' contention that the Third Cause of Action is subject to a one-year statute of limitation based on *Gatto* has been rejected by the Court.  Defendants' motion for summary judgment based on the bar of the statute of limitations is DENIED.

### 2.  Threats or Coercion.

Defendants move for summary judgment on the ground that there is no evidence that Abbate threatened or coerced Plaintiff.

In *Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998), the California Supreme Court explained that "section 52.1 does require an attempted or completed act of interference with a legal right, accompanied by a form of coercion."  *See also Venegas v. County of Los Angeles*, 32 Cal.4th 820, 843 (2004)("the language of section 52.1 provides remedies for 'certain misconduct that interferes with' federal or state laws, if accompanied by threats, intimidation, or coercion, and whether or not state action is involved.").  In *Venegas*, the California Supreme Court explained:

> In *Jones v. Kmart Corp.* ..., we acknowledged

that Civil Code section 52.1 was adopted 'to
stem a tide of hate crimes.'  But contrary to
the County's position, our statement did not
suggest that section 52.1 was limited to such
crimes, or required plaintiffs to demonstrate
that County or its officers had a
discriminatory purpose in harassing them,
that is, that they committed an actual hate
crime.  We continued in *Jones* by simply
observing that the language of section 52.1
provides remedies for 'certain misconduct
that interferes with' federal or state laws,
if accompanied by threats, intimidation, or
coercion, and whether or not state action is
involved.

*Id.* at 843.  "The essence of a Bane Act claim is that the

defendant, by the specified improper means (i.e., 'threats,

intimidation or coercion'), tried to or did prevent the plaintiff

from doing something he or she had the right to do under the law

or to force the plaintiff to do something that he or she was not

required to do under the law."  *Austin B. v. Escondido Union*

*School Dist.*, 149 Cal.App.4th 860, 883 (2007).

   *Kincaid v. City of Fresno*, 2008 WL 2038390 (E.D.Cal.2008),

included a concession that the California Supreme Court has not

defined the terms "threats, intimidation, or coercion, or

attempts to interfere by threats, intimidation, or coercion."

The Court referred to a decision by the Massachusetts Supreme

Judicial Court, construing language in a statute that formed the

model for the Bane Act:

[A] 'threat' consists of the intentional
exertion of pressure to make another fearful
or apprehensive of injury or harm.
'Intimidation' involves putting in fear for
the purpose of compelling or deterring
conduct.  'Coercion' is the application to
another of such force, either physical or

79

1
2

> moral, as to constrain him to do against his
> will something he would not otherwise have
> done.

3  *Haufler v. Zotos*, 845 N.E.2d 322, 335-336 (Mass.2006).

4      Plaintiff responds that there is evidence that Abbate

5  coerced Aceves to give a statement implicating Plaintiff and that

6  Aceves told the prosecutor that he felt pressured by Abbate in

7  this regard.  Plaintiff argues that evidence that Abbate

8  misrepresented and "fabricated" evidence against Plaintiff raised

9  the continuous prospect of her conviction and incarceration,

10  which Plaintiff testified threatened her.  Plaintiff cites

11  *McCalden v. California Library Association*, 955 F.2d 1214 (9th

12  Cir.1989)*, cert. denied,* 504 U.S. 957 (1992) as "finding a claim

13  for a violation of California Civil Code § 51.7 sufficient,

14  although it alleged non-contemporaneous intimidating conduct that

15  was not even conveyed directly to the victim."

16      In *McCalden*, the Ninth Circuit addressed the district

17  court's dismissal with prejudice of the claim by McCalden, a

18  self-described "Holocaust revisionist", under California Civil

19  Code § 51.7 on the ground that the complaint did not sufficiently

20  allege intimidation by threat of violence committed to

21  plaintiff's person or property as required by Section 51.7.

22  Section 51.7(a), as amended in 1984, provided in relevant part:

23
24
25
26

> All persons within the jurisdiction of this
> state have the right to be free from any
> violence, or intimidation by threat of
> violence, committed against their persons or
> property because of their race, color,
> religion, ancestry, national origin,
> political affiliation, sex, sexual

1       orientation, age, disability, or position in
a labor dispute.  The identification in this
2       subdivision of particular bases of
discrimination is illustrative only rather
3       than restrictive.

4   **The Ninth Circuit ruled:**

5       Liberally construed, the complaint contains
one allegation of a specific threat - the
6       AJC's alleged statement to the CLA, 'at the
urging and request and with the knowledge,
7       approval and cooperation of Defendants Marvin
Hier ... and Simon Wiesenthal Center' that if
8       the contract with appellants were not
canceled, "[d]efendant CLA's 1984 Annual
9       Conference would be disrupted, there would be
damage to property and the CLA would be
10      'wiped out.'" ... Appellees claim that this
language can be construed only as a threat
11      against the CLA, not against the person or
property of appellant.  They cite *Coon v.*
12      *Joseph*, 192 Cal.App.3d 1269 ... (1987), in
which the court held that the plaintiff, a
13      gay man, could not state a § 51.7 claim
against a bus driver by alleging that his
14      lover was verbally abused and struck in his
presence.  The court stated:

15

16           The complaint establishes that no
violence or intimidation was
17           committed or threatened against
[plaintiff's] person and thus no
18           cause of action exists in his own
right.  Following [plaintiff's]
19           argument, any person would have the
right to recover damages for
20           himself or herself whenever the
rights of any other human being of
21           similar ... sexual orientation were
threatened.

22       *Id.* at 1277-78 ....

23       On a motion to dismiss, all reasonable
inferences are to be drawn in favor of the
24      non-moving party ... Appellant alleges that
the appellees intended to disrupt his
25      presentation by creating a demonstration that
appellees knew and intended 'would create a
26      reasonable probability of property damage and

of violence against Plaintiff and members of
Defendant CLA.' ... In view of all the facts
pled, it is reasonable to infer that any
property damage or injury threatened could be
directed against appellant, because the
allegations clearly link the alleged threat
to an intent to disrupt appellant's exhibit
and program.  This case must therefore be
distinguished from *Coon*, because it can be
reasonably inferred from the complaint that
the threatened violence was directed against
appellant.

Although appellees suggest that the statute
must be read as requiring the threat to be
conveyed directly to the person threatened,
the statute only requires that the plaintiff
be intimidated by threat of violence
committed against his person or property.  In
construing a remedial statute, on a motion to
dismiss, in the absence of clear state court
direction, this court is reluctant to read
any unnecessary restrictions into § 51.7.

955 F.2d at 1221-1222.

Plaintiff argues that, because Section 52.1 does not require

proof of animus against the plaintiff, "[i]t would therefore make

little sense that the more general Bane Act would require a

closer nexus between the perpetrator's threatening acts and the

constitutional violation than does the Unruh Act."  Contending

that Section 52.1 is a more general statute that should be

construed more broadly, Plaintiff argues:

[The] allegations that she was for the
duration of the prosecution against her,
subject to a legitimate threat of
prosecution, i.e., a loss of liberty, her
allegations under section 52.1 are
sufficient.  Indeed, the defendants by
causing plaintiff's prosecution and raising
the prospect of her imprisonment, committed
acts that were inherently coercive and
threatening.

1  Aceves' deposition testimony and the record of his interview

2  with Abbate and Hutton establishes that Abbate did not coerce

3  Aceves to give a statement implicating Plaintiff in the alleged

4  embezzlement.  However, there is evidence from which it may be

5  inferred that Abbate did not give Hutton complete financial and

6  other information during the course of his investigation.  If the

7  trier of fact determines that Abbate was pursuing the criminal

8  prosecution to threaten and intimidate Plaintiff to deter her

9  from bringing claims related to her employment, the case

10  authority cited above permits an inference of conduct prohibited

11  by Section 52.1.  Summary judgment on this ground is DENIED.

12         3.  Civil Code § 47(b) Privilege.

13  Defendants move for summary judgment as to the Third Cause

14  of Action on the ground that Plaintiff's claim is barred by the

15  litigation privilege set forth in California Civil Code § 47(b).

16  Section 47(b) bars a civil action for damages based on

17  statements made in any judicial proceeding, in any official

18  proceeding authorized by law, or in the initiation or course of

19  any mandate-reviewable proceedings authorized by law.  The

20  litigation privilege provided in Section 47(b)  applies to any

21  communication (1) made in judicial or quasi-judicial proceedings;

22  (2) by litigants or other participants authorized by law; (3) to

23  achieve the objects of the litigation; and (4) that have some

24  connection or logical relation to the action.  *A.F. Brown Elec.*

25  *Contractor, Inc. v. Rhino Elec.*, 137 Cal.App.4th 1118, 1126

26  (2006).  Section 47(b) establishes an absolute privilege for such

statements and bars all tort causes of action based on them except a cause of action for malicious prosecution. *Hagberg v. California Federal Bank*, 32 Cal.4th 350, 360 (2004). "'Section 47 gives all persons the right to report crimes to the police, the local prosecutor or an appropriate regulatory agency, even if the report is made in bad faith.'" *Hagberg, id.* at 365. "'[A] communication concerning possible wrongdoing, made to an official governmental agency such as a local police department, and which communication is designed to prompt action by that entity is as much a part of an "official proceeding" as a communication made after an official investigation has commenced ... After all, '[t]he policy underlying the privilege is to assure utmost freedom of communication between citizens and public authorities whose responsibility it is to investigate and remedy wrongdoing.' ... The importance of providing to citizens free and open access to governmental agencies for the reporting of suspected criminal activity outweighs the occasional harm that might befall a defamed individual. Thus the absolute privilege is essential."'" *Id.* at 364-365. Section 47(b)'s absolute privilege applies to "communications intended to instigate official investigation into [suspected] wrongdoing." *Id.* at 369. Statements made to prompt an official investigation that may result in the initiation of judicial proceedings also fall within the privilege set forth in Section 47(b). *Id.* at 361-36.

Plaintiff responds that, to the extent the Third Cause of Action alleges an unconstitutional malicious prosecution claim

under Section 52.1, it is not barred by the Section 47(b) privilege.  Plaintiff asserts that she "has found no case where a malicious prosecution claim and/or a section 52.1 claim based on malicious prosecution was dismissed based on an application of section 47(b)."

In *Hagberg*, the plaintiff filed a complaint alleging claims for false arrest, false imprisonment, slander, invasion of privacy, intentional infliction of emotional distress, and race discrimination in violation of the Unruh Civil Rights Act, Civil Code §§ 51 and 52.1.  The Supreme Court refused to address the plaintiff's contention that Section 47(b) should not be interpreted to bar liability where it is alleged that a business establishment's communication to the police concerning suspected criminal activity was motivated by racial or ethnic prejudice and therefore constituted unlawful discrimination by the business establishment in violation of the Unruh Civil Rights Act, because the plaintiff's evidence did not suffice to raise a question of fact that defendants were motivated by racial or ethnic prejudice.  32 Cal.4th at 375-376.  No case since *Hagberg* discusses application of Section 47(b) to a claim for violation of Section 52.1.

Summary judgment on this ground is DENIED.

G.   <u>FOURTH CAUSE OF ACTION FOR MALICIOUS PROSECUTION</u>.

The Fourth Cause of Action is for malicious prosecution under California common law against the Abbate Defendants and the Cassabon Defendants and alleges in pertinent part:

> **49.  The defendants' intentional and reckless acts, as described above, caused plaintiff ... to be maliciously prosecuted without probable cause or other legal basis. Plaintiff was acquitted at trial.  Plaintiff clarifies that the defendants' liability under this cause of action is not based on the privileged acts of reporting criminal activity and/or testifying in court, but, rather, fabricating evidence used to justify the filing and continuation of baseless criminal charges, as set forth hereinabove.**

Defendants move for summary judgment as to the Fourth Cause of Action for malicious prosecution on the ground that the District Attorney's Office acted with independent discretion.

"To establish a cause of action for malicious prosecution, a plaintiff must demonstrate that the prior action (1) was initiated by or at the direction of the defendant and legally terminated in the plaintiff's favor, (2) was brought without probable cause, and (3) was initiated with malice." *Siebel v. Mittlesteadt*, 41 Cal.4th 735, 740 (2007).

Defendants cite *Hogan v. Valley Hospital*, 147 Cal.App.3d 119 (1983).  In *Hogan*, a doctor brought a malicious prosecution action against certain hospitals and another doctor in which it was alleged that defendants had filed a false report with the Board of Medical Quality Assurance, which resulted in the filing of charges against plaintiff.  At the conclusion of the hearing before the Board of Medical Quality Assurance, it was found that no cause existed for the suspension or revocation of plaintiff's medical certificate.  The trial court sustained without leave to amend a demurrer to plaintiff's complaint on the grounds that the

communication from the hospitals were absolutely privileged under Section 47, that the Board had discretion to determine whether to file charges against plaintiff, and thus defendants were not responsible for the Board's ultimate decision to bring charges. The Court of Appeal affirmed, holding that although defendants would have been afforded absolute protection under Section 47 for an action for libel or slander, no such absolute privilege is afforded with respect to an action for malicious prosecution. The Court held that the trial court properly sustained the demurrer on the ground that the Board had conducted an independent investigation and determination prior to proceeding on the complaint, that it was the board, not defendants who initiated or procured the disciplinary proceedings against the plaintiff, and therefore plaintiff failed to allege the elements required to establish an action for malicious prosecution:

> The BMQA is similar to the State Bar Association. Each is empowered and directed to conduct an independent investigation of all complaints from the public prior to the filing of an accusation. (Bus. & Prof. Code, § 2200; Gov. Code, §§ 11500-11528). As a consequence, we are persuaded by the reasoning of *Stanwyck* and *Werner* that inasmuch as the BMQA conducted an independent investigation and determined prior to proceeding on the complaint, it was the BMQA, not respondents, who initiated or procured the disciplinary proceedings against appellant. Therefore, appellant failed to allege the elements required to establish an action for malicious prosecution.

*Johnson v. Superior Court*, 25 Cal.App.4th 1564 (1994). In *Johnson*, a psychologist sued expert consultants for malicious

87

1    prosecution in connection with disciplinary proceedings by the

2    California Board of Psychology and Board of Behavioral Science

3    Examiners against plaintiff.  The Court of Appeal affirmed that

4    plaintiff did not state a claim for malicious prosecution because

5    it was the Boards, not the expert consultants, who filed the

6    disciplinary proceedings against the plaintiff.  *Id.* at 1571.

7    *See also Stanwyck v. Horne*, 146 Cal.App.3d 450, 452

8    (1983)(independent investigation by State Bar presumed).

9         Plaintiff argues that the evidence is disputed whether the

10   District Attorney's Office conducted an independent

11   investigation, contending that there is evidence that Abbate

12   influenced the investigation by "making contrived allegations of

13   embezzlement against Fenters which he bolstered with a

14   fabricated, misleading spreadsheet and a coerced statement from

15   Aceves."  Plaintiff asserts that there is evidence that Abbate

16   "withheld crucial information pertaining to how many employees

17   used the register on a given shift and Robert Wilson's being

18   fired for stealing from Fenters."

19        Aceves' deposition testimony establishes that Aceves was not

20   coerced by Abbate to make the statements he made to Abbate and

21   Hutton.  However, there is evidence from which it may be inferred

22   that Abbate did not provide the described evidence to Hutton.

23   Summary judgment as to the Fourth Cause of Action is DENIED.

24        H.   FIFTH CAUSE OF ACTION FOR VIOLATION OF 29 U.S.C. §§ 201

25   *et seq.*

26        The Fifth Cause of Action is alleged against the Abbate

88

Defendants pursuant to 29 U.S.C. § 201 *et seq.*:

> 52.  By refusing to pay plaintiff ...
> overtime and other compensation to which she
> was clearly entitled, the defendants have
> denied her wages that she earned during her
> employment.  The defendants are subject to
> the terms of this statute, as they are
> engaged interstate commerce.

> 53.  The foregoing actions are in violation
> of 29 U.S.C. § 201, *et seq.,* and dictate that
> the defendants are liable to the plaintiff.
> Moreover, the defendants' violation of
> plaintiff's federal overtime and compensation
> rights was willful and thus entitles her to
> additional liquidated damages.

Defendants move for summary judgment as to Plaintiff's claim that "[b]y refusing to pay plaintiff ... overtime and other compensation to which she was clearly entitled, the defendants have denied her wages that she earned during her employment" in violation of 29 U.S.C. § 201 *et seq*.

Defendants refer to Plaintiff's deposition testimony that Fenters has no evidence to show that Yosemite Chevron's timecards are inaccurate; that she could not identify any specific date that she was not paid for overtime; that she could not identify any specific hour of overtime that she has not been paid for by Yosemite Chevron; and her testimony that there could be zero hours of overtime that have been unpaid.  In addition, Defendants refer to evidence that Yosemite Chevron paid all required overtime under the laws of California based on the time cards submitted by Plaintiff.

Plaintiff argues that summary judgment is not appropriate because she testified at her deposition that she was not paid

1  time and a half for overtime, even if she could not at her

2  deposition provide a calculation as to that time.

3       An employee seeking to recover unpaid minimum wages or

4  overtime under the FLSA "has the burden of proving that he

5  performed work for which he was not properly compensated."

6  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).

7  In view of the remedial purposes of the FLSA and the employer's

8  statutory obligation "to keep proper records of wages, hours and

9  other conditions and practices of employment," this burden is not

10 to be "an impossible hurdle for the employee." *Id.*  If an

11 employee establishes that overtime hours and wages were not

12 recorded by the employer as required by the FLSA, "an employee

13 has carried out his burden if he proves that he has in fact

14 performed work for which he was improperly compensated and if he

15 produces sufficient evidence to show the amount and extent of

16 that work as a matter of a just and reasonable inference.  *Id.*

17 The burden then shifts to the employer to show the precise number

18 of hours worked or to present evidence sufficient to negate "the

19 reasonableness of the inference to be drawn from the employee's

20 evidence." *Id.* at 688.  If the employer fails to make such a

21 showing, the court "may then award damages to the employee, even

22 though the result be only approximate." *Id.*

23      Summary judgment is GRANTED as to the Fifth Cause of Action.

24 Plaintiff's conclusory deposition testimony that she was not paid

25 overtime and the absence of evidence that Yosemite Chevron's

26 timecards are inaccurate fail to make a prima facie case.  She

has no evidence as to dates or times proving that she worked any
uncompensated overtime hours as a matter of reasonable inference.
She testified at her deposition that the there could be zero
hours of overtime that have been unpaid.[4]

I.   **SIXTH CAUSE OF ACTION FOR VIOLATION OF 29 U.S.C. § 215.**

The Sixth Cause of Action is against the Abbate Defendants
for violation of 29 U.S.C. § 215 *et seq.*:

> **55.  By retaliating against plaintiff ... for
> her complaining about the denial of her
> compensation and overtime rights, the
> defendants have violated the anti-retaliation
> provision of the Fair Labor Standards Act, 29
> U.S.C. §§ 215, 219.  The defendants are
> subject to the terms of this statute, as they
> are engaged in interstate commerce.**
>
> **56.  There was no valid, good faith basis to
> retaliate against the plaintiff, and her
> engaging in activity protected by the Fair
> Labor Standards Act was a motivating factor
> in their retaliation.  Plaintiff was in all
> respects qualified for her position and was
> performing well.**

Defendants move for summary judgment as to the Sixth Cause
of Action.   29 U.S.C. § 215(a)(3) provides that it is unlawful
for any person "to discharge or in any other manner discriminate
against any employee because such employee has filed any
complaint or instituted or caused to be instituted in any
proceeding under or related to this chapter, or has testified or
is about to testify in any such proceeding ...."[5]

---

[4]This ruling makes unnecessary Defendants' alternative ground
for summary judgment based on the statute of limitations.
[5]Plaintiff asserts that she complained to Abbate about sexual
harassment by another employee.  This is not alleged in the Sixth
Cause of Action.  Further, no legal authority has been discovered

1    Defendants move for summary judgment on the ground that
2    Plaintiff failed to exhaust administrative remedies before
3    bringing this cause of action.

4         *Lambert v. Ackerley*, 180 F.3d 997, 1002-1008 (9th Cir.1999),
5    *cert. denied*, 528 U.S. 1116 (2000), rejected the position that
6    the antiretaliation provision of Section 215(a)(3) extends only
7    to those employees who filed formal proceedings with the
8    Department of Labor, holding that "§ 215(a)(3) protects from
9    retaliation employees who complain to their employer about
10   alleged violations of the Act."

11   Defendants' motion for summary judgment on this ground is
12   DENIED.

13   As explained in *Wolf v. Coca-Cola Co.,* 200 F.3d 1337, 1342-
14   1343 (11th Cir.2000):

15             A prima facie case of FLSA retaliation
16             requires a demonstration by the plaintiff of
                 the following: '(1) she engaged in activity
                 protected under [the] act; (2) she
17             subsequently suffered adverse action by the
                 employer; and (3) a causal connection existed
18             between the employee's activity and the
                 adverse action.' ... If the employer asserts
19             a legitimate reason for the adverse action,
                 the plaintiff may attempt to show pretext ...
20             In demonstrating causation, the plaintiff
                 must prove that the adverse action would not
21             have been taken 'but for' the assertion of
                 FLSA rights.
22
23   Defendants argue that Plaintiff has no evidence that she

24   that allows a Section 215 claim of retaliation based on a complaint
     of sexual harassment; such a claim is covered by Title VII.
25   Plaintiff cannot proceed under the Sixth Cause of Action for her
     assertion that she complained to Abbate about the sexual harassment
26   by Montes.

1  "subsequently suffered an adverse action" by Yosemite Chevron

2  after allegedly making complaints to Abbate about wage and

3  overtime issues.   Defendants note that Plaintiff resigned her

4  employment at Yosemite Chevron on March 28, 2003.

5       In *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000), a

6  case involving Title VII, the Ninth Circuit held that "an action

7  is cognizable as an adverse employment action if it is reasonably

8  likely to deter employees from engaging in protected activity."[6]

---

10  [6]In *Vasquez v. County of Los Angeles,* 307 F.3d 884, 891 (9th
   Cir.2002), held that "the proper inquiry is to view the action
11  objectively to determine whether it was adverse" and that "a purely
   subjective analysis is not appropriate when deciding whether an
   employment action was adverse."  However, the 2002 *Vasquez* opinion
12  was withdrawn and superceded by *Vasquez v. County of Los Angeles*,
   349 F.3d 634, 646 (9th Cir.2003).  The Ninth Circuit, discussing the
13  prima facie case analysis*,* stated:

14            This   analysis   requires   us   to   examine
              separately  whether  the  'adverse  employment
15            action'  is  considered  through  an  objective  or
              subjective  lens.   We  addressed  this  question,
16            at  least  in  passing,  in  *Ray v. Henderson*.   We
              adopted  the  EEOC  standard  from  its  compliance
17            manual,  and  held  that  'an  action  is  cognizable
              as  an  adverse  employment  action  if  it  is
18            reasonably  likely  to  deter  employees  from
              engaging  in  protected  activity.'   In  context,
19            this  is,  at  least  in  part,  a  subjective
              standard  because  the  EEOC  manual  speaks  of
20            '"any  adverse  treatment  that  is  based  on  a
              retaliatory  motive  and  is  reasonably  likely  to
21            deter  *the  charging  party*  or  others  from
              engaging  in  protected  activity."'  ....

22
              Including  behavior  of  the  charging  party  in
23            the  standard  removes  it  from  the  hypothetical
              'reasonable  employee'  approach  and  makes  it
24            more  subjective.   Of  course,  it  is  not
              entirely  subjective  as  the  conduct  must  be
25            'reasonably  likely'  to  deter  the  protected
              activity,  even  by  the  charging  party.
26

Defendants argue that Plaintiff offers no legal authority to support her claim that reporting a suspected crime to law enforcement constitutes an adverse employment action, especially when Plaintiff had already resigned before the suspected criminal conduct was reported.

Plaintiff cites *E.E.O.C. v. Nalbandian Sales, Inc.*, 36 F.Supp.2d 1206, 1211 (E.D.Cal.1998), a case involving Title VII, as supporting the conclusion that evidence Plaintiff resigned because her complaints to Abbate about wage and hour, overtime, reimbursement and sexual harassment issues and then was wrongly prosecuted for embezzlement based on allegedly false and fabricated evidence is sufficient to state a claim for relief under Section 215.

In *Nalbandian Sales,* the plaintiff alleged that a former employer refused to rehire the employee in retaliation for a discrimination claim filed by the employee's sister. The Court ruled that "this court exercises authority to broadly interpret federal remedial legislation in order to effectuate the statute's overarching purposes. The majority of courts, including the Supreme Court 'have been willing to construe Title VII and companion provisions under the Fair Labor Standards Act, 29

---

For purposes of analysis, we will assume that the transfer met the *Ray* standard. However, this does not save Vasquez's retaliation claim because he has failed to show a causal link.

94

U.S.C. § 215(a)(3) ... broadly in order not to frustrate the purposes of these Acts, which is to prevent fear of economic retaliation from inducing employees "quietly to accept [unlawful] conditions."'"   36 F.Supp.2d at 1211.

Summary judgment for Defendants on the Sixth Cause of Action is GRANTED; there is no evidence from which it may be inferred that the Abbate Defendants filed a criminal complaint against Plaintiff based on her alleged complaints concerning wage and hour, overtime, and reimbursement issues.  Plaintiff had already resigned her employment before the alleged embezzlement was discovered.

<u>CONCLUSION</u>

For the reasons stated:

1.   Defendants Yosemite Chevron, Abbco Investments, LLC, and Robert Abbate's motion for summary judgment is GRANTED IN PART AND DENIED IN PART;

2.   Counsel for the Abbate Defendants shall prepare and lodge a form of order that the rulings set forth in this Memorandum Decision within five (5) days following the date of service of this decision;

3.   Consistent with Rule 56(d)(1), both parties shall have five (5) days following service of this decision to file a list of material facts which each party believes are not genuinely issues for purposes of trial.  If separately filed by the parties, these lists shall not exceed five pages.  To the extent practicable, the parties shall meet and confer to determine

95

whether and to what extent any material facts are agreed upon for purposes of trial.  Agreed upon facts should be listed in a joint filing.

IT IS SO ORDERED.

**Dated:    December 29, 2010                         /s/ Oliver W. Wanger**
                                                   UNITED STATES DISTRICT JUDGE